# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## WAYCROSS DIVISION

TWIN PINES MINERALS, LLC,

    *Plaintiff,*

v.

U.S. ARMY CORPS OF ENGINEERS;
CHRISTINE E. WORMUTH, Secretary of
the Army; MICHAEL L. CONNOR,
Assistant Secretary of the Army (Civil
Works); LTG. SCOTT A. SPELLMON,
Chief of Engineers; BG. JASON E. KELLY,
Commander, South Atlantic Division; COL.
JOSEPH R. GEARY, Commander, Savannah
District,

    *Defendants*.

Civil Action No: 5:22-cv-00036-LGW-BWC

---

## DECLARATION OF CHRISTOPHER STANFORD

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1.    My name is Christopher Stanford. I am over the age of 18 and competent to testify. The facts in this declaration are based on my personal knowledge regarding the events in question and are true and correct to the best of my knowledge and recollection. I offer this declaration in support of the Motion for Preliminary Injunction filed by Twin Pines Minerals, LLC ("Twin Pines") and for any other lawful purpose.

2.    I am a Staff Geologist and Environmental Scientist with TTL, Inc., an engineering and consulting firm with offices in Alabama, Georgia, Tennessee, and Texas. I have been with TTL since 2015. In that capacity, I assist individuals and companies with obtaining the environmental permits needed to develop their properties and conduct their businesses, including permits from the U.S. Army Corps of Engineers ("Corps") under Section 404 of the Clean Water

1

Act authorizing the discharge of "dredged and fill material" into jurisdictional "waters of the United States."

3.      As I describe below, I have worked with Twin Pines since 2018 to secure the environmental permits needed to construct and operate a "heavy mineral-sands" mine in Charlton County, Georgia known as the "Saunders Demonstration Mine."

## Heavy Mineral Sands and the Mining Process

4.      Heavy mineral sands consist of sediments that contain dense ("heavy") minerals of economic value. Heavy mineral sand deposits form because of ancient geologic forces, in which heavy minerals are freed from inland rocks by weathering and erosion and transported to coastal areas by streams and rivers, as well as coastal events, where they are deposited. There, physical processes like waves and tides separate the minerals primarily based on their density, concentrating the heaviest minerals as layered sediments in coastal depositional environments.

5.      Heavy mineral sands can be commonly observed at beaches and other areas, though they rarely are recognized as mineral deposits. For example, the photographs below show layers of heavy mineral sands clearly visible on beaches in northeast and central Florida.



*Figure   . Heavy mineral sands on a modern beach on Little Talbot Island, northeast Florida*



*Figure   . Heavy mineral sands on a modern beach on Little Talbot Island, northeast Florida*

---

[1] Reproduced from USGS, Titanium Mineral Resources in Heavy-Mineral Sands in the Atlantic Coastal Plan of the Southeastern United States, Scientific Investigations Report No. 2018-5045.

[2] Reproduced from USGS, Titanium Mineral Resources in Heavy-Mineral Sands in the Atlantic Coastal Plan of the Southeastern United States, Scientific Investigations Report No. 2018-5045.



*Figure  . Heavy mineral deposits at Vero Beach, Florida following Hurricane Frances*



*Figure  . Heavy mineral deposits at Vero Beach, Florida following Hurricane Frances*

---

[3] Reproduced from USGS, Titanium Mineral Resources in Heavy-Mineral Sands in the Atlantic Coastal Plan of the Southeastern United States, Scientific Investigations Report No. 2018-5045.

[4] Reproduced from USGS, Titanium Mineral Resources in Heavy-Mineral Sands in the Atlantic Coastal Plan of the Southeastern United States, Scientific Investigations Report No. 2018-5045.

6.    Large deposits of heavy mineral sands exist locally in the coastal plain of the Southeastern United States. The heavy minerals from these coastal deposits contain titanium, zirconium, and "rare earth" elements, needed to manufacture, for example, modern electronics for consumer and defense applications. According to the U.S. Geological Survey, the "extensive heavy-mineral sand deposits in the southeastern U.S. coastal plain represent an enormous, under-utilized domestic source of these mineral resources."[5]

7.    According to the U.S. government, critical minerals are non-fuel minerals or mineral materials essential to the economic or national security of the U.S. and with a supply chain vulnerable to disruption. As the U.S. Geological Survey has also reported, the "United States is heavily reliant on imports of these mineral commodities, which are critical to the U.S. economy and security."[6] For this reason, the United States government has formally designated titanium and zirconium, two elements found in and recovered from, heavy mineral sands in the Southeastern coastal plain, as "critical minerals."[7] Critical minerals are also characterized as serving an essential function in the manufacturing of a product, the absence of which would have significant consequences for the economy or national security.

8.    Significant heavy mineral sands deposits are found along "Trail Ridge," a physiographic feature formed at the location of an ancient shoreline, which extends approximately 200 km from northeastern Florida through southeastern Georgia and Charlton County (Figure 5

---

[5] USGS, Heavy-Mineral Sand Resources in the Southeastern U.S. (Apr. 2, 2018), available at www.usgs.gov/centers /geology%2C-geophysics%2C-and-geochemistry-science-center/science/heavy-mineral-sand-resources overview

[6] USGS, Heavy-Mineral Sand Resources in the Southeastern U.S. (Apr. 2, 2018), available at www.usgs.gov/centers /geology%2C-geophysics%2C-and-geochemistry-science-center/science/heavy-mineral-sand-resources overview

[7] USGS, 2022 Final List of Critical Minerals, 87 Fed. Reg. 10381 (Feb. 24, 2022).

and Figure 6). While deposits vary in size and grade, the U.S. Geological Survey reports that the

Trail Ridge deposits have an average heavy-mineral content of about 4 percent.[8]



*Figure   . Map showing approximate location of Trail Ridge*

---

[8] USGS, Titanium Mineral Resources in Heavy-Mineral Sands in the Atlantic Coastal Plan of the Southeastern United States, Scientific Investigations Report No. 2018-5045.

[9] USGS, Titanium Mineral Resources in Heavy-Mineral Sands in the Atlantic Coastal Plan of the Southeastern United States, Scientific Investigations Report No. 2018-5045.



*Figure  . Location of select heavy mineral deposits along Trail Ridge in southeastern Georgia*

**The Saunders Demonstration Mine**

9.       The Saunders Demonstration Mine is located on property in Charlton County, Georgia. The mine site is located southeast of the Okefenokee National Wildlife Refuge, approximately 3 miles from the refuge's southeastern corner and approximately 11 miles from the Okefenokee canoe trail and the nearest camping platform, which is approximately the distance from the federal courthouse in Brunswick to the Satilla River at its closest point. The site, which

---

[10] Reproduced from Pirkle et al., Heavy-Mineral Mining in the Atlantic Coastal Plan and What Deposit Locations Tell Us About Ancient Shorelines, Journal of Coastal Research, 69(sp1):154-175.

was managed as a commercial pine plantation for most of the past century before being denuded by the West Mims Fire in 2017, is currently covered with scrub and pine saplings. It is bounded to the south by Highway 94 and the Norfolk Southern Railway. Maps showing the location of the mine site are included as Figure 7 and Figure 8 below. Figure 9 is a photograph depicting the general condition of the mine site.



*Figure   . Location of Saunders Demonstration Mine*



*Figure  . Location of Saunders Demonstration Mine*



*Figure  . Aerial photograph of proposed mine site*

10.     At the Saunders Demonstration Mine, minerals will be extracted from heavy mineral sands primarily through the use of water and gravity. Prior to mining, topsoil will be excavated and stockpiled to be used in the reclamation process after mining is completed. Heavy

mineral sands will be excavated using an electric dragline, with excavation depths ranging from 20 to 50 feet below the land surface. With only extremely minor exceptions at three small, isolated areas of the mine, the mining depth will not extend below the 120-foot elevation contour, which is above the mean surface water elevation of the Okefenokee Swamp. The mine will use no chemicals to process extracted minerals. The mine will also be a "zero discharge" facility, meaning that no process water will be discharged from the site; instead, all process water will be retained, recycled, or evaporated.

11.    Excavated sand will be transported via a conveyor to a "wet processing facility." There, the excavated mineral sands will be processed in "spiral concentrators." Spiral concentrators are helical sluices that use water, centrifugal force, and the differential densities of the minerals being processed to separate lower density granular and sandy material from the heavier target minerals. In this process, water and heavy mineral sands are fed into the top of the spiral. As the slurry moves down the spiral, lower density materials remain suspended or settle toward the outer edge of the coil, while the heavier target minerals settle out first and migrate toward the inside of the coil, where they are concentrated and collected. Photographs of spiral coil concentrators showing the separation of materials by density are included below as Figure 10 and Figure 11.



*Figure     . Spiral coil separator with visible heavy minerals*



*Figure     . Spiral coil separator with bands of minerals visible*

12.     After the heavy minerals are separated and concentrated in the coils, the remaining

sand — approximately 98% of what was removed — will then be returned to the excavation site

via another conveyor and redeposited. The mined area will then be reclaimed and restored using the original topsoil previously stockpiled from the site. The concentrated heavy minerals recovered from the spirals will then either be transported for sale as bulk concentrates or further processed in an adjacent "dry processing plant" (also known as the "minerals separation plant"), which uses electrostatic processes and magnets to further separate and refine the target minerals (e.g., titanium bearing minerals (ilmenite, rutile, leucoxene) and zircon). After processing, the final products will be containerized, bulk shipped, or loaded on truck or rail, depending on customers' individual needs.

13. Beyond Section 404 of the Clean Water Act, which is discussed below, the Saunders Demonstration Mine is subject to strict environmental regulation and oversight by the Georgia Environmental Protection Division ("Georgia EPD"). It requires numerous environmental permits from the agency in order to commence and continue operations. These include a Surface Mining Permit issued under the Georgia Surface Mining Act; an NPDES Industrial Stormwater Permit under the Georgia Water Quality Control Act and the federal Clean Water Act to ensure that stormwater from the site meets all applicable regulatory requirements; a Groundwater Withdrawal Permit to ensure that water withdrawals do not deplete the underlying aquifer; and an Air Quality Permit to ensure that dust and point source emissions from the site meet air quality standards.

**The 404 Permitting Process and Jurisdictional Determinations**

14. Under the federal Clean Water Act, the Corps issues permits authorizing the placement of "dredged or fill" material into "waters of the United States," including jurisdictional wetlands. Because Section 404 of the Clean Water Act authorizes the Corps to issue these permits, they are known as "404 permits."

15.     It is critical for landowners to know whether a water or wetland is subject to regulation under the Clean Water Act, because (unless it falls within certain narrow exemptions) an unpermitted discharge into jurisdictional waters violates the Clean Water Act. Therefore, at a landowners' request, the Corps will determine whether waters and wetlands constitute "waters of the United States" that are subject to Clean Water Act jurisdiction. These determinations by the Corps are known as "jurisdictional determinations" or "JDs."

16.     The Corps may issue a jurisdictional determination in two forms, either a "preliminary jurisdictional determination," or "PJD," or an "approved jurisdictional determination," or "AJD," based on the landowner's request.

17.     A PJD is a non-appealable, non-binding determination that indicates waters of the United States may be present on a property and may also provide approximate locations for those waters of the United States. A PJD is only advisory in nature.

18.     An AJD is an official determination by the Corps that jurisdictional waters of the United States are present or absent on a landowner's property. If the Corps determines that jurisdictional waters are present, the Corps must clearly identify the waters on the project site that the agency considers to be jurisdictional. The Corps must also provide the basis for its jurisdictional determination, providing the documentation that supports the AJD.  AJDs issued by the Corps are valid and binding on the agency for 5 years except in two narrow circumstances. First, an AJD may be reopened if "new information" that relates to whether a water meets the requirements to be jurisdictional is developed and warrants reopening the determination before the expiration date. Second, an AJD may be reopened before the expiration date if the District Engineer identifies, after notice and comment, specific geographic areas with rapidly changing environmental conditions that merit re-issuance on a more frequent basis. The Saunders

Demonstration Mine is not in an area that has been identified as having rapidly changing environmental conditions meriting more frequent reevaluation.

19.     While some waters like the Savannah River are clearly jurisdictional, it can be difficult to tell whether other waters like ephemeral streams or wetlands that are not adjacent to traditional navigable water or tributary are subject to Clean Water Act regulation. Jurisdiction over these other waters is established based on a technical and legal analysis. First, a "wetlands delineation" is prepared that identifies and delineates all wetlands on the site according to the criteria and methods in the Corps' 1987 Wetlands Delineation Manual and the appropriate Regional Supplement. Under the Corps' 1987 Manual, wetlands are identified based on a technical evaluation of soil characteristics (the presence or absence of soils exhibiting characteristics that develop from inundation or saturation by groundwater or surface water); the prevalence of hydrophytic vegetation (vegetation typically adapted for life in saturated soil conditions); and the area's hydrology. Second, after all wetlands and other waters on a site have been identified and delineated based on the technical criteria, through the AJD process the Corps applies the legal definitions in its regulations to determine whether individual waters and wetlands qualify as "waters of the United States."

