**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL WILDLIFE REFUGE ASSOCIATION, NATIONAL PARKS CONSERVATION ASSOCIATION, DEFENDERS OF WILDLIFE, and CENTER FOR BIOLOGICAL DIVERSITY, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:22-cv-03498-JDB |
| UNITED STATES ARMY CORPS OF ENGINEERS and MICHAEL CONNOR, in his official capacity as Assistant Secretary of the Army for Civil Works, | |
| Defendants. | |

**DEFENDANT-INTERVENOR TWIN PINES MINERALS LLC'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO TRANSFER**

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 1

   I.  Twin Pines' Proposed Mine ................................................................................ 1

  II.  Course of Proceedings and Outcome of the First Litigation ........................... 3

LEGAL STANDARD ...................................................................................................... 7

ARGUMENT AND CITATION OF AUTHORITY ...................................................... 7

   I.  Plaintiffs Could Have Brought Their Case in the Southern District of Georgia ............... 8

  II.  The Interests of Justice Strongly Favor Transfer ............................................ 8

      A.  The Public Interest Factors Favor Transfer ............................................ 9

          1.  The interest in having local controversies decided locally strongly favors transfer ............................................................................. 9

              a.  This case should be resolved where the resources at issue are located and where the effects of the decision will be felt ............... 10

              b.  The significance of the Okefenokee Swamp does not justify venue in this district ............................................................................ 13

          2.  The transferee district's familiarity with the settlement agreement and with the general subject matter of this dispute both support transfer ............................................................................................. 15

          3.  The congestion factor is neutral .............................................................. 16

      B.  The Private Interest Factors Strongly Support Transfer ............................... 17

          1.  Twin Pines' choice of forum is entitled to greater weight ...................... 17

          2.  Plaintiffs' claim arose in the Southern District of Georgia ..................... 19

          3.  The remaining private interest factors ................................................... 19

      C.  Public Policy and the Interests of Justice Require Transfer ......................... 20

CONCLUSION ............................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

\* *Alabama v. U.S. Army Corps of Eng'rs*,
   304 F. Supp. 3d 56 (D.D.C. 2018) (Bates, J.) ................................................................... *passim*

\**Alaska Wilderness League v. Jewell*,
   99 F. Supp. 3d 112 (D.D.C. 2015) (Bates, J.) .................................................................. *passim*

*Citizen Advocates for Responsible Expansion (I-Care) v. Dole*,
   561 F. Supp. 1238 (D.D.C. 1983) .......................................................................................14

*Erickson v. Corinthian Colleges, Inc.*,
   2013 WL 5493162 (S.D.N.Y. Oct. 1, 2013) .......................................................................18

*Georgia v. Wheeler*,
   418 F. Supp. 3d. 1336 (S.D. Ga. 2019) ..............................................................................15

*Hargrave v. Oki Nursery, Inc.*,
   646 F.2d 716 (2d Cir. 1980) ...............................................................................................20

*Intrepid Potash-New Mexico, L.L.C. v. Dep't. of the Interior*,
   669 F. Supp. 2d 88 (D.D.C. 2009) ........................................................................................7

\**National Wildlife Federation v. U.S. Army Corps of Engineers*,
   312 F. Supp. 3d 167 (D.D.C. 2018) (Bates, J.) ......................................................13, 14, 15

*New Hope Power Co. v. United States Army Corps of Eng'rs*,
   724 F. Supp. 2d 90 (D.D.C. 2010) ..................................................................................7, 10

*Onyeneho v. Allstate Ins. Co.*,
   466 F. Supp. 2d 1 (D.D.C. 2006) ........................................................................................18

\**Pres. Soc'y of Charleston v. U.S. Army Corps of Eng'rs*,
   893 F. Supp. 2d 49 (D.D.C. 2012) .....................................................................9, 10, 13, 14

*Schmid Labs., Inc. v. Hartford Accident & Indem. Co.*,
   654 F. Supp. 734 (D.D.C. 1986) .........................................................................................17

\**Shawnee Tribe v. United States*,
   298 F. Supp. 2d 21 (D.D.C. 2002) ...................................................................................9, 15

*Sierra Club v. Flowers*,
   276 F. Supp. 2d 62 (D.D.C. 2003) ......................................................................................10

*Trout Unlimited v. U.S. Dept. of Agriculture,*
  944 F. Supp. 13 (1996) ..................................................................................10

*Virts v. Prudential Life Ins. Co. of Am.,*
  950 F. Supp. 2d 101 (D.D.C. 2013) (Bates, J.)..........................................17

*\*W. Watersheds Project v. Pool,*
  942 F. Supp. 2d 93 (D.D.C. 2013) (Bates, J.).........................................7, 9, 10

**Statutes**

28 U.S.C. § 1404(a) ......................................................................................1, 19, 20

33 U.S.C. § 1344.................................................................................................3, 5

**Other Authorities**

Georgia General Assembly,
  House Bill 71 (2023)....................................................................................11

Georgia EPD, Twin Pines Minerals, LLC,
  https://epd.georgia.gov/twin-pines.............................................................12

*The Navigable Waters Protection Rule: Definition of "Waters of the United
  States,"* 85 Fed. Reg. 22250 (Apr. 21, 2020) ...........................................4

*U.S. District Courts – Combined Civil and Criminal Federal Court Management
  Statistics* (Dec. 31, 2022).........................................................................16