20.     The information the Corps needs to prepare AJDs is readily available to the agency from a variety of sources. These sources include, but are not limited to, site visits by agency staff; verified wetlands delineations; government topographic, soil, and national wetland inventory maps; satellite and aerial imagery; hydrologic data; and the Corps' Antecedent Precipitation Tool.

21.     If waters of the United States are present, then the landowner must obtain a permit from the Corps before discharging any dredged or fill material into them. For a large and complex project like the Saunders Demonstration Mine, this typically requires the landowner to apply for

and obtain an individual Section 404 permit from the Corps. In my experience, obtaining an induvial Section 404 permit for even a straightforward project may take several years and with compensatory mitigation can cost hundreds of thousands of dollars. Where a project is complex or controversial, both the time required and the costs increase significantly, often requiring the landowner to spend several years attempting to secure the permit. This is especially true if the Corps determines that an Environmental Impact Statement under the National Environmental Policy Act must be prepared to inform its permitting decision.

22.     Section 404 permits require that adverse impacts to wetlands, streams and other aquatic resources be avoided and minimized to the extent practicable. Where impacts to jurisdictional waters cannot be avoided, the Corps can require mitigation from the permittee to replace the loss of wetland and aquatic resource functions in the watershed. Compensatory mitigation can be carried out through four methods: the restoration of a previously existing wetland or other aquatic site, the enhancement of an existing aquatic site's functions, the establishment (i.e., creation) of a new aquatic site, or the preservation of an existing aquatic site. At a complex mine site where jurisdictional wetlands are present, significant compensatory mitigation would almost certainly be required, with associated costs easily running into the tens-of-millions of dollars.

**The Twin Pines AJDs**

23.     Throughout the period that Twin Pines has been developing the Saunders Demonstration Mine, the legal definition of the phrase "waters of the United States" has been in a state of extreme flux, resulting in significant uncertainty regarding which waters and wetlands were subject to Clean Water Act jurisdiction. For example, in 2015, the Obama Administration issued a new rule, known as the "Clean Water Rule" or the "WOTUS Rule," that substantially expanded the jurisdictional reach of the Clean Water Act and brought many new waters and

15

wetlands under the Corps' control. However, this rule was challenged in court and the Corps was blocked from applying it in certain states (including Georgia) but not in others. As a result, there was a patchwork of regulation, where whether a water was subject to regulation under the Clean Water Act depended on the state where the property was located.

24. Shortly after taking office, the Trump Administration took steps almost immediately to withdraw the WOTUS Rule and to replace it with a new jurisdictional rule more closely aligned with Justice Scalia's interpretation of the Clean Water Act in *Rapanos v. United States*. This rule, which is known as the "Navigable Waters Protection Rule" or "NWPR," was finalized in April of 2020.

25. On July 3, 2019, TTL submitted an application on behalf of Twin Pines for an individual Section 404 Permit. This application was prepared and submitted based on the assumption that wetlands on the site would be considered jurisdictional under the rules that were then in effect. The original permit application included a project boundary of approximately 2,414 acres and a 1,456-acre mine site. After discussions with the Corps and Georgia EPD, however, Twin Pines reduced the project boundary to 1,042 acres, and the mine site to 898, to proceed with a smaller "demonstration project." TTL submitted an application on behalf of Twin Pines for an individual Section 404 Permit for the smaller "demonstration project" on March 4, 2020. The demonstration project was intended to demonstrate that "mining can be conducted in an environmentally responsible manner" and to validate previously completed groundwater models showing that mining will have, at the very most, a negligible impact on local groundwater resources, surface water resources, and the Okefenokee Swamp.

26. After the NWPR became effective on June 22, 2020, Twin Pines applied for an AJD to confirm that certain wetlands were not jurisdictional. Twin Pines submitted its initial

request on July 20, 2020 and Corps staff visited the site to review the aquatic features on site on September 16, 2020. At that visit, it became apparent that many additional wetlands not included in the original request would also be considered non-jurisdictional. We thus withdrew our July request, grouped these wetlands into seven distinct "Review Areas," and requested two separate AJDs to cover these areas — one for Reviews Areas 1-5 and the other for Reviews Areas 6-7.

27.     The first request, for Review Areas 1-5, was submitted on September 25, 2020 and granted on October 15, 2020. This AJD (the "2020 AJD") confirms that "waters of the United States" are not present on Review Areas 1 through 5. The non-jurisdictional features confirmed by the 2020 AJD include, but are not limited to, almost 300 acres of wetlands within the project boundary for the current proposed mine site. A true and correct copy of the Corps' 2020 AJD is attached as Exhibit A to this declaration.

28.     The second request, for Review Areas 6 and 7, was submitted on November 18, 2020 and granted on March 24, 2021. The "2021 AJD" confirms that "waters of the United States" are not present within Review Areas 6 through 7. The non-jurisdictional features confirmed by the 2021 AJD include many wetlands north of the project boundary and about 10 acres in its southeast corner. A true and correct copy of the Corps' 2021 AJD is attached as Exhibit B to this declaration.

29.     Both AJDs explain that the Corps based its determination on a "wetland delineation" conducted in accordance with the 1987 "Corps of Engineers Wetland Delineation Manual," as amended, and a separate determination based on the regulatory definition of "waters of the United States" regarding the jurisdictional status of each aquatic feature identified within each Review Area.

30.    Both AJDs document the Corps' determination that aquatic features present within the Review Areas are non-jurisdictional and state the basis for that determination for each aquatic feature identified in each area.

31.    Both AJDs explain that these determinations were based on Corps' review of the following technical information:

      a.    An evaluation and verification by the Corps of a wetlands delineation conducted using the Corps' 1987 Wetlands Delineation Manual and the most recent regional supplements

      b.    A "connectivity report" prepared and submitted on behalf of Twin Pines;

      c.    Aerial, satellite, and other imagery;

      d.    U.S. Government soil maps, topographic maps, and national wetlands inventory maps;

      e.    Information from the Corps' "Antecedent Precipitation Tool"; and

      f.    The Corps' own observations collected during multiple visits to the property.

Exhibit A at 10-16; Exhibit B at 5-11.

32.    Both AJDs specify that none of the aquatic features identified in any of the Review Areas "are subject to the jurisdiction of the Clean Water Act" and, thus, "the placement of dredged or fill material into these wetlands/other waters would not require prior Department of the Army authorization pursuant to Section 404 of the Clean Water Act." Exhibit A at 1; Exhibit B at 1.

33.    The 2020 AJD stated:

> There are aquatic resources within the review area that are not waters of the United States and are therefore not subject to the jurisdiction of the Clean Water Act. Specifically, wetlands WC, WD, WE, WF, WG, WH, WJ, WK, WA-2, WA-3, WA-4, WA-6, WA-7, WA-8, WA-9, and ditches D1, D2, D3, and D5 as identified on the enclosed exhibits entitled "Review Area 1", "Review Area 2", "Review Area 3", "Review Area 4", and "Review Area 5", approved by this office on October 14, 2020 are non-jurisdictional. The placement of dredged or fill material into these wetlands/other waters would not require prior

Department of the Army authorization, pursuant to Section 404 of the Clean Water Act (33 United States Code § 1344).

This approved JD will remain valid for a period of 5-years unless new information warrants revision prior to that date.

Exhibit A at 1.

34.     The 2021 AJD states:

We have completed an approved JD for the site. The wetlands were delineated in accordance with criteria contained in the 1987 "Corps of Engineers Wetland Delineation Manual," as amended by the most recent regional supplements to the manual. I have enclosed an "Approved JD Form," which details whether streams, wetlands and/or other waters present on the site are subject to the jurisdiction of the U.S. Army Corps of Engineers and how the Corps determined jurisdiction.

There are aquatic resources within the review area that are not waters of the United States and are therefore not within the jurisdiction of Section 404 of the Clean Water Act (33 United States Code § 1344). Specifically, ditches "6Ditch-6 NWPR, 6Ditch-2 NWPR, 7Ditch-1 NWPR, 7Ditch NWPR, 7Ditch-KEY NWPR, 7Ditch-ADK NWPR," and the wetlands labeled "Non-Adjacent Wetland" as identified on the enclosed exhibits entitled "Review Area 6" and "Review Area 7" dated November 16, 2020. The placement of dredged or fill material into these wetlands/other waters would not require prior Department of the Army authorization pursuant to Section 404.

This approved JD will remain valid for a period of 5-years unless new information warrants revision prior to that date.

Exhibit B at 1.

**Twin Pines' Reliance on the AJDs and its Revisions
to the Saunders Demonstration Mine**

35.     Based on 2020 AJD, Twin Pines directed TTL to revise and reconfigure the design of the Saunders Demonstration Mine to avoid jurisdictional waters. TTL redrew the project boundary accordingly, substantially reducing the overall project boundary and the number of acres to be mined. Working with other engineers, TTL also reconfigured the layout of the minerals processing areas, water treatment systems, and other project infrastructure so the project could move forward without a Section 404 Permit from the Corps.

19

36.     TTL submitted a revised application to Georgia EPD for a Surface Mining Permit reconfigured to avoid jurisdictional areas on November 13, 2020, approximately one month after the 2020 AJD was issued. The second was submitted on June 25, 2021. The reconfigured mine site is shown in Figure 12 below. Areas excluded from the mine to avoid jurisdictional waters can be seen in the alterations to the project boundary along the northern edge of the mine site.

37.     In reliance on the 2020 AJD, TTL formally withdrew Twin Pines' application for an individual Section 404 permit from the Corps in October 2020. At the time the permit application was withdrawn, Twin Pines had been working for more more than 27 months to secure the permit. It had gone through three separate public meetings concerning the project and the Section 404 permit, which were held in St. George, Georgia, Folkston, Georgia, and virtually via WebEx by the Corps.



*Figure   . Mine site reconfigured to avoid  urisdictional waters*

**The Decision Rescinding Twin Pines' AJDs**

38.     I have reviewed the decision issued by the Assistant Secretary of the Army (Civil Works) (the "ASA") rescinding the AJDs issued to Twin Pines. Although the AJDs should remain valid until 2025 and 2026 respectively, the ASA's decision states that Twin Pines' AJDs are no longer valid. It also states that any new AJD will be prepared using the Corps jurisdictional rules in effect when the new AJD is issued.

39.     The Corps currently utilizes the "pre-2015" regulations to determine its jurisdiction under the Clean Water Act. These are the regulations that were in effect prior to the Obama Administration's promulgation of the WOTUS Rule in 2015. Under these regulations, the Corps considers significantly more waters and wetlands to be jurisdictional than it did under the NWPR, which was in effect when the AJDs were issued to Twin Pines. The Corps has proposed to adopt these regulations and stated that it intends to further expand its jurisdictional rule through a subsequent rulemaking.

40.     The decision to rescind the AJDs and force Twin Pines to apply for new AJDs prepared under more expansive jurisdictional rules will result in significant areas of Twin Pines' property being considered waters of the United States subject to Clean Water Act jurisdiction. As a result, Twin Pines must choose between (a) applying for and obtaining a Section 404 permit from the Corps authorizing the placement of dredged and fill material into these newly jurisdictional areas or (b) limiting its mining activities to upland areas that will not be considered jurisdictional, even under the new and expanded test.

41.     Twin Pines will incur significant costs under either scenario. If Twin Pines pursues an individual Section 404 permit, the permit would not likely be issued for several years. I am confident in this projection because the Corps has informed TTL it intends to prepare a full Environmental Impact Statement under the National Environmental Policy Act before any

permitting decision is made. The costs associated with preparing the permit application, navigating the public permitting process, and completing any required compensatory mitigation will easily run into the tens-of-millions of dollars.

42.     Twin Pines only other alternative is to limit its mining activities to upland areas that would not be considered jurisdictional. To analyze this option, TTL has evaluated the site of the Saunders Demonstration Mine and calculated the number of upland acres that could be mined without impacting any areas that would likely to be considered jurisdictional under the pre-2015 rules, and thus without first obtaining a Section 404 permit from the Corps. More than 300 acres of wetlands need to be excluded from the current proposed mine site — reducing it approximately 60%. While this option would allow Twin Pines to move forward without the delay that reapplying for a Section 404 permit would entail, it would force Twin Pines to abandon highly valuable mineral deposits in the areas to be excluded. This change would also result in a more difficult approach to mining that would also slow the mining effort.



*Figure    . Minable upland areas at the Saunders Demonstration Mine*

43.    I declare under penalty of perjury that the foregoing is true and correct.

Executed this 7th day of July, 2022.