Georgia House of Representatives, Natural Resources & Environment Resource
  Management Subcommittee, Hearing on House Bill 71, (Mar. 14, 2023) .............................11

## INTRODUCTION

Intervenor Twin Pines Minerals, LLC respectfully requests that this case be transferred to the United States District Court for the Southern District of Georgia in the interests of justice under 28 U.S.C. § 1404(a). The case should be transferred to Georgia because the subject matter is intensely local. It involves a specific proposal to mine a specific tract of land in South Georgia, the jurisdictional status of specific aquatic resources at the proposed mine site, and the procedures employed by local officials in the Savannah District of the United States Corps of Engineers. The mining proposal has generated unprecedented interest from stakeholders in Georgia, including the Georgia General Assembly, and the impact of a decision resolving Plaintiffs' claims will be felt most acutely by stakeholders in Georgia.

Equally important, the case should be transferred to the Southern District of Georgia because Plaintiffs' complaint is a collateral attack on a Settlement Agreement entered to resolve a prior case under the jurisdiction of that court. *See generally Twin Pines Minerals, LLC v. U.S. Army Corps of Eng'rs*, Civil Action No. 5:22-cv-36 (S.D. Ga.). Plaintiffs knew about that case — their attorneys even sent a letter to Twin Pines acknowledging that litigation, commenting on the merits of the suit, and claiming its irrelevance — but chose not to participate. Having made that choice and lost, Plaintiffs should not be permitted to challenge the resulting Settlement Agreement in a different district. To the extent any such collateral attack is allowed, it should be decided by the court with jurisdiction over the original litigation.

## BACKGROUND

### I.     Twin Pines' Proposed Mine

Twin Pines Minerals LLC ("Twin Pines") has been working since 2017 to obtain the permits and approvals necessary to construct and operate a heavy mineral-sands mine in Charlton County, Georgia. AR 115. The mine will bring badly needed economic development to Charlton

County and the surrounding area. The Charlton County Board of Commissioners and the City of Folkston and Charlton County Board of Economic Development actively support this project, recognizing that it "will result in economic development that is beneficial to all of Charlton County," AR 124–25, by creating "approximately one hundred fifty (150) local high-paying jobs with benefits in Charlton County," and generating "substantial yearly tax revenue to the County." AR 124.

The project has also generated substantial opposition due to its location near the Okefenokee National Wildlife Refuge. Twin Pines is not proposing to "mine the swamp" as opponents have asserted, however. The proposed mine site (depicted in Figures 1 and 2 below) is located on private property three miles away from the southeast corner of the refuge and approximately 11 miles from the nearest canoe trail. AR 54. And the land is not swampland. It is a former commercial pine plantation denuded by fire in 2017. Any habitat at the site was destroyed many years ago by a century's worth of clear-cut forestry.



*Figure 1. Location of Twin Pines Mine in Charlton County, Georgia. (AR 55)*



*Figure 2. Aerial Photograph of Proposed Mine Site (AR 56)*

The mining process itself is environmentally benign. The process requires digging sand from a hole, using water and gravity and to separate heavy minerals from the sand (approximately 2% by weight), and then returning processed sand to the hole. AR 50–58 (Sanford Decl.). After the hole is filled (which will occur continuously as sand is returned to the mine pit), the site will be graded to its original contours and replanted. *Id.* No chemicals are used in the mining or beneficiation process, and no wastewater will be discharged into the environment. *Id.* While Plaintiffs assert that certain impacts will occur, these claims will be evaluated carefully by the appropriate regulatory agencies — whether the United States Army Corps of Engineers or the Georgia Environmental Protection Division ("Georgia EPD") — and no permit will issue if Plaintiffs' claims have merit.

## II.    Course of Proceedings and Outcome of the First Litigation

In 2019 and again in 2020, Twin Pines applied to the United States Army Corps of Engineers for a permit under Section 404 of the Clean Water Act, 33 U.S.C. § 1344, to alter aquatic resources at the mine-site. AR 116. This application was based on a working assumption that some

areas on the property would be considered "Waters of the United States" subject to federal jurisdiction. On April 21, 2021, however, the Corps adopted a new definition of that term calling that assumption into doubt. *See The Navigable Waters Protection Rule: Definition of "Waters of the United States,"* 85 Fed. Reg. 22250 (Apr. 21, 2020). After the new definition was adopted, Twin Pines requested and received from the Corps two "Approved Jurisdictional Determinations" (or "AJDs") confirming that no "Waters of the United States" are present and therefore a Clean Water Act permit would not be required. AR 63–66 (Sanford Decl.), 72–102 (AJDs), 116–17 (Ingle Decl.). After the first AJD was issued, Twin Pines withdrew its application for a federal permit and redirected its efforts to securing the permits and approvals required from Georgia EPD. AR 66–67 (Sanford Decl.), 116–17 (Ingle Decl.).

Over its 5 years of work, Twin Pines had invested more than $47 million to develop its Charlton County mine. AR 115. In June of 2022, however, the Corps abruptly withdrew the two AJDs — threatening to force Twin Pines to start the process all over again — based on a determination that the Savannah District failed to engage in government-to-government consultation with the Muscogee (Creek) Nation. The memo rescinding the AJDs stated that the tribe had requested such consultation before the AJDs were issued, and it stated that the Savannah District personnel erred by failing to grant that request. AR 130 (Letter from Savannah District).