Christopher Stanford

**STANFORD DECLARATION**

**EXHIBIT A**



**DEPARTMENT OF THE ARMY**
U.S. ARMY CORPS OF ENGINEERS
SAVANNAH DISTRICT
100 W. OGLETHORPE AVENUE
SAVANNAH, GEORGIA 31401-3604

15 OCT 2020

Regulatory Division
SAS-2018-00554

Steven R. Ingle (single@twinpinesminerals.com)
Twin Pines Minerals, LLC
2100 Southbridge Parkway,
Birmingham, Alabama  35209

Dear Mr. Ingle:

I refer to a letter submitted on your behalf by TTL,  requesting an Approved Jurisdictional Determination (JD) for your sites located West of the town of Saint George, and North of State Route 94, in Charlton County, Georgia (Latitude 30.525932, Longitude -82.124468). This project has been assigned number SAS-2018-00554 and it is important that you refer to this number in all communication concerning this matter.

We have completed an approved JD for the site.  The wetlands were delineated in accordance with criteria contained in the 1987 "Corps of Engineers Wetland Delineation Manual," as amended by the most recent regional supplements to the manual.  I have enclosed an "Approved JD Form," which details whether the aquatic resources within the review area are subject to the jurisdiction of the U.S. Army Corps of Engineers and how the Corps determined jurisdiction.

There are aquatic resources within the review area that are not waters of the United States and are therefore not subject to the jurisdiction of the Clean Water Act. Specifically, wetlands WC, WD, WE, WF, WG, WH, WJ, WK, WA-2, WA-3, WA-4, WA-6, WA-7, WA-8, WA-9, and ditches D1, D2, D3, and D5 as identified on the enclosed exhibits entitled "Review Area 1", "Review Area 2", "Review Area 3", "Review Area 4", and "Review Area 5", approved by this office on October 14, 2020 are non-jurisdictional. The placement of dredged or fill material into these wetlands/other waters would not require prior Department of the Army authorization, pursuant to Section 404 of the Clean Water Act (33 United States Code § 1344).  This approved JD will remain valid for a period of 5-years unless new information warrants revision prior to that date.

You may request an administrative appeal for any approved JD under the Corps regulations at 33 Code of Federal Regulations (C.F.R.) Part 331.  Enclosed you will find a Notification of Administrative Appeal Options and Process and Request for Appeal form.

- 2 -

If you intend to sell property that is part of a project that requires Department of the Army Authorization, it may be subject to the Interstate Land Sales Full Disclosure Act. The Property Report required by Housing and Urban Development Regulation must state whether, or not a permit for the development has been applied for, issued or denied by the U.S. Army Corps of Engineers (Part 320.3(h) of Title 33 of the C.F.R.).

The delineation included herein has been conducted to identify the location and extent of the aquatic resource boundaries and/or the jurisdictional status of aquatic resources for purposes of the Clean Water Act for the particular sites identified in this request. This delineation and/or jurisdictional determination may not be valid for the Wetland Conservation Provisions of the Food Security Act of 1985, as amended. If you or your tenant are USDA program participants, or anticipate participation in USDA programs, you should discuss the applicability of a certified wetland determination with the local USDA service center, prior to starting work.

This communication does not convey any property rights, either in real estate or material, or any exclusive privileges. It does not authorize any injury to property, invasion of rights, or any infringement of federal, state or local laws, or regulations. It does not obviate your requirement to obtain state or local assent required by law for the development of this property. If the information you have submitted, and on which the U.S. Army Corps of Engineers has based its determination is later found to be in error, this decision may be revoked.

A copy of this letter is being provided to the following party: Cindy House-Pearson chpearson@ttlusa.com.

Thank you in advance for completing our on-line Customer Survey Form located at http://corpsmapu.usace.army.mil/cm_apex/f?p=regulatory_survey. We value your comments and appreciate your taking the time to complete a survey each time you have interaction with our office.

If you have any questions, please call Holly Ross, at (678) 422-2727.

Sincerely,

RUTLIN.WILLIA M.M.1390465064

Digitally signed by RUTLIN.WILLIAM.M.139046506 4
Date: 2020.10.15 13:51:52 -04'00'

William Rutlin
Coastal Branch Chief

Enclosures



REVIEW AREA 1

USACE Reviewed Jurisdictional Determination Area (red polygon) Approved 14 OCTOBER 2020

WG 5.550± AC

WH 3.180± AC

WF 4.055± AC

WE 4.218± AC

D1

LEGEND
Jurisdictional Determination (70± AC)
Non-Adjacent Wetland
Ditch "D-1" (412± LF)

0   500
Feet

DRAWN BY: DEK
CHECKED BY: DMS
DRAWING DATE: 9/23/2020
REVISION DATE: 10/7/2020
TTL JOB NO. 0001802008004.00
APPROX. SCALE:   1 in = 500 ft

REVIEW AREA 1: WATERS OF THE U.S. FEATURES MAP
TWIN PINES MINERALS
ST. GEORGE, CHARLTON COUNTY, GEORGIA
BASEMAP: Maxar, Vivid Imagery, 11/20/2019 (0.5 m Resolution, West), 3/24/2018 (0.46 m Resolution, East),

TTL



Case 2:21-cv-00496-LGW-BWC Document 135-1 Filed 02/23/24 Page 28 of 55

**REVIEW AREA 2**

USACE Reviewed Jurisdictional
Determination Area (red polygon)
Approved 14 OCTOBER 2020

LEGEND

Jurisdictional Determination (56± AC)

Non-Adjacent Wetland

Culvert Location

0          400
Feet

WA-8
1.304± AC

WA-9
16.980± AC

WK
2.500± AC

DRAWN BY: DEK
CHECKED BY: CMS
DRAWING DATE: 9/23/2020
REVISION DATE 10/7/2020
TTL JOB NO. 0001802000604.00
APPROX. SCALE:   1 in = 400 ft

REVIEW AREA 2: WATERS OF THE U.S. FEATURES MAP
TWIN PINES MINERALS
ST. GEORGE, CHARLTON COUNTY, GEORGIA

BASEMAP: Maxar, Vivid Imagery, 11/20/2019 (0.5 m Resolution, West), 3/24/2018 (0.46 m Resolution, East).

TTL





REVIEW AREA 4

USACE Reviewed Jurisdictional
Determination Area (red polygon)
Approved 14 OCTOBER 2020

WA-4
19,097± AC

WA-3
103,714± AC

D-3

WJ
1,071± AC

LEGEND

Jurisdictional Determination (225± AC)

Non-Adjacent Wetland

Ditch & Drainage Direction "D-3" (412± LF)

Culvert Location

0        700
Feet

REVIEW AREA 4: WATERS OF THE U.S. FEATURES MAP
TWIN PINES MINERALS
ST. GEORGE, CHARLTON COUNTY, GEORGIA
BASEMAP: Maxar, Vivid Imagery, 11/20/2019 (0.5 m Resolution, West), 3/24/2018 (0.46 m Resolution, East),

DRAWN BY: DEK
CHECKED BY: CMS
DRAWING DATE: 9/23/2020
REVISION DATE: 10/7/2020
TTL JOB NO. 0001802006040.00
APPROX. SCALE: 1 in = 700 ft

TTL



REVIEW AREA 5: WATERS OF THE U.S. FEATURES MAP
TWIN PINES MINERALS
ST. GEORGE, CHARLTON COUNTY, GEORGIA
BASEMAP: Maxar, Vivid Imagery, 11/20/2019 (0.5 m Resolution, West), 3/24/2018 (0.46 m Resolution, East).

| DRAWN BY: DEK |
|---|
| CHECKED BY: CMS |
| DRAWING DATE: 9/23/2020 |
| REVISION DATE: 10/7/2020 |
| TTL JOB NO. 0001802000604.00 |
| APPROX. SCALE: 1 in = 700 ft |

**LEGEND**
- ⬜ Jurisdictional Determination (295± AC)
- 🟩 Non-Adjacent Wetland
- ➡️ Ditch & Drainage Direction "D-5" (648± LF)
- 🟡 Culvert Location

0    700
Feet

**REVIEW AREA 5**

USACE Reviewed Jurisdictional
Determination Area (red polygon)
Approved 14 OCTOBER 2020

WC 0.957± AC
WH
WA-2 153.254± AC
WD 6.323± AC
D-5
WH 14.141± AC

| NOTIFICATION OF ADMINISTRATIVE APPEAL OPTIONS AND PROCESS AND REQUEST FOR APPEAL | | |
|---|---|---|
| Applicant: **Steven R. Ingle** | File Number: SAS-2018-00554 | Date: October 15, 2020 |
| Attached is: | | See Section below |
| | INITIAL PROFFERED PERMIT (Standard Permit or Letter of permission) | A |
| | PROFFERED PERMIT (Standard Permit or Letter of permission) | B |
| | PERMIT DENIAL | C |
| X | APPROVED JURISDICTIONAL DETERMINATION | D |
| | PRELIMINARY JURISDICTIONAL DETERMINATION | E |

**SECTION I** - The following identifies your rights and options regarding an administrative appeal of the above decision. Additional information may be found at http://www.usace.army.mil/CECW/Pages/reg_materials.aspx or Corps regulations at 33 C.F.R. § Part 331.

**A: INITIAL PROFFERED PERMIT:** You may accept or object to the permit.

ACCEPT: If you received a Standard Permit, you may sign the permit document and return it to the district engineer for final authorization. If you received a Letter of Permission (LOP), you may accept the LOP and your work is authorized. Your signature on the Standard Permit or acceptance of the LOP means that you accept the permit in its entirety, and waive all rights to appeal the permit, including its terms and conditions, and approved jurisdictional determinations associated with the permit.

OBJECT: If you object to the permit (Standard or LOP) because of certain terms and conditions therein, you may request that the permit be modified accordingly. You must complete Section II of this form and return the form to the district engineer. Your objections must be received by the district engineer within 60 days of the date of this notice, or you will forfeit your right to appeal the permit in the future. Upon receipt of your letter, the district engineer will evaluate your objections and may: (a) modify the permit to address all of your concerns, (b) modify the permit to address some of your objections, or (c) not modify the permit having determined that the permit should be issued as previously written. After evaluating your objections, the district engineer will send you a proffered permit for your reconsideration, as indicated in Section B below.

**B: PROFFERED PERMIT:** You may accept or appeal the permit.

ACCEPT: If you received a Standard Permit, you may sign the permit document and return it to the district engineer for final authorization. If you received a Letter of Permission (LOP), you may accept the LOP and your work is authorized. Your signature on the Standard Permit or acceptance of the LOP means that you accept the permit in its entirety, and waive all rights to appeal the permit, including its terms and conditions, and approved jurisdictional determinations associated with the permit.

APPEAL: If you choose to decline the proffered permit (Standard or LOP) because of certain terms and conditions therein, you may appeal the declined permit under the Corps of Engineers Administrative Appeal Process by completing Section II of this form and sending the form to the division engineer. This form must be received by the division engineer within 60 days of the date of this notice.

**C: PERMIT DENIAL:** You may appeal the denial of a permit under the Corps of Engineers Administrative Appeal Process by completing Section II of this form and sending the form to the division engineer. This form must be received by the division engineer within 60 days of the date of this notice.

**D: APPROVED JURISDICTIONAL DETERMINATION:** You may accept or appeal the approved JD or provide new information.

ACCEPT: You do not need to notify the Corps to accept an approved JD. Failure to notify the Corps within 60 days of the date of this notice means that you accept the approved JD in its entirety, and waive all rights to appeal the approved JD.

APPEAL: If you disagree with the approved JD, you may appeal the approved JD under the Corps of Engineers Administrative Appeal Process by completing Section II of this form and sending the form to the division engineer. The division engineer must receive this form within 60 days of the date of this notice.

**E: PRELIMINARY JURISDICTIONAL DETERMINATION:** You do not need to respond to the Corps regarding the preliminary JD. The Preliminary JD is not appealable. If you wish, you may request an approved JD (which may be appealed), by contacting the Corps district for further instruction. Also you may provide new information for further consideration by the Corps to reevaluate the JD.

| SECTION II - REQUEST FOR APPEAL or OBJECTIONS TO AN INITIAL PROFFERED PERMIT |
|---|

REASONS FOR APPEAL OR OBJECTIONS:  (Describe your reasons for appealing the decision or your objections to an initial proffered permit in clear concise statements.  You may attach additional information to this form to clarify where your reasons or objections are addressed in the administrative record.)