Twin Pines filed suit against the Corps in the Southern District of Georgia to set the Corps' rescission aside and to reinstate its AJDs. *See Twin Pines Minerals, LLC v. United States Army Corps of Engineers*, 22-cv-36 (S.D. Ga. 2022); AR 163–89. Twin Pines' complaint and motion for preliminary injunction alleged that reasons stated by the Corps for rescinding the AJDs were both factually and legally flawed. AR 163–89 (Twin Pines Complaint); AR 22–47 (Motion for Preliminary Injunction). During the litigation, it also became clear that the asserted factual basis

for rescinding the AJDs — erroneous information that the tribe had asked to consult on the AJDs before they were issued — did not occur. AR 6; AR 34–36.

As the Twin Pines filings in the Georgia litigation show, *see* AR 160–96, 22–159, its challenges to the Corps' decision were substantial. Following the filing of Twin Pines' motion for preliminary injunction, the Corps elected to settle Twin Pines' claims. To that end, the Corps executed a Settlement Agreement with Twin Pines in late August 2022. AR 2–11. The Settlement Agreement was effectuated by a letter from the Corps' Savannah District issued on August 22, 2023, which reinstated the AJDs for Twin Pines' property. AR 1. In that letter, the Chief of the Regulatory Division in the Savannah District informed Twin Pines that his previous "letter of June 8, 2022" rescinding "certain Approved Jurisdictional Determinations (AJDs) issued on October 15, 2020 (SAS-2018-00554), and March 24, 2021 (SAS-2018-00554-ACM), is hereby withdrawn." *Id.* The Savannah District reiterated that Twin Pines' AJDs would be "'binding on the Government' within the meaning of the 1989 Memorandum of Agreement between the United States Environmental Protection Agency and the United States Department of the Army concerning the determination of the geographic jurisdictional scope of 'waters of the United States' for purposes of Clean Water Act section 404 . . . ." *Id.* And it reinstated the AJDs for their full term, even tolling the deadlines for the period from the date they were rescinded through the resolution of Twin Pines case. *Id.*

Plaintiffs and their counsel at the Southern Environmental Law Center (SELC) knew about Twin Pines' lawsuit to reinstate the AJDs and followed the litigation closely. Indeed, Plaintiffs and their attorneys have monitored all phases of this project from the very beginning. In 2019 and 2020, SELC submitted voluminous comments on behalf of the Plaintiff organizations and others urging the Corps to deny Twin Pines' application for a permit. (Complaint [ECF 1] at 3, 5.) And

after the AJDs were issued, the SELC sent a letter on behalf of Plaintiffs and other members of the

Okefenokee Protection Alliance urging Georgia Governor Brian Kemp to intervene to prevent

Georgia EPD from issuing a state permit from being issued. *See* Letter from William Sapp,

Executive Committee Chair, Okefenokee Protection Alliance to Georgia Gov. Brian Kemp,

attached as Exhibit 1.[1]

After Twin Pines filed its lawsuit in the Southern District of Georgia, Plaintiffs' counsel of

record in this case wrote to Twin Pines and the Federal Defendants expressly acknowledging the

litigation but asserting that it was inconsequential. AR 19–21 (Letter from Plaintiffs' Counsel to

S. Ingle, President, Twin Pines Minerals, LLC, Regarding Notice of Prospective Clean Water Act

Violations Associated with Proposed Titanium Mine on Trail Ridge in Charlton County, Georgia,

Aug. 11, 2022). The letter stated that it did not matter if Twin Pines prevailed in having the AJDs

reinstated or not, because they alleged the AJDs would still be invalid, and Twin Pines would

require a federal permit even if the AJDs were reinstated. The letter also stated that Plaintiffs were

prepared to file a citizen suit if Twin Pines took any action without a permit in reliance on the

reinstated AJDs. *Id.* Having issued this threat, Plaintiffs and their counsel then made a strategic

decision not to intervene in the litigation to defend the Corps' action rescinding the AJDs on the

merits.

Twin Pines and the Federal Defendants entered into a Settlement Agreement providing for

the AJDs to be reinstated on August 22, 2023, AR 2–10, after which Twin Pines dismissed its case

against the Corps, *see Twin Pines Minerals, LLC v. U.S. Army Corps of Eng'rs*, Civil Action No.

---

[1] The Plaintiff organizations are all participants in the Okefenokee Protection Alliance, whose Executive Committee Chair, William Sapp, is a Senior Attorney at SELC. *See* Okefenokee Protection Alliance, Partners, https://protectokefenokee.org/partners/ (last visited May 6, 2023).

5:22-cv-36, ECF 28, Notice of Voluntary Dismissal. Now, apparently regretting their decision not to participate when given the chance, the Plaintiffs have mounted a collateral attack by filing a separate action in this Court to have the Corps' reinstatement of the AJDs pursuant to the Settlement Agreement "set aside." (ECF 1 at 20.)

## LEGAL STANDARD

District courts have discretion to transfer a case to another venue "[f]or the convenience of parties and witnesses, in the interest of justice." *W. Watersheds Project v. Pool*, 942 F. Supp. 2d 93, 96 (D.D.C. 2013) (Bates, J.) (quoting 28 U.S.C.§ 1404(a)). The Court's analysis proceeds in two steps:

> First, a court must decide whether plaintiffs could have brought their case in the proposed transferee district. Second, a court must exercise its discretion to adjudicate the motion for transfer according to an individualized, case-by-case consideration of convenience and fairness.