ADDITIONAL INFORMATION: The appeal is limited to a review of the administrative record, the Corps memorandum for the record of the appeal conference or meeting, and any supplemental information that the review officer has determined is needed to clarify the administrative record.  Neither the appellant nor the Corps may add new information or analyses to the record.  However, you may provide additional information to clarify the location of information that is already in the administrative record.

| POINT OF CONTACT FOR QUESTIONS OR INFORMATION: |
|---|

| If you have questions regarding this decision and/or the appeal process you may contact:<br>Holly A. Ross<br>US Army Corps of Engineers, Savannah District<br>1104 North Westover Blvd, Suite 9<br>Albany, Georgia 31707<br>678-422-2727 | If you only have questions regarding the appeal process you may also contact:<br>Mr. Philip Shannin<br>Administrative Appeal Review Officer<br>CESAS-PDS-O<br>60 Forsyth Street Southwest, Floor M9<br>Atlanta, Georgia 30303-8803<br>Phone: (404) 562-5136; Fax: (404) 562-5138<br>Email: Philip.a.shannin@usace.army.mil |

RIGHT OF ENTRY:  Your signature below grants the right of entry to Corps of Engineers personnel, and any government consultants, to conduct investigations of the project site during the course of the appeal process.  You will be provided a 15-day notice of any site investigation, and will have the opportunity to participate in all site investigations.

| _____<br>Signature of appellant or agent. | Date: | Telephone number: |
|---|---|---|



**U.S. ARMY CORPS OF ENGINEERS**
REGULATORY PROGRAM
APPROVED JURISDICTIONAL DETERMINATION FORM (INTERIM)
NAVIGABLE WATERS PROTECTION RULE

## I. ADMINISTRATIVE INFORMATION
Completion Date of Approved Jurisdictional Determination (AJD): 14-OCT-2020
ORM Number: SAS-2018-00554
Associated JDs: N/A
Review Area Location[1]:
    State/Territory: GA    City:    County/Parish/Borough: Charlton County
    Center Coordinates of Review Area: Latitude 30.525932 Longitude -82.124468

## II. FINDINGS
**A. Summary:** Check all that apply. At least one box from the following list MUST be selected. Complete the corresponding sections/tables and summarize data sources.

- ☐ The review area is comprised entirely of dry land (i.e., there are no waters or water features, including wetlands, of any kind in the entire review area). Rationale: N/A or describe rationale.
- ☐ There are "navigable waters of the United States" within Rivers and Harbors Act jurisdiction within the review area (complete table in section II.B).
- ☐ There are "waters of the United States" within Clean Water Act jurisdiction within the review area (complete appropriate tables in section II.C).
- ☒ There are waters or water features excluded from Clean Water Act jurisdiction within the review area (complete table in section II.D).

## B. Rivers and Harbors Act of 1899 Section 10 (§ 10)[2]

| § 10 Name | § 10 Size | § 10 Criteria | Rationale for § 10 Determination |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

## C. Clean Water Act Section 404
Territorial Seas and Traditional Navigable Waters ((a)(1) waters)[3]

| (a)(1) Name | (a)(1) Size | (a)(1) Criteria | Rationale for (a)(1) Determination |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

Tributaries ((a)(2) waters):

| (a)(2) Name | (a)(2) Size | (a)(2) Criteria | Rationale for (a)(2) Determination |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

Lakes and ponds, and impounds of jurisdictional waters ((a)(3) waters):

| (a)(3) Name | (a)(3) Size | (a)(3) Criteria | Rationale for (a)(3) Determination |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

Adjacent wetlands ((a)(4) waters):

| (a)(4) Name | (a)(4) Size | (a)(4) Criteria | Rationale for (a)(4) Determination |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

---

[1] Map(s)/Figure(s) are attached to the AJD provided to the requestor.
[2] If the navigable water is not subject to the ebb and flow of the tide or included on the District's list of Rivers and Harbors Act Section 10 navigable waters list, do NOT use this document to make the determination. The District must continue to follow the procedure outlined in 33 CFR part 329.14 to make a Rivers and Harbors Act Section 10 navigability determination.
[3] A stand-alone TNW determination is completed independently of a request for an AJD. A stand-alone TNW determination is conducted for a specific segment of river or stream or other type of waterbody, such as a lake, where independent upstream or downstream limits or lake borders are established. A stand-alone TNW determination should be completed following applicable guidance and should NOT be documented on the AJD form.
[4] Some excluded waters, such as (b)(2) and (b)(4), may not be specifically identified on the AJD form unless a requestor specifically asks a Corps district to do so. Corps Districts may, in case-by-case instances, choose to identify some or all of these waters within the review area.
[5] Because of the broad nature of the (b)(1) exclusion and in an effort to collect data on specific types of waters that would be covered by the (b)(1) exclusion, four sub-categories of (b)(1) exclusions were administratively created for the purposes of the AJD Form. These four sub-categories are not new exclusions, but are simply administrative distinctions and remain (b)(1) exclusions as defined by the NWPR.

     Form Version 29 July 2020_updated



## U.S. ARMY CORPS OF ENGINEERS
### REGULATORY PROGRAM
### APPROVED JURISDICTIONAL DETERMINATION FORM (INTERIM)
### NAVIGABLE WATERS PROTECTION RULE

## D. Excluded Waters or Features

Excluded waters ((b)(1) – (b)(12))[4]:

| Exclusion Name | Exclusion Size | Exclusion[5] | Rationale for Exclusion Determination |
|---|---|---|---|
| Review Area 1 D1 | 412 feet | (b)(5) Ditch that is not an (a)(1) or (a)(2) water, and those portions of a ditch constructed in an (a)(4) water that do not satisfy the conditions of (c)(1) | This feature appears to be a man-dug ditch that was constructed to drain depressional wetland areas. This feature was dug through wetland WE, an non-adjacent wetland, and continues east through upland areas. This ditch does not appear to modify or relocate a natural channel, nor was it constructed through an adjacent wetland. Further, this ditch did not meet the flow requirements to be considered a tributary under the NWPR. Based on this, the ditch is best defined as a paragraph (b)(5) non-jurisdictional water under the NWPR |
| Review Area 1 WE | 4.22 acres | (b)(1) Non-adjacent wetland | This wetland is not adjacent to any (a)(1)-(a)(3) waters as defined by the NWPR. This wetland does not abut any (a)(1)-(a)(3) waters, is not inundated or have a direct surface water connection to any (a)(1)-(a)(3) waters in a typical year. This wetland is physically separated from all (a)(1)-(a)(3) waters |
| Review Area 1 WF | 4.05 acres | (b)(1) Non-adjacent wetland | This wetland is not adjacent to any (a)(1)-(a)(3) waters as defined by the NWPR. This wetland does not abut any (a)(1)-(a)(3) waters, is not inundated or have a direct surface water connection to any (a)(1)-(a)(3) waters in a typical year. This wetland is physically separated from all (a)(1)-(a)(3) waters |
| Review Area 1 WG | 5.55 acres | (b)(1) Non-adjacent wetland | This wetland is not adjacent to any (a)(1)-(a)(3) waters as defined by the NWPR. This wetland does not abut any (a)(1)-(a)(3) waters, is not inundated or have a direct surface water connection to any (a)(1)-(a)(3) waters in a typical year. This wetland is physically separated from all (a)(1)-(a)(3) waters |
| Review Area 1 WH | 3.18 acres | (b)(1) Non-adjacent wetland | This wetland is not adjacent to any (a)(1)-(a)(3) waters as defined by the NWPR. This wetland does not abut any (a)(1)-(a)(3) waters, is not inundated or have a direct surface water connection to any (a)(1)-(a)(3) waters in a typical year. This wetland is physically separated from all (a)(1)-(a)(3) waters |
| Review Area 2 WA-8 | 1.3 acres | (b)(1) Non-adjacent wetland | This wetland is not adjacent to any (a)(1)-(a)(3) waters as defined by the NWPR. This wetland does not abut any (a)(1)-(a)(3) waters, is not inundated or have a direct surface water connection to any (a)(1)-(a)(3) waters in a typical year. This wetland is physically separated from all (a)(1)-(a)(3) waters |
| Review Area 2 WA-9 | 16.98 acres | (b)(1) Non-adjacent wetland | This wetland is not adjacent to any (a)(1)-(a)(3) waters as defined by the NWPR. This wetland does not abut any (a)(1)-(a)(3) waters, is not inundated or have a direct surface water connection to any (a)(1)-(a)(3) waters in a typical year. This wetland is physically separated from all (a)(1)-(a)(3) waters |

[1] Map(s)/Figure(s) are attached to the AJD provided to the requestor.
[2] If the navigable water is not subject to the ebb and flow of the tide or included on the District's list of Rivers and Harbors Act Section 10 navigable waters list, do NOT use this document to make the determination. The District must continue to follow the procedure outlined in 33 CFR part 329.14 to make a Rivers and Harbors Act Section 10 navigability determination.
[3] A stand-alone TNW determination is completed independently of a request for an AJD. A stand-alone TNW determination is conducted for a specific segment of river or stream or other type of waterbody, such as a lake, where independent upstream or downstream limits or lake borders are established. A stand-alone TNW determination should be completed following applicable guidance and should NOT be documented on the AJD form.
[4] Some excluded waters, such as (b)(2) and (b)(4), may not be specifically identified on the AJD form unless a requestor specifically asks a Corps district to do so. Corps Districts may, in case-by-case instances, choose to identify some or all of these waters within the review area.
[5] Because of the broad nature of the (b)(1) exclusion and in an effort to collect data on specific types of waters that would be covered by the (b)(1) exclusion, four sub-categories of (b)(1) exclusions were administratively created for the purposes of the AJD Form. These four sub-categories are not new exclusions, but are simply administrative distinctions and remain (b)(1) exclusions as defined by the NWPR.

Form Version 29 July 2020_updated



**U.S. ARMY CORPS OF ENGINEERS**
**REGULATORY PROGRAM**
**APPROVED JURISDICTIONAL DETERMINATION FORM (INTERIM)**
**NAVIGABLE WATERS PROTECTION RULE**

| Review Area 2 WK | 2.5 acres | (b)(1) Non-adjacent wetland | This wetland is not adjacent to any (a)(1)-(a)(3) waters as defined by the NWPR. This wetland does not abut any (a)(1)-(a)(3) waters, is not inundated or have a direct surface water connection to any (a)(1)-(a)(3) waters in a typical year. This wetland is physically separated from all (a)(1)-(a)(3) waters. This wetland feature is connected via culvert to an off-site b(1) wetland which also does not meet any of the adjacency criteria. |
|---|---|---|---|
| Review Area 3 D2 | 1090 feet | (b)(5) Ditch that is not an (a)(1) or (a)(2) water, and those portions of a ditch constructed in an (a)(4) water that do not satisfy the conditions of (c)(1) | This feature appears to be road-side ditch that was constructed adjacent to the road. The road was constructed prior to 1970 and thus prior to Clean Water Act regulation. This feature follows along the north-south road and beside wetland WA-7, a non-adjacent wetland, and continues north through upland areas to a culvert. This ditch does not appear to modify or relocate a natural channel, nor was it constructed through an adjacent wetland. Further, this ditch did not meet the flow requirements to be considered a tributary under the NWPR. Based on this, the ditch is best defined as a paragraph (b)(5) non-jurisdictional water under the NWPR |
| Review Area 3 WA-6 | 28.79 acres | (b)(1) Non-adjacent wetland | This wetland is not adjacent to any (a)(1)-(a)(3) waters as defined by the NWPR. This wetland does not abut any (a)(1)-(a)(3) waters, is not inundated or have a direct surface water connection to any (a)(1)-(a)(3) waters in a typical year. This wetland is physically separated from all (a)(1)-(a)(3) waters. This wetland feature is disconnected from downstream waters via an artificial structure (road) that does not allow direct hydrologic surface connection through or over in a typical year. The road was constructed prior to 1970 and thus prior to Clean Water Act regulation. |
| Review Area 3 WA-7 | 11.6 acres | (b)(1) Non-adjacent wetland | This wetland is not adjacent to any (a)(1)-(a)(3) waters as defined by the NWPR. This wetland does not abut any (a)(1)-(a)(3) waters, is not inundated or have a direct surface water connection to any (a)(1)-(a)(3) waters in a typical year. This wetland is physically separated from all (a)(1)-(a)(3) waters. This wetland feature is disconnected from downstream waters via an artificial structure (road) that does not allow for a direct hydrologic surface connection through or over in a typical year. Water discharged from the wetland flows north through a road-side ditch that does not meet the flow requirements to be considered a tributary under the NWPR, nor would this ditch be considered an adjacent wetland under the NWPR. The ditch crosses under the road several hundred feet north of WA-7 and traverses another 200 feet before intersecting with potentially adjacent wetlands west of WA-7. The road was constructed prior to 1970 and thus prior to Clean Water Act regulation. |
| Review Area 4 | 412 feet | (b)(5) Ditch that is not an (a)(1) or | This feature appears to be a man-dug ditch constructed |

[1] Map(s)/Figure(s) are attached to the AJD provided to the requestor.
[2] If the navigable water is not subject to the ebb and flow of the tide or included on the District's list of Rivers and Harbors Act Section 10 navigable waters list, do NOT use this document to make the determination. The District must continue to follow the procedure outlined in 33 CFR part 329.14 to make a Rivers and Harbors Act Section 10 navigability determination.
[3] A stand-alone TNW determination is completed independently of a request for an AJD. A stand-alone TNW determination is conducted for a specific segment of river or stream or other type of waterbody, such as a lake, where independent upstream or downstream limits or lake borders are established. A stand-alone TNW determination should be completed following applicable guidance and should NOT be documented on the AJD form.
[4] Some excluded waters, such as (b)(2) and (b)(4), may not be specifically identified on the AJD form unless a requestor specifically asks a Corps district to do so. Corps Districts may, in case-by-case instances, choose to identify some or all of these waters within the review area.
[5] Because of the broad nature of the (b)(1) exclusion and in an effort to collect data on specific types of waters that would be covered by the (b)(1) exclusion, four sub-categories of (b)(1) exclusions were administratively created for the purposes of the AJD Form. These four sub-categories are not new exclusions, but are simply administrative distinctions and remain (b)(1) exclusions as defined by the NWPR.