*Alabama v. U.S. Army Corps of Eng'rs*, 304 F. Supp. 3d 56, 62 (D.D.C. 2018) (Bates, J.) (citations and quotation marks omitted). At the second step, the Court must consider "case-specific factors related to the public interest of justice and the private interests of the parties and witnesses." *Intrepid Potash-New Mexico, L.L.C. v. Dep't. of the Interior*, 669 F. Supp. 2d 88, 93 (D.D.C. 2009). While it is the movant's burden to show that transfer is warranted, "[t]ransfer should be granted where the balance of private considerations of the parties of convenience and fairness and public concerns, such as systemic integrity, weigh in its favor." *New Hope Power Co. v. United States Army Corps of Eng'rs*, 724 F. Supp. 2d 90, 95 (D.D.C. 2010).

## ARGUMENT AND CITATION OF AUTHORITY

This case should be transferred to the Southern District of Georgia because this case could have been brought in the Southern District of Georgia and because the public- and private-interest factors strongly favor transfer.

I.      **Plaintiffs Could Have Brought Their Case in the Southern District of Georgia**

Plaintiffs could have filed this suit in the Southern District of Georgia. In a case challenging agency action, venue is proper where "a defendant in the action resides"; "a substantial part of the events … giving rise to the claim occurred"; or where "a substantial part of the property that is the subject of the action is situated." *Alabama*, 304 F. Supp. 3d at 62 (quoting 28 U.S.C. § 1391(e)(1)). Each requirement is met here.

First, the Corps' Savannah District Office, which reinstated Twin Pines' AJDs and effectuated the Settlement Agreement challenged in this case, AR 2–11 (Settlement Agreement), 130 (Savannah District Letter), is in the Southern District of Georgia. Second, the complaint is a collateral attack on that Settlement Agreement, which resolved a dispute between Twin Pines and the Corps about wetlands on Twin Pines' property in the Southern District of Georgia. Third, the Settlement Agreement and the decision to reinstate Twin Pines' AJDs — which Plaintiffs seek to have set aside, (ECF 1 at 20) — resolved litigation Twin Pines brought against the Corps in the U.S. District Court for the Southern District of Georgia. Because the proposed transferee venue was the venue for that litigation, the events giving rise to the present complaint — Plaintiffs' allegation that the federal Defendants did not adequately explain its decision to enter the Settlement Agreement and reinstate Twin Pines' AJDs — is centered on that district, which Twin Pines first selected because its property and the relevant Corps office are both located there. As such, venue in the Southern District of Georgia is proper.

II.     **The Interests of Justice Strongly Favor Transfer**

Having established that venue in the Southern District of Georgia is proper, the Court must "analyze the private- and public-interest factors that underlie the case-specific discretionary transfer inquiry under § 1404." *Alabama*, 304 F. Supp. 3d at 63. The Court thus must determine whether "convenience factors for the parties involved as well as 'public-interest factors of systemic

integrity and fairness' that fall 'under the heading of "the interest of justice"' weigh in favor of transfer." *W. Watersheds Project*, 942 F. Supp. 2d at 96–7 (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 30 (1988)). As explained below, these factors weigh heavily in favor of transfer to Georgia where the property and litigation at issue here are located.

### A.  The Public Interest Factors Favor Transfer

The "public interest" factors to be considered by the Court include:

> (1) the transferee's familiarity with the governing laws; (2) whether one circuit is more familiar with the same parties and issues than other courts; (3) the relative congestion of each court; and (4) the local interest in deciding local controversies at home.

*Alabama.*, 304 F. Supp. 3d at 63. Here, three of the four factors support transfer, while the fourth (relative congestion) is neutral. In addition, the public interest against piecemeal litigation, duplicative litigation, and forum shopping weigh heavily in favor of transfer to the judicial district and court that oversaw the litigation resulting in the Settlement Agreement Plaintiffs ask this Court to unwind.

### 1.  The interest in having local controversies decided locally strongly favors transfer

We begin with the final public interest factor, because "[t]he 'interest in having local controversies decided at home'" is considered "preeminent," the "most important," and "the most persuasive." *See Alabama*, 304 F. Supp. 3d at 67 ("preeminent" and "most important"); *Shawnee Tribe v. United States*, 298 F. Supp. 2d 21, 26 (D.D.C. 2002) ("most persuasive"). *See also Alaska Wilderness League v. Jewell*, 99 F. Supp. 3d 112, 116 (D.D.C. 2015) (Bates, J.); *W. Watersheds Project*, 942 F. Supp. 2d at 97; *Pres. Soc'y of Charleston v. U.S. Army Corps of Eng'rs*, 893 F. Supp. 2d 49, 54 (D.D.C. 2012). As this Court explained in *Alabama v. U.S. Army Corps of Engineers*, "justice is promoted by having a 'localized controversy resolved in the region it impacts.'" 304 F. Supp. 3d at 67 (quoting *W. Watersheds Project*, 942 F. Supp. 2d at 102)

(emphasis removed)). Thus, courts "have consistently transferred cases when the challenged action predominately affects local interests . . . ." *Id.* (transferring dispute over the Corps' management of Lake Lanier and the Chattahoochee River to the Northern District of Georgia and explaining that the action was "decidedly local" because the project was in Georgia and the impacts of the decision would be felt there).[2] This rationale applies equally "to controversies involving federal decisions that impact the local environment, and to controversies requiring judicial review of an administrative decision." *W. Watersheds Project*, 942 F. Supp. 2d at 102 (quoting *Flowers*, 276 F. Supp. 2d at 70); *see also Alabama*, 304 F. Supp. 3d at 67.