Form Version 29 July 2020_updated



**U.S. ARMY CORPS OF ENGINEERS**
REGULATORY PROGRAM
APPROVED JURISDICTIONAL DETERMINATION FORM (INTERIM)
NAVIGABLE WATERS PROTECTION RULE

| D3 | | (a)(2) water, and those portions of a ditch constructed in an (a)(4) water that do not satisfy the conditions of (c)(1) | in uplands. Overland flow from wetland WA-3 drains through a culvert under Georgia Highway 94 and into this ditch This ditch does not appear to modify or relocate a natural channel, nor was it constructed through an adjacent wetland. Further, this ditch did not meet the flow requirements to be considered a tributary under the NWPR. Based on this, the ditch is best defined as a paragraph (b)(5) non-jurisdictional water under the NWPR |
|---|---|---|---|
| Review Area 4 WA-3 | 103.71 acres | (b)(1) Non-adjacent wetland | This wetland is not adjacent to any (a)(1)-(a)(3) waters as defined by the NWPR. This wetland does not abut any (a)(1)-(a)(3) waters, is not inundated or have a direct surface water connection to any (a)(1)-(a)(3) waters in a typical year. This wetland is physically separated from all (a)(1)-(a)(3) waters. Water discharged from the wetland flows south through a culvert and an excluded b(5) ditch, constructed in uplands, that does not meet the definition of an a(1) – a(4) water. |
| Review Area 4 WA-4 | 19.1 acres | (b)(1) Non-adjacent wetland | This wetland is not adjacent to any (a)(1)-(a)(3) waters as defined by the NWPR. This wetland does not abut any (a)(1)-(a)(3) waters, is not inundated or have a direct surface water connection to any (a)(1)-(a)(3) waters in a typical year. This wetland is physically separated from all (a)(1)-(a)(3) waters. This wetland feature is disconnected from downstream waters via an artificial structure (road) that does not allow direct hydrologic surface connection through or over in a typical year. The road was constructed prior to 1970 and thus prior to Clean Water Act regulation. Wetland WA-4 is upgradient of WA-3 and therefore non-adjacent regardless of the artificial separation, due to WA-3's exclusion. |
| Review Area 4 WJ | 1.07 acres | (b)(1) Non-adjacent wetland | This wetland is not adjacent to any (a)(1)-(a)(3) waters as defined by the NWPR. This wetland does not abut any (a)(1)-(a)(3) waters, is not inundated or have a direct surface water connection to any (a)(1)-(a)(3) waters in a typical year. This wetland is physically separated from all (a)(1)-(a)(3) waters |
| Review Area 5 D5 | 648 feet | (b)(5) Ditch that is not an (a)(1) or (a)(2) water, and those portions of a ditch constructed in an (a)(4) water that do not satisfy the conditions of (c)(1) | This feature appears to be a man-dug ditch that was constructed to drain depressional wetland areas. This feature was dug through wetland WH, a non-adjacent wetland. The ditch starts at a culvert under Georgia Highways 94, continues southeast, ends at a culvert under the railroad tracks which drains to the south to an off-site property. This ditch does not appear to modify or relocate a natural channel, nor was it constructed through an adjacent wetland. Further, this ditch did not meet the flow requirements to be considered a tributary under the NWPR. Based on this, the ditch is best defined as a paragraph (b)(5) non-jurisdictional water under the NWPR |
| Review Area 5 | 153.25 acres | (b)(1) Non-adjacent wetland | This wetland is not adjacent to any (a)(1)-(a)(3) waters |

[1] Map(s)/Figure(s) are attached to the AJD provided to the requestor.
[2] If the navigable water is not subject to the ebb and flow of the tide or included on the District's list of Rivers and Harbors Act Section 10 navigable waters list, do NOT use this document to make the determination. The District must continue to follow the procedure outlined in 33 CFR part 329.14 to make a Rivers and Harbors Act Section 10 navigability determination.
[3] A stand-alone TNW determination is completed independently of a request for an AJD. A stand-alone TNW determination is conducted for a specific segment of river or stream or other type of waterbody, such as a lake, where independent upstream or downstream limits or lake borders are established. A stand-alone TNW determination should be completed following applicable guidance and should NOT be documented on the AJD form.
[4] Some excluded waters, such as (b)(2) and (b)(4), may not be specifically identified on the AJD form unless a requestor specifically asks a Corps district to do so. Corps Districts may, in case-by-case instances, choose to identify some or all of these waters within the review area.
[5] Because of the broad nature of the (b)(1) exclusion and in an effort to collect data on specific types of waters that would be covered by the (b)(1) exclusion, four sub-categories of (b)(1) exclusions were administratively created for the purposes of AJD Form. These four sub-categories are not new exclusions, but are simply administrative distinctions and remain (b)(1) exclusions as defined by the NWPR.

Form Version 29 July 2020_updated



**U.S. ARMY CORPS OF ENGINEERS**
**REGULATORY PROGRAM**
**APPROVED JURISDICTIONAL DETERMINATION FORM (INTERIM)**
**NAVIGABLE WATERS PROTECTION RULE**

| | | | |
|---|---|---|---|
| WA-2 | | | as defined by the NWPR.  This wetland does not abut any (a)(1)-(a)(3) waters, is not inundated or have a direct surface water connection to any (a)(1)-(a)(3) waters in a typical year.  This wetland is physically separated from all (a)(1)-(a)(3) waters. This wetland feature is disconnected from adjacent waters to the north via an artificial structure (road) that does not allow direct hydrologic surface connection through or over in a typical year. The road was constructed prior to 1970 and thus prior to Clean Water Act regulation. |
| Review Area 5 WC | 0.96 acres | (b)(1) Non-adjacent wetland | This wetland is not adjacent to any (a)(1)-(a)(3) waters as defined by the NWPR.  This wetland does not abut any (a)(1)-(a)(3) waters, is not inundated or have a direct surface water connection to any (a)(1)-(a)(3) waters in a typical year.  This wetland is physically separated from all (a)(1)-(a)(3) waters. It appears that wetland WC was historically connected to wetland WH, but a road was constructed through this wetland separating the two wetlands. There is no evidence of a direct hydrologic surface connection between WC and WH through or over the road. A roadside ditch does expand from WC to WD and to a culvert under the road to wetland WH, but this roadside ditch does not meet the flow requirements to be considered a tributary under the NWPR. Further, it does not appear to have been created in an adjacent wetland nor is there evidence to suggest that the ditch modified or relocated a natural channel.<br><br>This ditch drains south through culverts to an off-site property that was inaccessible for field review. A review of aerial imagery and USGS topography maps indicate that there are potential wetlands directly south of wetlands WC, WD, and WH. However, these wetland areas south of the road appear to be situated on top of a flat ridge and surrounded by upland areas based on the aerial imagery and USGS Topo Maps. Based on this, Wetlands WC, WD and WH would not meet the definition of an adjacent wetland under the NWPR and are best defined as a (b)(1) non-adjacent wetland. |
| Review Area 5 WD | 6.3 acres | (b)(1) Non-adjacent wetland | This wetland is not adjacent to any (a)(1)-(a)(3) waters as defined by the NWPR.  This wetland does not abut any (a)(1)-(a)(3) waters, is not inundated or have a direct surface water connection to any (a)(1)-(a)(3) waters in a typical year.  This wetland is physically separated from all (a)(1)-(a)(3) waters. It appears that wetland WC was historically connected to wetland WH, but a road was constructed through this wetland separating the two wetlands. There is no evidence of a direct hydrologic surface connection between WC and WH through or over the road. A roadside ditch does expand from WC to WD and to a culvert under the road to wetland WH, but this roadside ditch does not meet |

[1] Map(s)/Figure(s) are attached to the AJD provided to the requestor.
[2] If the navigable water is not subject to the ebb and flow of the tide or included on the District's list of Rivers and Harbors Act Section 10 navigable waters list, do NOT use this document to make the determination. The District must continue to follow the procedure outlined in 33 CFR part 329.14 to make a Rivers and Harbors Act Section 10 navigability determination.
[3] A stand-alone TNW determination is completed independently of a request for an AJD. A stand-alone TNW determination is conducted for a specific segment of river or stream or other type of waterbody, such as a lake, where independent upstream or downstream limits or lake borders are established. A stand-alone TNW determination should be completed following applicable guidance and should NOT be documented on the AJD form.
[4] Some excluded waters, such as (b)(2) and (b)(4), may not be specifically identified on the AJD form unless a requestor specifically asks a Corps district to do so. Corps Districts may, in case-by-case instances, choose to identify some or all of these waters within the review area.
[5] Because of the broad nature of the (b)(1) exclusion and in an effort to collect data on specific types of waters that would be covered by the (b)(1) exclusion, four sub-categories of (b)(1) exclusions were administratively created for the purposes of the AJD Form. These four sub-categories are not new exclusions, but are simply administrative distinctions and remain (b)(1) exclusions as defined by the NWPR.

Form Version 29 July 2020_updated



**U.S. ARMY CORPS OF ENGINEERS**
**REGULATORY PROGRAM**
**APPROVED JURISDICTIONAL DETERMINATION FORM (INTERIM)**
**NAVIGABLE WATERS PROTECTION RULE**

| | | | the flow requirements to be considered a tributary under the NWPR. Further, it does not appear to have been created in an adjacent wetland nor is there evidence to suggest that the ditch modified or relocated a natural channel.<br><br>This ditch drains south through culverts to an off-site property that was inaccessible for field review. A review of aerial imagery and USGS topography maps indicate that there are potential wetlands directly south of wetlands WC, WD, and WH. However, these wetland areas south of the road appear to be situated on top of a flat ridge and surrounded by upland areas based on the aerial imagery and USGS Topo Maps. Based on this, Wetlands WC, WD and WH would not meet the definition of an adjacent wetland under the NWPR and are best defined as a (b)(1) non-adjacent wetland. |
|---|---|---|---|
| Review Area 5 WH | 14.14 acres | (b)(1) Non-adjacent wetland | This wetland is not adjacent to any (a)(1)–(a)(3) waters as defined by the NWPR. This wetland does not abut any (a)(1)–(a)(3) waters, is not inundated or have a direct surface water connection to any (a)(1)–(a)(3) waters in a typical year. This wetland is physically separated from all (a)(1)–(a)(3) waters. It appears that wetland WC was historically connected to wetland WH, but a road was constructed through this wetland separating the two wetlands. There is no evidence of a direct hydrologic surface connection between WC and WH through or over the road. A roadside ditch does expand from WC to WD and to a culvert under the road to wetland WH, but this roadside ditch does not meet the flow requirements to be considered a tributary under the NWPR. Further, it does not appear to have been created in an adjacent wetland nor is there evidence to suggest that the ditch modified or relocated a natural channel.<br><br>This ditch drains south through culverts to an off-site property that was inaccessible for field review. A review of aerial imagery and USGS topography maps indicate that there are potential wetlands directly south of wetlands WC, WD, and WH. However, these wetland areas south of the road appear to be situated on top of a flat ridge and surrounded by upland areas based on the aerial imagery and USGS Topo Maps. Based on this, Wetlands WC, WD and WH would not meet the definition of an adjacent wetland under the NWPR and are best defined as a (b)(1) non-adjacent wetland. |

## III.  SUPPORTING INFORMATION
**A.  Select/enter all resources** that were used to aid in this determination and attach data/maps to this document and/or references/citations in the administrative record, as appropriate.