> a. *This case should be resolved where the resources at issue are located and where the effects of the decision will be felt*

The present dispute is intensely local. It is focused on a specific mining project in Charlton County, Georgia, and on the jurisdictional status of specific aquatic features at the proposed mining site. And all parties to this controversy have or claim strong ties to the State of Georgia, Charlton County, and the Okefenokee Swamp. Twin Pines' proposal has generated strong support from local interests, including the Charlton County Commission, and the City of Folkston and Charlton

---

[2] *See also, e.g., W. Watersheds Project*, 942 F. Supp. 2d at 102 (transferring case involving grazing on federal lands to Utah where "Utah residents who use those lands for cattle grazing will be directly affected by the outcome of the case" and explaining that "the District of Utah possesses a significant and predominant interest in this suit given the impact its resolution will have upon the affected lands, wildlife, and people of that district" (quotation omitted)); *Pres. Soc'y of Charleston*, 893 F. Supp. 2d at 58 ("Because any potential impacts are to be felt locally, the controversy is truly local to the District of South Carolina."); *New Hope Power Co.*, 724 F. Supp. 2d at 97 (transferring case involving wetlands on sugarcane farm in Florida because "[c]itizens of Florida, not the District of Columbia, will be most directly affected"); *Sierra Club v. Flowers,* 276 F. Supp. 2d 62, 71 (D.D.C. 2003) (transferring case involving the Everglades to Florida because "the depth and extent of Florida's interest is indisputable"); *Trout Unlimited v. U.S. Dept. of Agriculture*, 944 F. Supp. 13, 17–8, 20 (1996) (finding transfer appropriate where the "controversy [arose] from an administrative decision made in Colorado which directly affects Colorado's Arapaho and Roosevelt National Forests, water systems, wildlife, and more importantly, its people").

County Development Authority, due to its potential to double the county tax digest and create hundreds of high-paying jobs in an economically depressed area. AR 24, 115, 124–25.

It has also generated substantial opposition from local interests. *See*, *e.g.*, ECF 1 ¶ 29 (stating that "the Okefenokee National Wildlife Refuge is economically important to local residents" and that refuge visitation is "critically important to Georgia and nearby communities, supporting over 750 jobs, $17.2 million in annual employment income, $5.4 million in annual tax revenue, and $64.7 million in annual economic output per year"); Exhibit 1, Letter from Okefenokee Protection Alliance to Gov. Kemp (stating that "Georgians love their swamp" and noting the "tens of thousands" of comments submitted by Georgians regarding the project). And the Georgia General Assembly recently held hearings to evaluate, before rejecting, legislation advocated by Plaintiffs to ban mining in this specific area due to its local characteristics. *See* Georgia General Assembly, H.B. 71 (reciting that the Okefenokee Swamp is both locally significant and a "vital part of Georgia" that is of "importance to all citizens of the state"), *available at* https://www.legis.ga.gov/api/legislation/document/20232024/212765 (last visited May 5, 2023).

The testimony presented at the Committee hearing on House Bill 71 by Georgia stakeholders on both sides further emphasized the deeply local characteristics of this dispute. *See* Georgia House of Representatives, *Natural Resources & Environment Resource Management Subcommittee 03.14.23*, YouTube (Mar. 14, 2023), https://www.youtube.com/watch?v=r2M41HPfHt4&t=1170s (last visited May 7, 2023). For example, the Charlton County Commissioner for District 4 spoke about the need for taxes from businesses like Twin Pines to support the County budget, emphasizing that Charlton County has the highest number of dirt roads in the state, 100% of the students in its public schools get free lunch, and the County's only hospital

closed with an IRS lien. *Id.* at 140:09–143:00. He further explained that the mine would provide jobs and training for future jobs, *id.* at 143:00–143:12; and would help constituents with "real life issues" like "access to healthcare," *id.* at 146:12–146:20. Meanwhile, a City Councilmember spoke in support of the mine on behalf of Folkston, Georgia, a city in Charlton County, *id.* at 148:53; and Representative John Corbett discussed the economic conditions in Charlton County, *id.* at 2:05–2:06:20. Others, including long-time residents of Charlton County who are opposed to the mine, spoke passionately about their love for the swamp and its significance to them. This testimony before the Georgia Legislature leaves no doubt about the local nature and local consequences of this dispute.

The state and federal regulators tasked with reviewing Twin Pines' permit applications are also local to Georgia. Now that the focus has shifted to State permits, officials at Georgia's Environmental Protection Division have assumed the lead. ECF 1 ¶ 69; *see also* Georgia EPD, Twin Pines Minerals, LLC, https://epd.georgia.gov/twin-pines (last visited May 5, 2023). But even when the permit was being handled by the Corps, the vast majority of the individuals involved — including those responsible for the issuance, rescission, and reinstatement of the AJDs, AR 72–102 — reside in the Corps' Savannah District, which is in the Southern District of Georgia. And all decisions were based on information gathered by Savannah District staff during visits to the mine site in Charlton County and through their review of its particularized features, including the local hydrology. AR 81–7, 93–102.