---

[1] Map(s)/Figure(s) are attached to the AJD provided to the requestor.
[2] If the navigable water is not subject to the ebb and flow of the tide or included on the District's list of Rivers and Harbors Act Section 10 navigable waters list, do NOT use this document to make the determination. The District must continue to follow the procedure outlined in 33 CFR part 329.14 to make a Rivers and Harbors Act Section 10 navigability determination.
[3] A stand-alone TNW determination is completed independently of a request for an AJD. A stand-alone TNW determination is conducted for a specific segment of river or stream or other type of waterbody, such as a lake, where independent upstream or downstream limits or lake borders are established. A stand-alone TNW determination should be completed following applicable guidance and should NOT be documented on the AJD form.
[4] Some excluded waters, such as (b)(2) and (b)(4), may not be specifically identified on the AJD form unless a requestor specifically asks a Corps district to do so. Corps Districts may, in case-by-case instances, choose to identify some or all of these waters within the review area.
[5] Because of the broad nature of the (b)(1) exclusion and in an effort to collect data on specific types of waters that would be covered by the (b)(1) exclusion, four sub-categories of (b)(1) exclusions were administratively created for the purposes of the AJD Form. These four sub-categories are not new exclusions, but are simply administrative distinctions and remain (b)(1) exclusions as defined by the NWPR.

Form Version 29 July 2020_updated



**U.S. ARMY CORPS OF ENGINEERS**
**REGULATORY PROGRAM**
**APPROVED JURISDICTIONAL DETERMINATION FORM (INTERIM)**
**NAVIGABLE WATERS PROTECTION RULE**

_X_    Information submitted by, or on behalf of, the applicant/consultant: *WOTUS Delineation Report, September 28, 2018 and WOTUS Connectivity Screening, September 2020.* This information *is* sufficient for purposes of this AJD.

\_\_\_\_    Data sheets prepared by the Corps: *Title(s) and/or date(s).*

_X_    Photographs: *(aerial and other) USGS Earth Explorer 03/18/1963, 01/21/1970; USGS EROS NHAP, 02/14/1984; USGS EROS NAPP 02/18/1993; USGS Express Aerials Imagery 02/01/2006; Google Earth, 03/06/2018; Vivid 03/06/2018 & 11/20/2019; Twin Pines Orthoimagery 09/2018. Site photographs provided in September 28, 2018 delineation report*

_X_    Corps Site visit(s) conducted on: *November 2018 and September 16, 2020.*

\_\_\_\_    Previous Jurisdictional Determinations (AJDs or PJDs): *ORM Number(s) and date(s).*

_X_    Antecedent Precipitation Tool: *provide detailed discussion in Section III.B.*

_X_    USDA NRCS Soil Survey: *Web Soil Survey map provided for the areas in the September Delineation Report.*

_X_    USFWS NWI maps: *NWI Mapping provided in the September Delineation Report.*

_X_    USGS topographic maps: *Moniac, Florida and Saint George, GA USGS 7.5 Minute Quad Maps, 2017 provided in Approved Jurisdictional Request submission; Moniac, Florida and Saint George, GA USGS 7.5 Minute Quad Maps, 1994 provided in September 28, 2018 delineation report.*

**Other data sources used to aid in this determination:**

| Data Source (select) | Name and/or date and other relevant information |
|---|---|
| USGS Sources | N.A. |
| USDA Sources | N.A. |
| NOAA Sources | N.A. |
| USACE Sources | N.A. |
| State/Local/Tribal Sources | N.A. |
| Other Sources | N.A. |

**B.**   **Typical year assessment(s):** APT was run for the review areas for September 16, 2020 (date of most recent Corps site visit). APT output indicated normal conditions and the Drought Index (PDSI) indicated "Incipient Wetness". The site is in a typical year and experiencing conditions that are within the normal ranges for a typical year.

**C.**   **Additional comments to support AJD:** The five review areas contain non-adjacent wetlands and ditches. The wetlands are not adjacent to any a(1), a(2), or a(3) waters, and are not inundated by any a(1), a(2), or a(3) water in a typical year. None of the ditches meet the criteria to be considered an (a)(2) water and are excluded (b)(5) waters.

---

[1] Map(s)/Figure(s) are attached to the AJD provided to the requestor.
[2] If the navigable water is not subject to the ebb and flow of the tide or included on the District's list of Rivers and Harbors Act Section 10 navigable waters list, do NOT use this document to make the determination. The District must continue to follow the procedure outlined in 33 CFR part 329.14 to make a Rivers and Harbors Act Section 10 navigability determination.
[3] A stand-alone TNW determination is completed independently of a request for an AJD. A stand-alone TNW determination is conducted for a specific segment of river or stream or other type of waterbody, such as a lake, where independent upstream or downstream limits or lake borders are established. A stand-alone TNW determination should be completed following applicable guidance and should NOT be documented on the AJD form.
[4] Some excluded waters, such as (b)(2) and (b)(4), may not be specifically identified on the AJD form unless a requestor specifically asks a Corps district to do so. Corps Districts may, in case-by-case instances, choose to identify some or all of these waters within the review area.
[5] Because of the broad nature of the (b)(1) exclusion and in an effort to collect data on specific types of waters that would be covered by the (b)(1) exclusion, four sub-categories of (b)(1) exclusions were administratively created for the purposes of the AJD Form. These four sub-categories are not new exclusions, but are simply administrative distinctions and remain (b)(1) exclusions as defined by the NWPR.

**STANFORD DECLARATION**

**EXHIBIT B**



**DEPARTMENT OF THE ARMY**
U.S. ARMY CORPS OF ENGINEERS
SAVANNAH DISTRICT
100 W. OGLETHORPE AVENUE
SAVANNAH, GEORGIA 31401-3604

**MARCH 24, 2021**

Regulatory Division
SAS-2018-00554-ACM


Mr. Steven R. Ingle (single@twinpinesminerals.com)
Twin Pines Minerals, LLC
2100 Southbridge Parkway
Birmingham, Alabama 35209

Dear Mr. Ingle:

I refer to your letter submitted on your behalf by TTL, requesting an Approved
Jurisdictional Determination (JD) for your sites located West of the town of Saint George
and North of State Route 94, in Charlton County (Latitude 30.525932, Longitude
-82.124468). This project has been assigned number SAS-2018-00554-ACM and it is
important that you refer to this number in all communication concerning this matter.

We have completed an approved JD for the site. The wetlands were delineated in
accordance with criteria contained in the 1987 "Corps of Engineers Wetland Delineation
Manual," as amended by the most recent regional supplements to the manual. I have
enclosed an "Approved JD Form," which details whether streams, wetlands and/or other
waters present on the site are subject to the jurisdiction of the U.S. Army Corps of
Engineers and how the Corps determined jurisdiction.

There are aquatic resources within the review area that are not waters of the United
States and are therefore not within the jurisdiction of Section 404 of the Clean Water Act
(33 United States Code § 1344). Specifically, ditches "6Ditch-6 NWPR, 6Ditch-2
NWPR, 7Ditch-1 NWPR, 7Ditch NWPR, 7Ditch-KEY NWPR, 7Ditch-ADK NWPR," and
the wetlands labeled "Non-Adjacent Wetland" as identified on the enclosed exhibits
entitled "Review Area 6" and "Review Area 7" dated November 16, 2020. The
placement of dredged or fill material into these wetlands/other waters would not require
prior Department of the Army authorization pursuant to Section 404.

This approved JD will remain valid for a period of 5-years unless new information
warrants revision prior to that date. You may request an administrative appeal for any
approved JD under the Corps regulations at 33 Code of Federal Regulations (CFR) Part
331. Enclosed you will find a Notification of Administrative Appeal Options and Process
and Request for Appeal form.

If you intend to sell property that is part of a project that requires Department of the
Army Authorization, it may be subject to the Interstate Land Sales Full Disclosure Act.
The Property Report required by Housing and Urban Development Regulation must

- 2 -

state whether, or not a permit for the development has been applied for, issued or denied by the U.S. Army Corps of Engineers (Part 320.3(h) of Title 33 of the CFR).

This communication does not convey any property rights, either in real estate or material, or any exclusive privileges. It does not authorize any injury to property, invasion of rights, or any infringement of federal, state or local laws, or regulations. It does not obviate your requirement to obtain state or local assent required by law for the development of this property. If the information you have submitted, and on which the U.S. Army Corps of Engineers has based its determination is later found to be in error, this decision may be revoked.

Thank you in advance for completing our on-line Customer Survey Form located at http://corpsmapu.usace.army.mil/cm_apex/f?p=regulatory_survey. We value your comments and appreciate your taking the time to complete a survey each time you have interaction with our office.

If you have any questions, please contact Ms. Allison C. Murphy, Project Manager, Coastal Branch, via telephone at 912-652-5133 or email at Allison.c.murphy@usace.army.mil.

Sincerely,

William M. Rutlin
Chief, Coastal Branch

Copies Furnished: Cindy House-Pearson (chpearson@ttlusa.com) TTL

Enclosures

| NOTIFICATION OF ADMINISTRATIVE APPEAL OPTIONS AND PROCESS AND REQUEST FOR APPEAL | | | |
|---|---|---|---|
| Applicant: Steven R. Ingle | | File Number: SAS-2018-00554 | Date: March 24, 2021 |
| Attached is: | | | See Section below |
| | INITIAL PROFFERED PERMIT (Standard Permit or Letter of permission) | | A |
| | PROFFERED PERMIT (Standard Permit or Letter of permission) | | B |
| | PERMIT DENIAL | | C |
| x | APPROVED JURISDICTIONAL DETERMINATION | | D |
| | PRELIMINARY JURISDICTIONAL DETERMINATION | | E |

SECTION I – The following identifies your rights and options regarding an administrative appeal of the above decision. Additional information may be found at http://www.usace.army.mil/CECW/Pages/reg_materials.aspx or Corps regulations at 33 CFR Part 331.

A: INITIAL PROFFERED PERMIT: You may accept or object to the permit.

ACCEPT: If you received a Standard Permit, you may sign the permit document and return it to the district engineer for final authorization. If you received a Letter of Permission (LOP), you may accept the LOP and your work is authorized. Your signature on the Standard Permit or acceptance of the LOP means that you accept the permit in its entirety, and waive all rights to appeal the permit, including its terms and conditions, and approved jurisdictional determinations associated with the permit.

OBJECT: If you object to the permit (Standard or LOP) because of certain terms and conditions therein, you may request that the permit be modified accordingly. You must complete Section II of this form and return the form to the district engineer. Your objections must be received by the district engineer within 60 days of the date of this notice, or you will forfeit your right to appeal the permit in the future. Upon receipt of your letter, the district engineer will evaluate your objections and may: (a) modify the permit to address all of your concerns, (b) modify the permit to address some of your objections, or (c) not modify the permit having determined that the permit should be issued as previously written. After evaluating your objections, the district engineer will send you a proffered permit for your reconsideration, as indicated in Section B below.

B: PROFFERED PERMIT: You may accept or appeal the permit.

ACCEPT: If you received a Standard Permit, you may sign the permit document and return it to the district engineer for final authorization. If you received a Letter of Permission (LOP), you may accept the LOP and your work is authorized. Your signature on the Standard Permit or acceptance of the LOP means that you accept the permit in its entirety, and waive all rights to appeal the permit, including its terms and conditions, and approved jurisdictional determinations associated with the permit.

APPEAL: If you choose to decline the proffered permit (Standard or LOP) because of certain terms and conditions therein, you may appeal the declined permit under the Corps of Engineers Administrative Appeal Process by completing Section II of this form and sending the form to the division engineer. This form must be received by the division engineer within 60 days of the date of this notice.

C: PERMIT DENIAL: You may appeal the denial of a permit under the Corps of Engineers Administrative Appeal Process by completing Section II of this form and sending the form to the division engineer. This form must be received by the division engineer within 60 days of the date of this notice.

D: APPROVED JURISDICTIONAL DETERMINATION: You may accept or appeal the approved JD or provide new information.

ACCEPT: You do not need to notify the Corps to accept an approved JD. Failure to notify the Corps within 60 days of the date of this notice means that you accept the approved JD in its entirety, and waive all rights to appeal the approved JD.

APPEAL: If you disagree with the approved JD, you may appeal the approved JD under the Corps of Engineers Administrative Appeal Process by completing Section II of this form and sending the form to the division engineer. The division engineer must receive this form within 60 days of the date of this notice.