The narrow pretext for the present lawsuit — Plaintiffs' challenge to the Corps' decision to settle Twin Pines' litigation and to reinstate Twin Pines' AJDs — is even more intensely local. As explained above, Twin Pines sued the Corps in the Southern District of Georgia, where its property and proposed mine are located, to have the AJDs regarding its property reinstated. *See*

*generally Twin Pines Minerals, LLC v. U.S. Army Corps of Eng'rs*, Civil Action No. 5:22-cv-36 (S.D. Ga.); AR 160–96 (Twin Pines' Complaint); AR 22–159 (Motion for Preliminary Injunction and Exhibits). As discussed below, *see infra* Part II.B.2, the settlement discussions occurred in the context of the Southern District litigation and the Settlement Agreement was effectuated by Savannah District personnel in the Southern District of Georgia.

In short, the local nature of this case is inescapable. "Without question, the people 'whose rights and interests are in fact most vitally affected by th[is] suit' reside in Georgia … not in the District of Columbia." *Alabama*, 304 F. Supp. 3d. at 67 (quoting *Adams v. Bell*, 711 F.2d 161, 167 n.34 (D.C. Cir. 1983)). And, having "'chosen the forum wherein the project itself, the decisionmakers, and the affected community are all located,'" the Southern District of Georgia has "a strong interest in the outcome of this case." *Id.* (quoting *Pres. Soc'y of Charleston*, 893 F. Supp. 2d at 55).

### b. The significance of the Okefenokee Swamp does not justify venue in this district

Seeking to create some nexus with this district, Plaintiffs may assert that the case should be litigated in this district because the Okefenokee Swamp is nationally significant. But this Court's holdings in *National Wildlife Federation v. U.S. Army Corps of Engineers*, 312 F. Supp. 3d 167 (D.D.C. 2018) (Bates, J.); *Alaska Wilderness League v. Jewell*, 99 F. Supp. 3d 112 (D.D.C. 2015) (Bates, J.); and *Preservation Society of Charleston v. U.S. Army Corps of Engineers*, 893 F. Supp. 2d 49 (D.D.C. 2012), have all rejected similar arguments for litigating local controversies in Washington, D.C.

In *National Wildlife Federation*, for example, the plaintiffs asserted that litigation focused on the alleged impacts to the Apalachicola River and Bay — a National Estuarine Research Reserve and a UNESCO International Biosphere Reserve located in Florida — should be heard in

this district due to the national and international significance of the resources at issue. *See* 312 F. Supp. 3d at 169 & n.1. This very Court was "unconvinced by plaintiffs' various arguments that this is a national, as opposed to local, controversy": the "rivers, reservoirs, and Corps projects at the center" of the case were "all located within the ACF Basin, as [were] the people, environments, and commercial interests that [were going to] be directly affected by a decision in [the] case." The Court concluded that, "even if there might be a 'national aspect'" to the claims, "the 'most important factor' — the 'interest in having localized controversies decided at home' — strongly weigh[ed] in favor of transfer . . . ." *Id.* (quoting *W. Watersheds Project*, 942 F. Supp. 3d at 102).

Other decisions are in accord. The plaintiffs in *Alaska Wilderness League*, for example, asserted that a challenge to drilling in the Chuckchi Sea presented a "national concern" about a "national policy" impacting "the plight of the warming Arctic Ocean." 99 F. Supp. 3d at 117. But this Court held "there is no 'blanket rule' that 'national policy' cases should be brought in the District of Columbia . . . ." *Id.* Even accepting that the case implicated some national concerns, this Court found it "beyond cavil that the regulation most *directly* affects Alaskan lands, livelihoods, waters, and wildlife," and "the implications of a decision" would "be felt most acutely" in Alaska. *Id.* (quoting *W. Watersheds Project*, 942 F. Supp. 2d at 103. Accordingly, this Court found that the local interest outweighed the national interest and, therefore, transferred the case to the District of Alaska. *Id.*

So too here. "The fundamental issue in this case … is a local controversy in the purest sense." *Pres. Soc'y of Charleston*, 893 F. Supp. 2d at 57; *see also Citizen Advocates for Responsible Expansion (I-Care) v. Dole*, 561 F. Supp. 1238, 1240 (D.D.C. 1983) (finding that the connection between the dispute and the local community was "indisputable"). There is no good reason for a case with such strong local connections to be heard in Washington, D.C., seven-

hundred-and-fifty miles away from the people and lands most acutely affected, especially when

"this controversy will have no real-world impact on this district." *Nat'l Wildlife Fed.*, 312 F. Supp.

3d at 169.

### 2. The transferee district's familiarity with the settlement agreement and with the general subject matter of this dispute both support transfer

The first and second factor — the transferee's familiarity with the parties, with this dispute,

and with the governing laws — also firmly support transfer. The Southern District of Georgia is

already familiar with this specific controversy, having overseen the litigation and settlement

Plaintiffs seek to unwind. *See Twin Pines Minerals, LLC v. United States Army Corps of

Engineers*, 22-cv-0036 (S.D. Ga. 2022). The proposed transferee venue is thus uniquely familiar

with the subject matter of the present litigation. And, to the extent they are relevant, the proposed

transferee court is also thoroughly familiar with background principles of Clean Water Act

jurisdiction, having overseen challenges to a prior definition of "waters of the United States." *See,

e.g.*, *Georgia v. Wheeler*, 418 F. Supp. 3d. 1336 (S.D. Ga. 2019).