E: PRELIMINARY JURISDICTIONAL DETERMINATION: You do not need to respond to the Corps regarding the preliminary JD. The Preliminary JD is not appealable. If you wish, you may request an approved JD (which may be appealed), by contacting the Corps district for further instruction. Also you may provide new information for further consideration by the Corps to reevaluate the JD.

| SECTION II - REQUEST FOR APPEAL or OBJECTIONS TO AN INITIAL PROFFERED PERMIT |
|---|
| REASONS FOR APPEAL OR OBJECTIONS: (Describe your reasons for appealing the decision or your objections to an initial proffered permit in clear concise statements. You may attach additional information to this form to clarify where your reasons or objections are addressed in the administrative record.) |
| ADDITIONAL INFORMATION: The appeal is limited to a review of the administrative record, the Corps memorandum for the record of the appeal conference or meeting, and any supplemental information that the review officer has determined is needed to clarify the administrative record. Neither the appellant nor the Corps may add new information or analyses to the record. However, you may provide additional information to clarify the location of information that is already in the administrative record. |

| POINT OF CONTACT FOR QUESTIONS OR INFORMATION: | |
|---|---|
| If you have questions regarding this decision and/or the appeal process you may contact:<br>ALLISON C. MURPHY<br>U.S. ARMY CORPS OF ENGINEERS, SAVANNAH DISTRICT<br>100 W. OGLETHORPE AVENUE, SAVANNAH, GEORGIA 31401<br><br>PHONE: (912) 652-5133<br>EMAIL: ALLISON.C.MURPHY@USACE.ARMY.MIL | If you only have questions regarding the appeal process you may also contact:<br>Mr. Philip Shannin, Administrative Appeal Review Officer<br>CESAS-PDS-O<br>60 Forsyth Street Southwest, Floor M9<br>Atlanta, Georgia 30303-8803<br><br>Phone: (404) 562-5136; Fax: (404) 562-5138<br>Email: Philip.a.shannin@usace.army.mil -8801 |

| RIGHT OF ENTRY: Your signature below grants the right of entry to Corps of Engineers personnel, and any government consultants, to conduct investigations of the project site during the course of the appeal process. You will be provided a 15-day notice of any site investigation, and will have the opportunity to participate in all site investigations. | | |
|---|---|---|
| _____<br>Signature of appellant or agent. | Date: | Telephone number: |



**U.S. ARMY CORPS OF ENGINEERS**
REGULATORY PROGRAM
APPROVED JURISDICTIONAL DETERMINATION FORM (INTERIM)
NAVIGABLE WATERS PROTECTION RULE

## I. ADMINISTRATIVE INFORMATION

Completion Date of Approved Jurisdictional Determination (AJD): 24-MAR-2021
ORM Number: SAS-2018-00554-ACM
Associated JDs: SAS-2018-00554
Review Area Location[1]:
    State/Territory: GA    City:    County/Parish/Borough: Charlton County
    Center Coordinates of Review Area: Latitude 30.525932 Longitude -82.124468

## II. FINDINGS

**A. Summary:** Check all that apply. At least one box from the following list MUST be selected. Complete the corresponding sections/tables and summarize data sources.

☐ The review area is comprised entirely of dry land (i.e., there are no waters or water features, including wetlands, of any kind in the entire review area). Rationale: N/A or describe rationale.

☐ There are "navigable waters of the United States" within Rivers and Harbors Act jurisdiction within the review area (complete table in section II.B).

☐ There are "waters of the United States" within Clean Water Act jurisdiction within the review area (complete appropriate tables in section II.C).

☒ There are waters or water features excluded from Clean Water Act jurisdiction within the review area (complete table in section II.D).

**B. Rivers and Harbors Act of 1899 Section 10 (§ 10)[2]**

| § 10 Name | § 10 Size | § 10 Criteria | Rationale for § 10 Determination |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

**C. Clean Water Act Section 404**

Territorial Seas and Traditional Navigable Waters ((a)(1) waters)[3]

| (a)(1) Name | (a)(1) Size | (a)(1) Criteria | Rationale for (a)(1) Determination |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

Tributaries ((a)(2) waters):

| (a)(2) Name | (a)(2) Size | (a)(2) Criteria | Rationale for (a)(2) Determination |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

Lakes and ponds, and impounds of jurisdictional waters ((a)(3) waters):

| (a)(3) Name | (a)(3) Size | (a)(3) Criteria | Rationale for (a)(3) Determination |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

Adjacent wetlands ((a)(4) waters):

| (a)(4) Name | (a)(4) Size | (a)(4) Criteria | Rationale for (a)(4) Determination |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

---

[1] Map(s)/Figure(s) are attached to the AJD provided to the requestor.
[2] If the navigable water is not subject to the ebb and flow of the tide or included on the District's list of Rivers and Harbors Act Section 10 navigable waters list, do NOT use this document to make the determination. The District must continue to follow the procedure outlined in 33 CFR part 329.14 to make a Rivers and Harbors Act Section 10 navigability determination.
[3] A stand-alone TNW determination is completed independently of a request for an AJD. A stand-alone TNW determination is conducted for a specific segment of river or stream or other type of waterbody, such as a lake, where independent upstream or downstream limits or lake borders are established. A stand-alone TNW determination should be completed following applicable guidance and should NOT be documented on the AJD form.
[4] Some excluded waters, such as (b)(2) and (b)(4), may not be specifically identified on the AJD form unless a requestor specifically asks a Corps district to do so. Corps Districts may, in case-by-case instances, choose to identify some or all of these waters within the review area.
[5] Because of the broad nature of the (b)(1) exclusion and in an effort to collect data on specific types of waters that would be covered by the (b)(1) exclusion, four sub-categories of (b)(1) exclusions were administratively created for the purposes of the AJD Form. These four sub-categories are not new exclusions, but are simply administrative distinctions and remain (b)(1) exclusions as defined by the NWPR.

    Form Version 29 July 2020_updated



## U.S. ARMY CORPS OF ENGINEERS
### REGULATORY PROGRAM
### APPROVED JURISDICTIONAL DETERMINATION FORM (INTERIM)
### NAVIGABLE WATERS PROTECTION RULE

**D. Excluded Waters or Features**

Excluded waters ((b)(1) – (b)(12))[4]:

| Exclusion Name | Exclusion Size | Exclusion[5] | Rationale for Exclusion Determination |
|---|---|---|---|
| 6Ditch-6 NWPR | 1,088 feet | (b)(5) Ditch that is not an (a)(1) or (a)(2) water, and those portions of a ditch constructed in an (a)(4) water that do not satisfy the conditions of (c)(1) | Ditch does not alter or relocate a naturally occurring surface water channel. Further, no evidence was observed to indicate that this feature was dug in an (a)(4) adjacent wetland. This feature appears to be primarily constructed in uplands as well as a (b)(1) wetland. This feature did not exhibit intermittent or perennial flow on numerous dates of observation throughout 2018-2020 and appeared to pond water and briefly flow during, and after, precipitation events. |
| 6Ditch-2 NWPR | 2,045 feet | (b)(5) Ditch that is not an (a)(1) or (a)(2) water, and those portions of a ditch constructed in an (a)(4) water that do not satisfy the conditions of (c)(1) | These roadside ditches do not alter or relocate a naturally occurring surface water channel. Further, no evidence was observed to indicate that these features were dug in an (a)(4) adjacent wetland. These features appear to be primarily constructed in uplands as well as (b)(1) wetlands. These features did not exhibit intermittent or perennial flow on numerous dates of observation throughout 2018-2020 and appeared to pond water and briefly flow during, and after, precipitation events. |
| 6WB NWPR | 2.194 acres | (b)(1) Non-adjacent wetland | This feature is not adjacent to any (a)(1)-(a)(3) waters as defined by the NWPR. This wetland does not abut any (a)(1)-(a)(3) waters, is not inundated by any (a)(1)-(a)(3) waters, is physically separated from all (a)(1)-(a)(3) waters |

[1] Map(s)/Figure(s) are attached to the AJD provided to the requestor.
[2] If the navigable water is not subject to the ebb and flow of the tide or included on the District's list of Rivers and Harbors Act Section 10 navigable waters list, do NOT use this document to make the determination. The District must continue to follow the procedure outlined in 33 CFR part 329.14 to make a Rivers and Harbors Act Section 10 navigability determination.
[3] A stand-alone TNW determination is completed independently of a request for an AJD. A stand-alone TNW determination is conducted for a specific segment of river or stream or other type of waterbody, such as a lake, where independent upstream or downstream limits or lake borders are established. A stand-alone TNW determination should be completed following applicable guidance and should NOT be documented on the AJD form.
[4] Some excluded waters, such as (b)(2) and (b)(4), may not be specifically identified on the AJD form unless a requestor specifically asks a Corps district to do so. Corps Districts may, in case-by-case instances, choose to identify some or all of these waters within the review area.
[5] Because of the broad nature of the (b)(1) exclusion and in an effort to collect data on specific types of waters that would be covered by the (b)(1) exclusion, four sub-categories of (b)(1) exclusions were administratively created for the purposes of the AJD Form. These four sub-categories are not new exclusions, but are simply administrative distinctions and remain (b)(1) exclusions as defined by the NWPR.



# U.S. ARMY CORPS OF ENGINEERS
## REGULATORY PROGRAM
## APPROVED JURISDICTIONAL DETERMINATION FORM (INTERIM)
## NAVIGABLE WATERS PROTECTION RULE

|  |  |  |  |
|---|---|---|---|
|  |  |  | and does not have a direct hydrologic surface connection to any (a)(1)-(a)(3) waters in a typical year. |
| 6WC NWPR | 2.523 acres | (b)(1) Non-adjacent wetland | This feature is not adjacent to any (a)(1)-(a)(3) waters as defined by the NWPR. This wetland does not abut any (a)(1)-(a)(3) waters, is not inundated by any (a)(1)-(a)(3) waters, is physically separated from all (a)(1)-(a)(3) waters and does not have a direct hydrologic surface connection to any (a)(1)-(a)(3) waters in a typical year. |
| 6WF NWPR | 0.704 acres | (b)(1) Non-adjacent wetland | This feature is not adjacent to any (a)(1)-(a)(3) waters as defined by the NWPR. This wetland does not abut any (a)(1)-(a)(3) waters, is not inundated by any (a)(1)-(a)(3) waters, is physically separated from all (a)(1)-(a)(3) waters and does not have a direct hydrologic surface connection to any (a)(1)-(a)(3) waters in a typical year. |
| 6WG NWPR | 5.97 acres | (b)(1) Non-adjacent wetland | This feature is not adjacent to any (a)(1)-(a)(3) waters as defined by the NWPR. This wetland does not abut any (a)(1)-(a)(3) waters, is not inundated by any (a)(1)-(a)(3) waters, is physically separated from all (a)(1)-(a)(3) waters and does not have a direct hydrologic surface connection to any (a)(1)-(a)(3) waters in a typical year. |
| 7 Ditch NWPR | 1,268 feet | (b)(5) Ditch that is not an (a)(1) or (a)(2) water, and those portions of a ditch constructed in an (a)(4) water that do not satisfy the conditions of (c)(1) | Ditch does not alter or relocate a naturally occurring surface water channel. Further, no evidence was observed to indicate that this feature was dug in an (a)(4) adjacent wetland. |

[1] Map(s)/Figure(s) are attached to the AJD provided to the requestor.
[2] If the navigable water is not subject to the ebb and flow of the tide or included on the District's list of Rivers and Harbors Act Section 10 navigable waters list, do NOT use this document to make the determination. The District must continue to follow the procedure outlined in 33 CFR part 329.14 to make a Rivers and Harbors Act Section 10 navigability determination.
[3] A stand-alone TNW determination is completed independently of a request for an AJD. A stand-alone TNW determination is conducted for a specific segment of river or stream or other type of waterbody, such as a lake, where independent upstream or downstream limits or lake borders are established. A stand-alone TNW determination should be completed following applicable guidance and should NOT be documented on the AJD form.
[4] Some excluded waters, such as (b)(2) and (b)(4), may not be specifically identified on the AJD form unless a requestor specifically asks a Corps district to do so. Corps Districts may, in case-by-case instances, choose to identify some or all of these waters within the review area.
[5] Because of the broad nature of the (b)(1) exclusion and in an effort to collect data on specific types of waters that would be covered by the (b)(1) exclusion, four sub-categories of (b)(1) exclusions were administratively created for the purposes of the AJD Form. These four sub-categories are not new exclusions, but are simply administrative distinctions and remain (b)(1) exclusions as defined by the NWPR.