The merits of this case, which involves the Corps' reinstatement of Twin Pines' AJDs, are

inherently intertwined with the merits of Twin Pines' claims in the Georgia case. *Compare* (ECF

1 at 17–20), *with* AR 163–89 (Twin Pines Complaint). Even when *related* — not largely identical

— cases exist in a potential transferee venue, courts in this Circuit have viewed overlapping subject

matter as another reason to grant transfer. *See Shawnee Tribe*, 298 F. Supp. 2d at 27 ("The Court

is also persuaded that transfer is appropriate by virtue of the fact that a possibly related case is

already before the District Court for Kansas . . . ."). Finally, to the extent Plaintiffs attempt to

characterize this case as a simple APA challenge to federal agency action, there is no reason this

Court should resolve it instead of the Southern District of Georgia, as "'all federal courts are

presumed to be equally familiar with the law governing federal statutory claims.'" *Alabama*, 304

F. Supp. 3d at 68 (quoting *Fed. Hous. Fin. Agency v. First Tennessee Bank Nat'l Ass'n*, 856 F. Supp. 2d 186, 194 (D.D.C. 2012) (citation omitted)).

### 3.   The congestion factor is neutral

The final factor, relative congestion, is neutral. While the median time to dispose of a case in the District of Columbia is shorter (5 months as compared to 9.6 months in the Southern District of Georgia), and the number of cases per judge in the Southern District of Georgia is somewhat higher, *see U.S. District Courts – Combined Civil and Criminal Federal Court Management Statistics* (December 31, 2022), at 2, 95,[3] "only substantial congestion differences will tip the transfer balance . . . ." *Alaska Wilderness Soc'y*, 99 F. Supp. 3d at 118 (cleaned up).

There is nothing to suggest the resolution of this case is urgent or that any minor differences in court congestion are material to the transfer analysis. Plaintiffs sat out of the previous litigation last summer that would have conclusively determined the status of Twin Pines' AJDs, only to file a separate challenge to the reinstatement decision later. Further, while Plaintiffs have stated that the status of Twin Pines' AJDs is irrelevant to Twin Pines' ability to proceed with its project, it is undisputed that Twin Pines cannot move forward with its project unless and until Georgia's environmental regulators issue the required environmental permits — a process that is still ongoing.

---

[3] These differences may be due in part to the preponderance in this district of APA cases that can be resolved without discovery. It may also be due to the number of civil prisoner petitions, most of which are pro se and undergo an initial review by a Magistrate Judge and comprise nearly 50% of the civil cases filed in the Southern District of Georgia. *Compare U.S. District Courts – Combined Civil and Criminal Federal Court Management Statistics* (December 31, 2022), at 2 (showing the number of prisoner petitions to be only 8% of the total civil cases before the District of Columbia), *with id.* at 95 (showing the number of prisoner petitions to be almost half of the civil cases before the Southern District of Georgia). Given this, there is no indication that resolution of this case would require any additional time in the Southern District of Georgia.

**B.      The Private Interest Factors Strongly Support Transfer**

The private interest factors tip even more strongly toward transfer. In APA litigation to be decided on an administrative record, the only significant private-interest factors are where the claim arose and plaintiff's and defendant's choice of forum.

**1.  Twin Pines' choice of forum is entitled to greater weight**

The plaintiff's choice of forum is ordinarily given substantial weight, but here it should be given none. This factor is "not absolute." *Virts v. Prudential Life Ins. Co. of Am.*, 950 F. Supp. 2d 101, 106 (D.D.C. 2013) (Bates, J.) (quoting *Gipson v. Wells Fargo & Co.*, 563 F. Supp. 2d 149, 157 (D.D.C. 2008)). The weight given the plaintiff's choice is "weakened" when the federal programs that are the subject of the action are administered by federal personnel outside the plaintiff's chosen forum, *id.,* as is the case here. And even less deference is afforded when the Plaintiff's selection is marred by forum shopping and inappropriate strategic behavior. "[T]he transfer provisions in the U.S. Code, which grew out of the common law doctrine of *forum non conveniens,* were in part intended to prevent forum shopping." *Schmid Labs., Inc. v. Hartford Accident & Indem. Co.*, 654 F. Supp. 734, 737 (D.D.C. 1986) (transferring case upon finding plaintiff's forum choice was a tactical choice to benefit from a specific precedent).

Here, Plaintiffs' decision to file in this district should be disregarded because the litigation is a collateral attack on the Settlement Agreement entered to resolve the case Twin Pines filed in the Southern District of Georgia. Plaintiffs knew about the Georgia case. AR 19–21 (commenting on the Georgia litigation and stating an intent to sue if wetlands are impacted "regardless of the status" of Twin Pines' AJDs). They also knew that Twin Pines' stated objective in the litigation was to reinstate the two AJDs. AR 188 (requesting an order "setting aside the decision to rescind the Twin Pines AJDs" and "declaring that the Twin Pines AJDs remain valid and tolling the period for their expiration"). Yet, Plaintiffs made no attempt to participate in that litigation or to defend

the merits of the decision challenged by Twin Pines. Had they done so, they might have objected to Twin Pines dismissal based on the Settlement Agreement, or attempted to defend the Corps' original action, even if the agency preferred to resolve the case without litigation, as often happens in environmental disputes. But they did not. Instead, they told Twin Pines that its litigation and the status of its AJDs was irrelevant and allowed the litigation to proceed, only to file a collateral attack on the result of that litigation in an entirely different forum.