Form Version 29 July 2020_updated



**U.S. ARMY CORPS OF ENGINEERS**
REGULATORY PROGRAM
APPROVED JURISDICTIONAL DETERMINATION FORM (INTERIM)
NAVIGABLE WATERS PROTECTION RULE

|  |  |  | This feature appears to be primarily constructed in a (b)(1) wetland with the downstream, eastern portion being constructed in upland. This feature did not exhibit intermittent or perennial flow on numerous dates of observation throughout 2018-2020 and appeared to pond water and briefly flow during, and after, precipitation events. |
|---|---|---|---|
| 7 Ditch-KEY NWPR | 297 feet | (b)(5) Ditch that is not an (a)(1) or (a)(2) water, and those portions of a ditch constructed in an (a)(4) water that do not satisfy the conditions of (c)(1) | Ditch does not alter or relocate a naturally occurring surface water channel. Further, no evidence was observed to indicate that this feature was dug in an (a)(4) adjacent wetland. This feature is primarily constructed in an uplands. This feature did not exhibit intermittent or perennial flow on numerous dates of observation throughout 2018-2020 and appeared to pond water and briefly flow during, and after, precipitation events. |
| 7 Ditch-ADK NWPR | 199 feet | (b)(5) Ditch that is not an (a)(1) or (a)(2) water, and those portions of a ditch constructed in an (a)(4) water that do not satisfy the conditions of (c)(1) | Ditch does not alter or relocate a naturally occurring surface water channel. Further, no evidence was observed to indicate that this feature was dug in an (a)(4) adjacent wetland. This feature is primarily constructed in an uplands. This feature did not exhibit intermittent or perennial flow on numerous dates of observation throughout 2018-2020 and appeared to pond water and briefly flow during, and after, precipitation events. |
| 7 Ditch-1 NWPR | 5,267 feet | (b)(5) Ditch that is not an (a)(1) or (a)(2) water, and those portions of a ditch constructed in an (a)(4) water that do not satisfy the conditions of | These roadside ditches do not alter or relocate a naturally occurring surface water channel. Further, no evidence |

[1] Map(s)/Figure(s) are attached to the AJD provided to the requestor.
[2] If the navigable water is not subject to the ebb and flow of the tide or included on the District's list of Rivers and Harbors Act Section 10 navigable waters list, do NOT use this document to make the determination. The District must continue to follow the procedure outlined in 33 CFR part 329.14 to make a Rivers and Harbors Act Section 10 navigability determination.
[3] A stand-alone TNW determination is completed independently of a request for an AJD. A stand-alone TNW determination is conducted for a specific segment of river or stream or other type of waterbody, such as a lake, where independent upstream or downstream limits or lake borders are established. A stand-alone TNW determination should be completed following applicable guidance and should NOT be documented on the AJD form.
[4] Some excluded waters, such as (b)(2) and (b)(4), may not be specifically identified on the AJD form unless a requestor specifically asks a Corps district to do so. Corps Districts may, in case-by-case instances, choose to identify some or all of these waters within the review area.
[5] Because of the broad nature of the (b)(1) exclusion and in an effort to collect data on specific types of waters that would be covered by the (b)(1) exclusion, four sub-categories of (b)(1) exclusions were administratively created for the purposes of the AJD Form. These four sub-categories are not new exclusions, but are simply administrative distinctions and remain (b)(1) exclusions as defined by the NWPR.

Form Version 29 July 2020_updated



U.S. ARMY CORPS OF ENGINEERS
REGULATORY PROGRAM
APPROVED JURISDICTIONAL DETERMINATION FORM (INTERIM)
NAVIGABLE WATERS PROTECTION RULE

| | | (c)(1) | was observed to indicate that these features were dug in an (a)(4) adjacent wetland. These features appear to be primarily constructed in (b)(1) wetlands as well as upland. These features did not exhibit intermittent or perennial flow on numerous dates of observation throughout 2018-2020 and appeared to pond water during and after precipitation events. |
| --- | --- | --- | --- |
| 7WA-1 NWPR | 161.637 acres | (b)(1) Non-adjacent wetland | This feature is not adjacent to any (a)(1)-(a)(3) waters as defined by the NWPR. This wetland does not abut any (a)(1)-(a)(3) waters, is not inundated by any (a)(1)-(a)(3) waters, is physically separated from all (a)(1)-(a)(3) waters and does not have a direct hydrologic surface connection to any (a)(1)-(a)(3) waters in a typical year. |
| 7WA-5 NWPR | 7.936 acres | (b)(1) Non-adjacent wetland | This feature is not adjacent to any (a)(1)-(a)(3) waters as defined by the NWPR. This wetland does not abut any (a)(1)-(a)(3) waters, is not inundated by any (a)(1)-(a)(3) waters, is physically separated from all (a)(1)-(a)(3) waters and does not have a direct hydrologic surface connection to any (a)(1)-(a)(3) waters in a typical year. |

III.  **SUPPORTING INFORMATION**

A.  **Select/enter all resources** that were used to aid in this determination and attach data/maps to this document and/or references/citations in the administrative record, as appropriate.

  **x**  Information submitted by, or on behalf of, the applicant/consultant: WOTUS Delineation Reports 09/28/2018 and 07/03/2019
    This information *is* sufficient for purposes of this AJD.  Rationale: *N/A or describe rationale for insufficiency (including partial insufficiency).*

---

[1] Map(s)/Figure(s) are attached to the AJD provided to the requestor.
[2] If the navigable water is not subject to the ebb and flow of the tide or included on the District's list of Rivers and Harbors Act Section 10 navigable waters list, do NOT use this document to make the determination. The District must continue to follow the procedure outlined in 33 CFR part 329.14 to make a Rivers and Harbors Act Section 10 navigability determination.
[3] A stand-alone TNW determination is completed independently of a request for an AJD. A stand-alone TNW determination is conducted for a specific segment of river or stream or other type of waterbody, such as a lake, where independent upstream or downstream limits or lake borders are established. A stand-alone TNW determination should be completed following applicable guidance and should NOT be documented on the AJD form.
[4] Some excluded waters, such as (b)(2) and (b)(4), may not be specifically identified on the AJD form unless a requestor specifically asks a Corps district to do so. Corps Districts may, in case-by-case instances, choose to identify some or all of these waters within the review area.
[5] Because of the broad nature of the (b)(1) exclusion and in an effort to collect data on specific types of waters that would be covered by the (b)(1) exclusion, four sub-categories of (b)(1) exclusions were administratively created for the purposes of the AJD Form. These four sub-categories are not new exclusions, but are simply administrative distinctions and remain (b)(1) exclusions as defined by the NWPR.

Form Version 29 July 2020_updated



**U.S. ARMY CORPS OF ENGINEERS**
**REGULATORY PROGRAM**
**APPROVED JURISDICTIONAL DETERMINATION FORM (INTERIM)**
**NAVIGABLE WATERS PROTECTION RULE**

____ Data sheets prepared by the Corps: *Title(s) and/or date(s).*
____ Photographs: *(NA, aerial, other, aerial and other) Title(s) and/or date(s).*
__x__ Corps Site visit(s) conducted on: November 27-28, 2018 & October 21-25, 2019
__x__ Previous Jurisdictional Determinations (AJDs or PJDs): SAS-2018-00554
__x__ Antecedent Precipitation Tool: *provide detailed discussion in Section III.B.*
__x__ USDA NRCS Soil Survey:

    <u>Review Area 6</u>
- FIGURE 4: NATURAL RESOURCES CONSERVATION SERVICE (NRCS) SOILS MAP; Maxar, Vivid Imagery, 11/20/2019 (0.5 m Resolution, West), 3/24/2018 (0.46 m Resolution, East).

    <u>Review Area 7</u>
- FIGURE 4: NATURAL RESOURCES CONSERVATION SERVICE (NRCS) SOILS MAP; Maxar, Vivid Imagery, 11/20/2019 (0.5 m Resolution, West), 3/24/2018 (0.46 m Resolution, East).

__x__ USFWS NWI maps:

    <u>Review Area 6</u>
- FIGURE 5: NATIONAL WETLAND INVENTORY (NWI) MAP; Maxar, Vivid Imagery, 11/20/2019 (0.5 m Resolution, West), 3/24/2018 (0.46 m Resolution, East).

    <u>Review Area 7</u>
- FIGURE 5: NATIONAL WETLAND INVENTORY (NWI) MAP; Maxar, Vivid Imagery, 11/20/2019 (0.5 m Resolution, West), 3/24/2018 (0.46 m Resolution, East).

__x__ USGS topographic maps:

    <u>Review Area 6</u>
- FIGURE 1A: SITE LOCATION & TOPOGRAPHIC MAP (1918); Moniac, Georgia USACE & War Department Map, 1918
- FIGURE 1B: SITE LOCATION & TOPOGRAPHIC MAP (1942); Moniac, Georgia USACE & War Department Map, 1942
- FIGURE 1C: SITE LOCATION & TOPOGRAPHIC MAP (1966/1967); Moniac (West, 1967) & Saint George (East, 1966), Georgia USGS 7.5 Minute Quadrangle Map
- FIGURE 1D: SITE LOCATION & TOPOGRAPHIC MAP (1980); Okefenokee Swamp, Georgia USGS Quadrangle Map 1980
- FIGURE 1E: SITE LOCATION & TOPOGRAPHIC MAP (1981); Saint George, Georgia USGS 7.5 Minute Quadrangle Map, 1981
- FIGURE 1F: SITE LOCATION & TOPOGRAPHIC MAP (1994); Moniac (W) & Saint George (E), Georgia USGS 7.5 Minute Quadrangle Map, 1994
- FIGURE 1G: SITE LOCATION & TOPOGRAPHIC MAP (2017); Moniac (W) & Saint George (E), Georgia USGS 7.5 Minute Quadrangle Map, 2017
- FIGURE 1H: SITE LOCATION & TOPOGRAPHIC MAP (2020); Moniac (W) & Saint George (E), Georgia USGS 7.5 Minute Quadrangle Map, 2020

[1] Map(s)/Figure(s) are attached to the AJD provided to the requestor.
[2] If the navigable water is not subject to the ebb and flow of the tide or included on the District's list of Rivers and Harbors Act Section 10 navigable waters list, do NOT use this document to make the determination. The District must continue to follow the procedure outlined in 33 CFR part 329.14 to make a Rivers and Harbors Act Section 10 navigability determination.
[3] A stand-alone TNW determination is completed independently of a request for an AJD. A stand-alone TNW determination is conducted for a specific segment of river or stream or other type of waterbody, such as a lake, where independent upstream or downstream limits or lake borders are established. A stand-alone TNW determination should be completed following applicable guidance and should NOT be documented on the AJD form.
[4] Some excluded waters, such as (b)(2) and (b)(4), may not be specifically identified on the AJD form unless a requestor specifically asks a Corps district to do so. Corps Districts may, in case-by-case instances, choose to identify some or all of these waters within the review area.
[5] Because of the broad nature of the (b)(1) exclusion and in an effort to collect data on specific types of waters that would be covered by the (b)(1) exclusion, four sub-categories of (b)(1) exclusions were administratively created for the purposes of the AJD Form. These four sub-categories are not new exclusions, but are simply administrative distinctions and remain (b)(1) exclusions as defined by the NWPR.

           Form Version 29 July 2020_updated



DRAWN BY: DEK
CHECKED BY: DMS
DRAWING DATE: 11/16/2020
REVISION DATE: N/A
TTL JOB NO. 0001S02O0604.00
APPROX. SCALE:    1 in = 2,000 ft

## LEGEND

Review Area #6 (43± AC)

Review Area #7 (286± AC)

USGS Topographic Quadrangle Boundary

0    2,000
Feet
2,000

## FIGURE 1: REVIEW AREA LOCATIONS & TOPOGRAPHIC MAP
## TWIN PINES MINERALS
### ST. GEORGE, CHARLTON COUNTY, GEORGIA

BASEMAP: Moniac (W) & Saint George (E), Georgia USGS 7.5 Minute Quadrangle Map, 2020 10-ft Contour Intervals.

Review Area #6 Located At:
Approx. 30.518115°N, -82.1023°W

Review Area #7 Located At:
Approx. 30.532938°N, -82.114695°W



LEGEND

☐ Review Area #6 (43± AC)
▨ Non-Adjacent Wetland (10,687± AC)
▬ 6 Ditch-6 NWPR (1,088± LF)
▬ 6 Ditch-2 NWPR (2,045± LF)
• Culvert Location

0    200    400
Feet

REVIEW AREA 6 APPROVED JURISDICTIONAL DETERMINATION MAP
TWIN PINES MINERALS
ST. GEORGE, CHARLTON COUNTY, GEORGIA
BASEMAP: Maxar, Vivid Imagery, 11/20/2019 (0.5 m Resolution, West), 3/24/2018 (0.46 m Resolution, East).

DRAWN BY: DEK
CHECKED BY: CMS
DRAWING DATE: 11/16/2020
REVISION DATE: 3/17/2021
TTL JOB NO. 0001802006040.00
APPROX. SCALE:  1 in = 400 ft

6 WC NWPR
2,523± AC

6 WF NWPR
0,704± AC

6 Ditch-6 NWPR
1,088± LF

6 WG NWPR
5,970± AC

6 WB NWPR
2,194± AC

6 Ditch-2 NWPR