The only conceivable rationale for plaintiffs' conduct is a desire to avoid the Southern District of Georgia. This is forum shopping, pure and simple, and it should not be rewarded. *See Onyeneho v. Allstate Ins. Co*., 466 F. Supp. 2d 1, 4 (D.D.C. 2006) ("To the extent that plaintiffs are engaging in forum shopping, it weighs in favor of transfer to a more appropriate forum."). Having made a strategic decision not to intervene in Twin Pines' Georgia litigation when their participation would have been most effective and appropriate — during the first litigation — the Court should not countenance a collateral attack on the resulting Settlement Agreement and decision to reinstate the AJDs. And even if Plaintiffs' forum shopping does not itself weigh *in favor* of transfer, it counter-balances any weight that would ordinarily be given to Plaintiffs' choice of forum. *See*, *e.g.*, *Erickson v. Corinthian Colleges, Inc*., 2013 WL 5493162, at *3 (S.D.N.Y. Oct. 1, 2013) (plaintiff's choice given significantly less weight when it is "based on tactical, rather than legitimate reasons").

As the plaintiff in the original litigation, Twin Pines' original choice of forum should be given effect, especially because of its much stronger connection to the events giving rise to the claims in both cases. In contrast, accepting the Plaintiffs' approach would give Plaintiffs a veto over Twin Pines' choice of forum. In effect, it would allow Plaintiffs to secure a back-door transfer of the Georgia litigation to this district, without Plaintiffs ever having to participate in the case,

subject themselves to the jurisdiction of the Georgia court, or be bound by its rulings. Furthermore, Plaintiffs would do so without having to establish that transfer to this district is warranted under § 1404(a), which Plaintiffs could never do.

### 2. Plaintiffs' claim arose in the Southern District of Georgia

The third private interest factor — where the claim arose — also strongly supports transfer. "[C]ourts generally focus on where the decisionmaking process occurred to determine where the claims arose." *Alaska Wilderness League*, 99 F. Supp. 3d at 313 (quoting *Nat'l Ass'n of Homebuilders v. EPA*, 675 F. Supp. 2d 173, 179 (D.D.C. 2009)). The "final agency action" that Plaintiffs seek to set aside is the Corps' reinstatement of Twin Pines' AJDs pursuant to the Settlement Agreement between Twin Pines and the Corps. (ECF 1 ¶¶ 76, 83.) As discussed above, that agreement was entered to settle litigation pending before the Southern District of Georgia; all discussions leading to the reinstatement were carried out by attorneys operating under the jurisdiction of the Southern District of Georgia; the Settlement Agreement was implemented by Corps personnel based in the Savannah District in the Southern District of Georgia. And, as a condition of settlement, Twin Pines voluntarily dismissed its litigation in the Southern District of Georgia. Thus, to the extent the locus of the decisionmaking process carries weight, all indications are that the claim arose in the Southern District of Georgia.

### 3. The remaining private interest factors

The final two private-interest factors — the convenience of the witnesses and the ease of access to sources of proof — are neutral with respect to transfer because this is an APA case that will be decided on the administrative record, without discovery or witness testimony. *See Alabama*, 304 F. Supp. 3d at 66 (finding these factors "not 'particularly relevant to this case, which involves judicial review of an administrative decision and accordingly … neither discovery,

witnesses, nor a trial will be required,' and declining to "incorporate these factors into the private-interest calculation") (quoting *Alaska Wilderness League*, 99 F. Supp. 3d at 118 n.5).

C.      **Public Policy and the Interests of Justice Require Transfer**

Finally, considerations of public policy and the efficient administration justice also favor transfer. "The federal judiciary has an obvious interest in every litigation in having the whole case tried at one time." *Hargrave v. Oki Nursery, Inc*., 646 F.2d 716, 720 (2d Cir. 1980). Rewarding Plaintiffs' stratagem would have the opposite effect: it would create incentives for piecemeal litigation by rewarding strategic avoidance, rather than encouraging all interested parties to intervene to ensure whole controversies can be resolved. As this case demonstrates, the result of such a policy will be needlessly wasteful, duplicative litigation, and a substantial waste of judicial and private resources. Already, the federal judiciary has had to deal with two cases in separate venues instead of one; and the parties to the first case spent time and money negotiating the settlement agreement Plaintiffs now seek to unwind. More, were this Court to grant relief, Twin Pines' original case in the Southern District of Georgia would be reinstated, and its original claims (including its preliminary injunction motion, which was pending at the time of settlement) would still have to be resolved, creating an unnecessary risk of inconsistent judgments.

In short, Plaintiffs' approach to this litigation has nothing to commend it. The Court should decline to entertain the Plaintiffs' claims in this case and should instead transfer them to the Southern District of Georgia, as § 1404(a) allows.

## CONCLUSION

For the foregoing reasons, the Motion to Transfer should be granted.

Respectfully submitted this 8th day of May, 2023.

/s/ *Lewis B. Jones*
Lewis B. Jones
John L. Fortuna
Jones Fortuna LP
111 New Street, Suite A
Decatur, GA 30030
Phone: 404-850-3835
Email: ljones@jonesfortua.com
        jfortuna@jonesfortuna.com

*Counsel for Twin Pines Minerals, LLC*