**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL WILDLIFE REFUGE ASSOCIATION, *et al.* | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| The UNITED STATES ARMY CORPS OF ENGINEERS, *et al.* | ) Case No. 1:22-cv-03498-JDB ) ) |
| Defendants, | ) ) |
| and | ) ) |
| TWIN PINES MINERALS, LLC, | ) ) |
| Intervenor-Defendant. | ) |

<u>**PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION TO TRANSFER**</u>

This case challenges the arbitrary decision by U.S. Army Corps of Engineers ("Corps") officials in Washington, D.C., to reinstate two approved jurisdictional determinations issued to Intervenor-Defendant Twin Pines Minerals, LLC ("Twin Pines") that they had previously revoked. Those determinations, issued under a now-vacated rule that the Corps has determined to be unlawful, removed federal protections from hundreds of acres of wetlands at the doorstep of the Okefenokee National Wildlife Refuge, one of the most celebrated natural resources in the world.

Plaintiffs National Wildlife Refuge Association, National Parks Conservation Association, Defenders of Wildlife, and Center for Biological Diversity filed this challenge in the home district of three of the four plaintiffs, where the challenged decision was made, against federal Defendants located in Washington, D.C. The Okefenokee National Wildlife Refuge is a national treasure, and any impact to the Okefenokee would be felt not only by Georgia residents

1

but by the hundreds of thousands of non-residents who visit and advocate for the Refuge each year.

The federal Defendants whose decision is under review have raised no objection to venue in this Court. Yet Twin Pines has moved to transfer the case to the Southern District of Georgia. Given Plaintiffs' choice of this forum; the location of the parties; the nexus of the claims to Washington, D.C.; the relative congestion of the proposed transferee court's calendar; and the national (indeed, international) scope of impacts, the Court should deny Twin Pines' Motion to Transfer.

## BACKGROUND

This case challenges the August 22, 2022 reversal of a June 3, 2022 directive by the Assistant Secretary of the Army for Civil Works to revoke two approved jurisdictional determinations.[1] Below is a timeline of relevant events:

**July 2019.** Twin Pines submitted a Clean Water Act permit application requesting permission to discharge dredged and fill material into more than 500 acres of jurisdictional wetlands and more than 4,500 linear feet of jurisdictional streams as part of a mining operation at the doorstep of the Okefenokee National Wildlife Refuge. ECF No. 1 ¶ 39; *see also* U.S. Army Corps of Eng'rs, *Joint Public Notice – Savannah District/State of Georgia*, SAS-2018-00554, at 1 (July 12, 2019), https://perma.cc/6JXA-ZLKJ. Twin Pines later amended its application to

---

[1] The Clean Water Act requires landowners to obtain a permit before discharging dredged or fill material into "waters of the United States." 33 U.S.C. § 1344. To assist landowners in determining whether they have "waters of the United States" on their property, the Corps offers jurisdictional determinations as a public service. The purpose of a jurisdictional determination is to inform a property owner of the Corps' view on whether their property falls within the Clean Water Act's coverage at the time the jurisdictional determination is issued. A validly issued negative determination also creates a safe harbor against enforcement by federal agencies for five years from the date of issuance. *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 598 (2016).

slightly revise the proposed footprint of the mine. ECF No. 1 ¶ 42. During this timeframe, Twin Pines submitted a report showing that nearly all observed wetlands on the site were jurisdictional and would therefore require a Clean Water Act permit.

**April 2020**. While Twin Pines' amended permit application was pending, EPA and Corps Headquarters promulgated a new federal rule, called the Navigable Waters Protection Rule ("NWPR"), that radically narrowed the scope of waters protected by the Clean Water Act. Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250 (Apr. 21, 2020). Overnight, the NWPR excluded millions of miles of streams and tens of millions of acres of wetlands, including many on the proposed mine site, from federal protection under the Clean Water Act. ECF No. 1 ¶¶ 45–46, 49.

**June 2020**. Immediately after the NWPR's effective date, Twin Pines asked the Corps to issue an approved jurisdictional determination ("AJD") applying the NWPR. *Id.* ¶ 47.

**October 2020 and March 2021**. The Corps issued two new AJDs concluding that almost none of the previously protected wetlands on the mine site were jurisdictional under the NWPR. *See* AR000268–283 (Corps' Oct. 15, 2020 AJD); AR000250–263 (Corps' Mar. 24, 2021 AJD).

**August and September 2021**. Two federal courts vacated the NWPR, recognizing the "fundamental, substantive flaws" in the rule. *Pascua Yaqui Tribe v. U.S. Env't Prot. Agency*, 557 F. Supp. 3d 949, 955 (D. Ariz. 2021); *Navajo Nation v. Regan*, 563 F. Supp. 3d 1164, 1168 (D.N.M. 2021). In response, the Corps immediately began applying the prior regulatory scheme throughout the nation, ECF No. 1-1 at 2–3, under which many of the mine site wetlands were previously determined to be "waters of the United States." ECF No. 1 ¶¶ 37–39.

**December 2021**. EPA and Corps Headquarters proposed a new rule "defining the scope of waters protected under the Clean Water Act" and replacing the NWPR. Revised Definition of

Waters of the United States, 86 Fed. Reg. 69,372, 69,372–73 (Dec. 7, 2021). In explaining the need for its proposed rule, Corps Headquarters determined that the NWPR was "inconsistent with the objective of the Clean Water Act, the science, and the case law," *id.* at 69,395, laying out in detail the scientific and legal flaws in the NWPR. *See id.* at 69,407–69,416.

**January 2022**. Corps Headquarters issued internal guidance to all 38 Corps districts instructing district offices on how to address specific situations that might arise related to jurisdictional determinations made under the NWPR ("NWPR AJDs"). *See* ECF No. 1-1. The internal guidance clarified that "[p]ersons holding NWPR AJDs can no longer rely on those AJDs as accurately depicting jurisdictional waters within the review area of the AJD under the now-applicable regulations." *Id*. at 4. It explained that this applied "to all NWPR AJDs, regardless of whether they were affirmative vs. documented a lack of jurisdiction." *Id*. at 5. The internal guidance further clarified that an NWPR non-jurisdictional determination cannot "be used to support the discharge of dredged or fill material into aquatic resources that are considered to be waters of the U.S. under the pre-2015 regime." *Id*. at 4–5.

**June 3, 2022**. Assistant Secretary of the Army for Civil Works Michael Connor issued a directive formally revoking the Twin Pines NWPR AJDs. AR 000200–202. The order "direct[ed] the Corps to immediately notify the AJD recipients for the . . . Twin Pines parcels that they cannot rely on those AJDs to accurately delineate jurisdictional waters under the current regulatory regime and that their NWPR AJDs are not valid because the government-to-government consultations for the Federal actions regarding the determinations of jurisdictional status of waters on the parcels were not conducted as requested by the Tribes." AR000201.

**June 22, 2022**. Twin Pines challenged Assistant Secretary Connor's June 3 directive in the Southern District of Georgia. *Twin Pines Minerals, LLC v. U.S. Army Corps of Eng'rs*, 5:22-cv-00036-LGW-BWC (S.D. Ga. June 22, 2022); AR000163–196.

**August 22, 2022**. Before the deadline for the Corps and other federal defendants to answer or otherwise respond to the Complaint, the parties entered into an out-of-court settlement agreement reinstating the NWPR AJDs and directing the Corps' Savannah District to provide a letter to Twin Pines reiterating that the Twin Pines NWPR AJDs are valid. *Twin Pines Minerals, LLC v. U.S. Army Corps of Eng'rs*, 5:22-cv-00036-LGW-BWC, ECF No. 28 (Aug. 22, 2022) (filed notice of settlement agreement); AR000002–11 (settlement agreement).

**August 22, 2022**. At the direction of Corps Headquarters, and in a reversal of Assistant Secretary Connor's June 3, 2022 directive, AR000201, the Savannah District sent a letter notifying Twin Pines that the Twin Pines NWPR AJDs were valid. AR000006 (settlement agreement, directing the Savannah District to "provide a letter to Twin Pines reiterating that the Twin Pines AJDs are valid"); AR000001 (August 22, 2022 letter of the Corps' Savannah District to Twin Pines).

## ARGUMENT

### A.      Standard of Review.

Section 1404(a) allows a district court to transfer a civil action to another district or division where it might have been brought "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). In assessing whether transfer is proper, however, "plaintiffs' choice is afforded substantial deference." *Wilderness Soc'y v. Babbitt*, 104 F. Supp. 2d 10, 12 (D.D.C. 2000). In addition, because § 1404(a) "'provides for transfer to a *more* convenient forum, not to a forum likely to prove equally convenient or inconvenient,'" the

movant must make a strong showing that the alternative forum would be *superior* by "'show[ing] decisively that transfer is proper.'" *Friends of the Earth v. Haaland*, No. 21-cv-2317, 2022 WL 185196, at *2 (D.D.C. Jan. 20, 2022) (emphasis added) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 645–46 (1964) and *Jalloh v. Underwood*, 300 F. Supp. 3d 151, 155–56 (D.D.C. 2018)); *see also Sierra Club v. Van Antwerp*, 523 F. Supp. 2d 5, 11 (D.D.C. 2007) ("[A] court may not transfer a case 'from a plaintiff's chosen forum simply because another forum, in the court's view, may be superior to that chosen by the plaintiff.'"). Under this standard, courts "adjudicate motions to transfer according to [an] individualized, case-by-case consideration of convenience and fairness." *Sierra Club*, 523 F. Supp. 2d at 11 (quoting *Barham v. UBS Fin. Servs.,* 496 F. Supp. 2d 174, 176–77 (D.D.C. 2007).

This Court has identified several private and public interest factors to be considered when reviewing a motion to transfer. The private interest factors that are considered in administrative record review cases are:

> (1) [T]he plaintiff's choice of forum, unless the balance of convenience is strongly in favor of the defendants; (2) the defendants' choice of forum; (3) whether the claim arose elsewhere; [and] (4) the convenience of the parties.[2]

*Trout Unlimited v. U.S. Dep't of Agric.*, 944 F. Supp. 13, 16 (D.D.C. 1996) (internal citations omitted). Courts may also consider the following public interest factors:

> (1) the transferee's familiarity with the governing laws; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home.

*Id.* (internal citations omitted).

---

[2] Courts may also consider the convenience of the witnesses of the plaintiff and defendant and the ease of access to sources of proof. In administrative record review cases, however, these factors are not relevant, as Twin Pines acknowledges, ECF No. 25-1 at 23; *see also Nat'l Ass'n of Home Builders v. E.P.A.*, 675 F. Supp. 2d 173, 176 n.4 (D.D.C. 2009).

Because "limitations on jurisdiction and venue (under 28 U.S.C. § 1391) are usually adequate safeguards of the public interest . . . the balance of private-interest factors must be unclear . . . before these public-interest factors [are] given decisive weight." *Sheffer v. Novartis Pharms. Corp.*, 873 F. Supp. 2d 371, 379 (D.D.C. 2012) (Bates, J.) (citing *Ingram v. Eli Lilly & Co.*, 251 F. Supp. 2d 1, 5–6 (D.D.C. 2003)).

**B.      The Private Interest Factors Weigh Against Transfer.**

Although Plaintiffs acknowledge that this case *could* have been filed in the Southern District of Georgia, Plaintiffs' choice of forum, the location where the claim arose, and the convenience of the parties make the District of Columbia the more suitable forum and weigh heavily against transfer. Twin Pines' choice of forum, the lone private interest factor supporting transfer, is not entitled to deference.

> **1.      Plaintiffs' choice of their home forum, where the decision under review was made, warrants substantial deference.**

A plaintiff's choice of forum is ordinarily afforded "substantial deference," unless the plaintiff "chooses a forum that is not its home forum" or the plaintiff's choice of forum "has no meaningful ties to the controversy." *Alabama v. U.S. Army Corps of Eng'rs*, 304 F. Supp. 3d 56, 63 (D.D.C. 2018) (Bates, J.) (internal citation and quotations omitted); *see also Wilderness Soc'y*, 104 F. Supp. at 12 ("Absent specific facts that would cause a district court to question plaintiffs' choice of forum, plaintiffs' choice is afforded substantial deference."); *Gross v. Owen*, 221 F.2d 94, 95 (D.C. Cir. 1955) ("It is almost a truism that a plaintiff's choice of a forum will rarely be disturbed . . . unless the balance of convenience is strongly in favor of the defendant.").

Neither exception applies here. First, this is the home forum of three of the four Plaintiffs. The National Wildlife Refuge Association, the National Parks Conservation Association, and Defenders of Wildlife are each headquartered in Washington, D.C. ECF No. 1 ¶¶ 16–18. The

Center for Biological Diversity, though headquartered in Arizona, maintains an office in Washington, D.C. Ctr. for Biological Diversity, *Contact Us - Office Locations*, https://perma.cc/G2AY-R6D4. None of the Plaintiffs have a physical office space in Georgia.

Second, the chosen forum has meaningful ties to the controversy in this case. Assistant Secretary of the Army Michael Connor's June 3, 2022 "direct[ive]" to the Corps to revoke the Twin Pines NWPR AJDs was made in Washington, D.C. AR000200-202. Corps Headquarters in Washington, D.C. issued the preamble to the proposed rule defining "Waters of the United States," 86 Fed. Reg. at 69,372, 69,448, and the internal guidance relating to the vacatur of the NWPR, ECF No. 1-1, both key documents supporting Plaintiffs' claims. *See* ECF No. 1 ¶¶ 71– 76, 81–83. And the decision to withdraw the Assistant Secretary's June 3 directive and reinstate the Twin Pines NWPR AJDs—the decision challenged in this case—was made in Washington, D.C., by Washington, D.C.-based officials (indeed, the lower-ranking Georgia Corps officials lacked the authority to override the Assistant Secretary's June 3 directive; the reversal could have only come from Washington). Finally, as recognized by the federal Defendants, "[t]o enter into the Settlement Agreement . . . counsel obtained approval and authorization from the Assistant Attorney General for the Environment and Natural Resources Division ("ENRD") of the Department of Justice ("DOJ") . . . [who] is located in Washington, DC." ECF No. 26 at 2.

In short, because this district is Plaintiffs' home forum and has meaningful ties to the controversy at hand, Plaintiffs' choice of forum warrants substantial deference. *See Wilderness Soc'y*, 104 F. Supp. 2d at 12–13.

### 2.    Twin Pines' choice of forum is not entitled to deference.

The federal Defendants whose decision is under review have raised no objection to venue in this Court and have recognized that the challenged decision-making process occurred in

Washington, D.C. ECF No. 26 at 1–2. Although Twin Pines seeks to transfer the case to the

Southern District of Georgia, a movant's choice of forum is typically granted deference only if

the movant can "'establish that the added convenience and justice of litigating in their chosen

forum overcomes' any deference to the Plaintiffs' choice of venue." *Melnattur v. U.S.

Citizenship & Immigr. Servs.*, No. 20-cv-3013 (JDB), 2021 WL 3722732, at *5 (D.D.C. Aug. 23,

2021) (internal citations omitted). Twin Pines' motion does not meet that standard.

Twin Pines concedes that the Southern District of Georgia is not a more convenient

forum. ECF No. 25-1 at 23. Instead, Twin Pines argues that its choice of forum should control

because "[t]he only conceivable rationale" for Plaintiffs' choice of forum is "forum shopping."

*Id*. at 22. Twin Pines' claim is baseless. The District of Columbia is the home forum of three of

the four Plaintiffs and both federal Defendants. It is the forum where the challenged decision was

made. And it is the forum where the documents supporting Plaintiffs' claims were drafted and

issued. A lawsuit filed in Plaintiffs' home forum asserting claims that arose in that forum against

Defendants residing in that forum is not forum shopping.[3]

Twin Pines also complains that this case is an impermissible "collateral attack on the

Settlement Agreement entered to resolve the case Twin Pines filed in the Southern District of

Georgia." ECF No. 25-1 at 21. Twin Pines' characterization is both incorrect and beside the

point. The Administrative Procedure Act ("APA") grants Plaintiffs a cause of action to hold

unlawful and set aside an "agency action." 5 U.S.C. §§ 702, 706(2). That is what Plaintiffs

---

[3] In any event, a "plaintiffs' alleged forum shopping will be insufficient to warrant transfer" from
a proper venue, especially since "Intervenor['s] strong desire to ensure that this litigation takes
place in the [Southern] District of [Georgia] . . . . could be forum-shopping just as plaintiffs are
allegedly doing so." *See Sierra Club*, 523 F. Supp. 2d at 13; *accord Davis v. MTN Irancell
Telecomms. Servs. Co.*, No. 22-cv-829 (RDM), 2023 WL 2755415, at *8 (D.D.C. Mar. 30, 2023)
(noting *Schmid Labs., Inc. v. Hartford Accident & Indem. Co.*, 654 F. Supp. 734, 737 (D.D.C.
1986), relied on by Twin Pines, ECF No. 25-1 at 21, "put too much weight on forum-shopping
concerns—which, to the extent they exist, are often a two-way street").

challenge here: the *Corps'* action, taken by officials in Washington, D.C., to withdraw the Assistant Secretary of the Army's June 3 directive and reinstate the Twin Pines NWPR AJDs. The fact that the challenged agency action is the product of a settlement agreement does not make it any less "agency action;" nor does it immunize the action from judicial review or the requirements of the APA. *See, e.g.*, *United States v. Carpenter*, 526 F.3d 1237, 1241–42 (9th Cir. 2008) (rejecting claim that "Attorney General's decision to enter into the settlement agreement was not an 'agency action' subject to judicial review under the APA" and observing: "'[W]e think it alien to our concept of law to allow the [United States] to violate its laws under the cover of settling litigation.'" (quoting *Executive Bus. Media, Inc. v. U.S. Dep't of Def.*, 3 F.3d 759, 761 (4th Cir. 1993)). Nor does the settlement agreement change the critical fact, for transfer purposes, that the Corps' "decisionmaking process [] occurred primarily within the District of Columbia and the decisionmakers were located in the District of Columbia." *Nat'l Ass'n of Home Builders v. E.P.A.*, 675 F. Supp. 2d 173, 179 (D.D.C. 2009). In short, the fact that Plaintiffs' APA challenge to the Corps' D.C.-based action may have a collateral effect on a settlement agreement resolving claims in a Georgia case cannot wrench venue from the District of Columbia.

Twin Pines also accuses Plaintiffs of strategically avoiding the 2022 lawsuit in the Southern District of Georgia to "secure a back-door transfer of the Georgia litigation to this district, without [] ever having to participate in the case." ECF No. 25-1 at 22–23. This accusation strains credulity. Plaintiffs could not reasonably have known that the government would not defend, or even attempt to defend, the June 3 directive. Nor could they reasonably have known that the parties would voluntarily dismiss the lawsuit within just 60 days, prior to the deadline for the filing of an answer or responsive pleading. Even if they had, Plaintiffs in this

case would not have had a mechanism, as intervenors in the 2022 lawsuit, to influence an out-of-court settlement between Twin Pines and the Corps.

In any event, the suggestion that this is a second iteration of the same case filed in a different district is simply wrong. This case is neither an attempt to defend the initial revocation of the AJDs, nor is it a collateral attack on the settlement agreement between Twin Pines and the Corps. Moreover, Plaintiffs' case against the reinstatement of the Twin Pines NWPR AJDs involves completely different claims, theories, and operative facts than Twin Pines' challenge to the initial revocation. *Compare* ECF No. 1 at 17–19, *with* AR000183–188. As described above, this case is an APA challenge to an arbitrary and capricious decision by Corps headquarters to unlawfully withdraw the Assistant Secretary's June 3 directive and reinstate unlawful AJDs.

Because Twin Pines has not established that there is any "added convenience" or "justice" in litigating in its chosen forum, this factor is not entitled to any deference. *Melnattur*, 2021 WL 3722732 at *5 (internal citation and quotations omitted).

### 3.   Plaintiffs' claims arose in Washington, D.C., where the challenged decision was made.

"In cases brought under the APA, courts generally focus on where the decisionmaking process occurred to determine where the claims arose." *Nat'l Ass'n of Home Builders*, 675 F. Supp. 2d at 179; *see also Akiachak Native Cmty. v. Dep't of Interior*, 502 F. Supp. 2d 64, 67–68 (D.D.C. 2007). In *National Association of Home Builders*, for example, even though the case concerned a section of river located entirely within the proposed transferee district, the court found that the claims arose elsewhere because "the decisions being challenged" were not made by officials located in the proposed transferee district. 675 F. Supp. 2d at 178. Similarly, in *Akiachak Native Community*, the court denied transfer to a district where "the land that [was] the

subject of th[e] dispute [was] located and the impact of any decision [would] be felt" because the challenged decision-making occurred in Washington, D.C. 502 F. Supp. 2d at 67–68.

Like those cases, even though the wetlands that are the subject of this dispute are located in the proposed transferee district, Plaintiffs' claims challenge a decision made in Washington, D.C.—namely, the decision to withdraw the Assistant Secretary of the Army for Civil Works' June 3 directive and reinstate the Twin Pines NWPR AJDs. Twin Pines has not shown otherwise. Nor could it: Savannah District personnel do not have the authority to withdraw or reverse a decision made by the Assistant Secretary of the Army.

Ignoring these facts, Twin Pines argues that Plaintiffs' claims arose in the Southern District of Georgia because "the Settlement Agreement was implemented by Corps personnel based in the Savannah District in the Southern District of Georgia." ECF No. 25-1 at 23. But as Twin Pines' own settlement agreement makes clear, the Savannah District sent the cited letter because decision-makers in Washington, D.C., directed that the "Savannah District[] shall provide a letter to Twin Pines reiterating that the Twin Pines AJDs are valid . . . ." AR000006. Indeed, as confirmed by the federal Defendants, "[t]o enter into the Settlement Agreement . . . counsel obtained approval and authorization from the Assistant Attorney General for the Environment and Natural Resources Division ("ENRD") of the Department of Justice . . . [who] is located in Washington, DC." ECF No. 26 at 2.

As described above, the relevant question is "where the decisionmaking process occurred"—not where an administrative task carrying out the decision was performed. Because the decision-making process occurred in Washington, D.C., this factor weighs heavily against transfer.

4.      **The convenience of the parties weighs against transfer.**

The convenience of the parties also weighs against transfer. Three of the four Plaintiffs are headquartered in Washington, D.C. and both federal Defendants are located in Washington, D.C. No party is incorporated or has a principal place of business in Georgia, and, unlike this district, no counsel is located in the Southern District of Georgia.

C.      **The Public Interest Factors Do Not Support Transfer.**

Because the balance of the private interest factors is clear, the public interest factors are not entitled to "decisive weight." *Sheffer*, 873 F. Supp. 2d at 379 (Bates, J.) ("[T]he balance of private-interest factors must be unclear . . . before these public-interest factors would be given decisive weight." (citing *Ingram*, 251 F.Supp.2d at 5–6)). In any event, the public interest factors do not support transfer either. The relative congestion of the proposed transferee court's calendar weighs against transfer, and the proposed transferee is no more competent to resolve the case than this one. And because any harm to the Okefenokee National Wildlife Refuge would impact national interests, the location of the Refuge is not dispositive.

1.      **The relative expertise of the courts does not support transfer.**

"It is of course well settled that no federal court is more competent than any other to resolve questions of federal law." *Oceana v. Bureau of Ocean Energy Mgmt.*, 962 F. Supp. 2d 70, 78 (D.D.C. 2013); *Sierra Club v. Flowers*, 276 F. Supp. 2d 62, 70, n. 6 (D.D.C. 2003) (quoting *In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1175 (D.C. Cir. 1987)). Where, as in this APA case, there are no state law issues at play, "both courts are competent to interpret the federal statute[] involved in this case . . . [and] there is no reason to transfer or not transfer based on this factor." *Nat'l Wildlife Fed'n v. Harvey*, 437 F. Supp. 2d 42, 49 (D.D.C. 2006). If any distinction exists, it is that this Court is widely acknowledged to have a

particular expertise in administrative law, as Twin Pines concedes. *See* ECF No. 25-1 at 20 n.3 (noting "the preponderance in this district of APA cases" relative to the Southern District of Georgia); *see also Stewart v. Azar*, 308 F. Supp. 3d 239, 248 (D.D.C. 2018) ("If anything, this Court has more experiences with APA cases, which would weigh against transfer."); *Mashpee Wampanoag Tribe v. Zinke*, No. 18-cv-2242 (RMC), 2019 WL 2569919, at *8 (D.D.C. June 21, 2019) ("These [administrative law questions] are issues with which the D.C. Circuit is as familiar, if not more so, than the First Circuit.").

   Twin Pines argues that "[t]he transferee district's familiarity with the . . . general subject matter of this dispute" support transfer. ECF No. 25-1 at 19. As an initial matter, the "matter of this dispute" is the arbitrary action of the Corps' headquarters and the Assistant Secretary reinstating Twin Pines NWPR AJDs. Even if the substance of Twin Pines' 2022 lawsuit were at issue, there is no indication the Southern District of Georgia court had any familiarity with the substance of that lawsuit given the company's voluntary dismissal only 60 days after it was filed—before the deadline for defendants to answer or otherwise respond to the complaint. *See Twin Pines Minerals, LLC*, No. 5:2022-cv-00036, ECF No. 28 (S.D. Ga. Aug. 22, 2022).

   Twin Pines also asserts that "[t]he transferee district's familiarity with the settlement agreement" supports transfer. ECF No. 25-1 at 19. But there is no evidence that the Southern District of Georgia has any familiarity at all with that settlement agreement, an out-of-court agreement that was neither filed with, nor even described to, the Southern District of Georgia. *Twin Pines Minerals, LLC*, No. 5:2022-cv-00036, ECF No. 28 (merely "notif[ying] the Court that [Twin Pines] has entered into an out-of-court Settlement Agreement with Defendants."). Indeed, as recognized by the federal Defendants, "the parties to the [Georgia] case agreed 'not to submit [the] Settlement Agreement to the [Southern District of Georgia] for its approval, and

Twin Pines agree[d] not to attach the Settlement Agreement to its notice of voluntary dismissal."
ECF No. 26 at 2 (citing AR000008). This factor does not support transfer.

      **2.**      **The relative congestion of the courts weighs against transfer.**

      Twin Pines' assertion that the final factor, relative congestion of the courts, is "neutral,"
ECF No. 25-1 at 20, is belied by the very data that Twin Pines cites regarding the median time to
dispose of a case in each district. In fact, the "relative congestion" factor weighs against transfer.
As Twin Pines reports, the median interval from filing to disposition in this district is 5 months,
compared to 9.6 months in the Southern District of Georgia. *Id.* (citing *U.S. District Courts –
Combined Civil and Criminal Federal Court Management Statistics* 2, 95 (Dec. 31, 2022)). This
Court has consistently found that similar disparities weigh in favor of hearing the case in the less
congested district[4]—here, the District of Columbia.

      **3.**      **Because this case will impact national interests, the geographic location of the
Okefenokee National Wildlife Refuge is not dispositive in the transfer
analysis.**

      Plaintiffs do not dispute that the challenged decision affects the Okefenokee National
Wildlife Refuge and surrounding communities. Yet, as courts in this district have repeatedly
found, "the mere presence of a local interest, in the form of property located within the proposed
transferee district, is not dispositive in the transfer analysis." *Natl Ass'n of Home Builders*, 675
F. Supp. 2d at 178 (declining to transfer a challenge to the designation of the Santa Cruz River as

---

      [4] *See, e.g.*, *Akinyode v. U.S. Dep't of Homeland Sec.*, No. 21-cv-110 (JDB), 2021 WL
3021440, at *5 (D.D.C. July 16, 2021) (Bates, J.) (difference between 5.1 months and 10.1
months "weighs slightly against transfer"); *Taylor v. Shinseki*, 13 F. Supp. 3d 81, 91 (D.D.C.
2014) (Bates, J.) (difference between 8.7 months and 12.9 months "weighs slightly against
transfer"); *Virts v. Prudential Life Ins. Co. of Am.*, 950 F. Supp. 2d 101, 108 (D.D.C. 2013)
(Bates, J.) (difference between 9.7 months and 3.7 months "slightly supports . . . motion to
transfer"); *Treppel v. Reason*, 793 F. Supp. 2d 429, 439 (D.D.C. 2011) (Bates, J.) (difference
between 8.4 months and 4.8 months "weighs in favor of transfer"); *F.T.C. v. Cephalon, Inc.*, 551
F. Supp. 2d 21, 31 (D.D.C. 2008) (Bates, J.) (difference between 9 months and 5.7 months
"supports transfer").

a traditional navigable water); *see also Otay Mesa Prop. L.P. v. U.S. Dep't of Interior*, 584 F.

Supp. 2d 122 (D.D.C. 2008) (declining to transfer a challenge to a rule designating

approximately 4,000 acres in San Diego County as critical habitat for endangered fairy shrimp);

*Akiachak Native Cmty.,* 502 F.Supp.2d at 68 (declining to transfer case even though "the

ramifications of any decision . . . [would] affect principally Alaska"); *Greater Yellowstone Coal.*

*v. Bosworth*, 180 F. Supp. 2d 124, 126, 129–30 (D.D.C. 2001) (declining to transfer challenge to

grazing permits on land adjacent to Yellowstone National Park); *Wilderness Soc'y*, 104 F. Supp.

2d at 16–17 (declining to transfer challenge to EIS related to oil and gas development in Alaska);

*Mashpee Wampanoag Tribe*, 2019 WL 2569919, at *9 (declining to transfer dispute over 320

acres of land in Mashpee, Massachusetts).

As in those cases, the national interest in the protection of the Okefenokee National

Wildlife Refuge is at least as strong as the local interest, as demonstrated by the significant

involvement by D.C.-based federal officials; the nearly 200,000 comments submitted by

individuals from across the nation and abroad opposing the Twin Pines mine; the sustained

national media attention; the overwhelming number of non-resident visitors; the national and

international research use of the Okefenokee; and the interstate footprint of the Okefenokee.

**Involvement of Washington, D.C.-based federal officials.** Secretary of the Interior Deb

Haaland and Assistant Secretary of the Army Michael Connor have each played an outsized role

in the proposed mine review to date. Secretary Haaland visited the Okefenokee National Wildlife

Refuge last year and then expressed the Department's "profound interest in protecting the health

and integrity of the swamp ecosystem," which she recognized is "unlike any other found in

North America." Letter from Deb Haaland, U.S. Sec'y of Interior, to Brian P. Kemp, Governor,

State of Georgia 1 (Nov. 22, 2022) (attached as Ex. 1) ("Haaland Letter"). Assistant Secretary

Connor took the unusual step of personally reviewing the Twin Pines NWPR AJDs and then publicized his decision to revoke them. Assistant Sec'y of the Army for Civ. Works (@ASACivilWorks), Twitter (June 5, 2022, 10:13 AM), https://perma.cc/Q2CW-R8AV?type=image.

Former D.C.-based federal officials have also engaged in the review process to an unprecedented degree. Former Secretary of the Interior Bruce Babbitt, who oversaw a similar proposal in the mid-1990s, former deputy Secretary of the Interior Lynn Scarlett, and former U.S. Fish and Wildlife Service directors from the Nixon, Ford, Carter, Clinton, and George W. Bush administrations have each spoken out against the proposal. *See* AR000247. The involvement of so many high-ranking federal officials speaks to the national importance of the Okefenokee National Wildlife Refuge.

**Out-of-state comments.** Nearly 200,000 individuals from all 50 states and at least 12 countries submitted comments to the Corps or Georgia Environmental Protection Division opposing the proposed mine. Sapp Decl. ¶¶ 5–6 (attached as Ex. 2). In addition, more than 85 scientists from across the country have spoken out in opposition to the mine, including professors from universities in Alabama, Arkansas, Colorado, Florida, Illinois, Indiana, Maine, North Carolina, South Carolina, and Virginia., among others. Open letter from Amy Sharma, Vice President, Science for Georgia, et al. (Sept. 16, 2022), https://perma.cc/JAZ8-RFPX. The national scope of opposition, which is far from routine for a mining project in Georgia, is further evidence of the national impact of the challenged decision.

**National media coverage.** The media coverage has also been national in scope, demonstrating the widespread impacts associated with the challenged decision. News articles or opinion pieces have appeared in the New York Times, the Washington Post, AP News, National

Public Radio (All Things Considered), The Guardian, Axios, Politico, Vice, Grist, Bloomberg News, Atlanta Journal Constitution, and Florida Times-Union, among others. *See, e.g.*, Margaret Renkl, *Opinion: The Fate of the Okefenokee Swamp is in Your Hands*, N.Y. Times (Feb. 27, 2023), https://perma.cc/C6C7-7SSC; Hamza Shaban, *Army Corps blocks strip mine near Okefenokee wetlands after opposition*, Wash. Post (June 4, 2022), https://perma.cc/W373-6DV9; Russ Bynam, *Interior secretary: 'Unacceptable' to mine near famed swamp*, Associated Press (Dec. 7, 2022), https://perma.cc/4HQB-RHCG.

**Non-resident visitors.** According to the U.S. Fish and Wildlife Service, "in any given year, visitors from all 50 states and 40 countries" visit the Okefenokee. U.S. Fish & Wildlife Serv., *Okefenokee NWR 2022 Combined Fact Sheets*, at 6 (2022), https://perma.cc/6464-A7S4 ("Okefenokee Fact Sheet"). In a recent year, non-residents made up 471,860 of the Refuge's 723,509 visits—or approximately 65%. U.S. Fish & Wildlife Serv., *The Economic Contributions of Recreational Visitation at Okefenokee National Wildlife Refuge*, at 2 (May 2019), https://perma.cc/K3QL-EVCB. In fact, the Refuge estimates at least 10% of its overall visitation is made up of international visitors. Okefenokee Fact Sheet at 6. These hundreds of thousands of annual visitors, hailing from all over the world, will also feel the impacts of any damage to the National Wildlife Refuge.

**National and international research significance.** According to the U.S. Fish and Wildlife Service, the Okefenokee National Wildlife Refuge "provides an important baseline for wetland research worldwide," and "[t]he water of the Suwanee River as it exits the swamp is a standard reference for scientific study throughout the world." *Id.* at 3. The Refuge also contains eight "Research Natural Areas," a nationwide network of ecological areas managed by federal agencies for national research and education. *Id.* In addition, its amphibian populations "act as

18

bio-indicators of global health." *Id.* Indeed, the Okefenokee has been designated a Wetland of

International Importance under the Ramsar Convention of 1971. *Id.* Any harm to the Refuge will

affect the scientists and academics who rely on it for research and study as well.

**Interstate impact.** The Okefenokee National Wildlife Refuge spans two states, and the

proposed mine site is located less than five miles from the Florida border, meaning impacts (both

economic and environmental) will cross state lines. S. Env't Law Ctr., *Proposed Twin Pines*

*Mine and the Okefenokee Swamp* (March 17, 2023) (attached as Ex. 3). For example, the

Okefenokee is a critical link in important wildlife corridors that connect park and conservation

lands throughout the Southeast. For example, the proposed Florida Wildlife Corridor stretches

from Everglades National Park to the Okefenokee National Wildlife Refuge to protect habitat for

threatened and endangered species across the region, including the Red-Cockaded Woodpecker,

Whooping Crane, Wood Stork, Florida Panther, and Eastern Indigo Snake. ECF No. 1 ¶ 28.

**Cultural importance to Tribal nations.** The cultural and historic resources associated

with the Okefenokee Swamp are also important, with Native American roots reaching back

thousands of years. For example, the Muscogee (Creek) Nation, a self-governed Native

American tribe now located in Ocmulgee, Oklahoma, has designated its ancestral homelands

within the Okefenokee Swamp as a Traditional Cultural Property under the National Historic

Preservation Act. *See* Haaland Letter at 1. Indeed, the word "Okefenokee" itself, a Muscogee

word meaning "trembling earth," is a testament to the region's Native American history.

Because this case will intensely impact national, as well as local, interests, this case is

distinguishable from those cited by Twin Pines. Among other things, the proactive participation

of high-ranking Washington, D.C. officials demonstrates the national importance of the Refuge

and the potential national impacts of this case, separating it from those cited by Twin Pines. For

example, in *Alabama v. U.S. Army Corps of Engineers*, 304 F. Supp. 3d 56 (D.D.C. 2018) and

*National Wildlife Federation v. U.S. Army Corps of Engineers*, 312 F. Supp. 3d 167 (D.D.C.

2018), the court found that "[t]he decision was made by personnel from the Corps' offices in

Atlanta and Mobile," not Washington, D.C., and therefore granted the motion to transfer. *See*

*Alabama*, 304 F. Supp. at 63; *see also Nat'l Wildlife Fed'n*, 312 F. Supp. 3d at 169

(incorporating reasoning from *Alabama*, a related case). Likewise, in *Alaska Wilderness League*

*v. Jewell*, 99 F. Supp. 3d 112 (D.D.C. 2015), the court emphasized that "it [was] abundantly clear

that the material decisions in this case came *not* from the Department of the Interior in

Washington, D.C., but from the Fish and Wildlife Service's regional office in Alaska," *id.* at 119,

and that "*all* of the substantive work leading to the publication of the [incidental-take regulation]

was done in Alaska," *id.* at 120. Similarly, in *Pres. Soc'y of Charleston v. U.S. Army Corps of*

*Engineers*, 893 F. Supp. 2d 49 (D.D.C. 2012), the court recognized that "'a clear majority of the

operative events' took place within the District of South Carolina." *Id.* at 57 (internal citation

omitted).

      Here, as described above, none of the relevant decision-making took place in the

Southern District of Georgia. Although the Savannah District of the Corps issued the initial

AJDs, this case does not challenge those determinations or the conclusions made within them.

Instead, this case challenges the decision by the Assistant Secretary of the Army and Corps

headquarters about how to treat those AJDs in light of national policy changes—a decision that

was not and could not have been made in the Savannah District.

      Given the national scope of potential impacts, *Wilderness Society v. Babbitt*, 104 F. Supp.

2d 10 (D.D.C. 2000), is more instructive here. In that case, national conservation associations

challenged an Environmental Impact Statement assessing the impacts of oil and gas development

in a National Petroleum Reserve in Alaska. The government moved to transfer the case from the

District of Columbia to the District of Alaska because, among other things, "the specific lands at

issue [were] in Alaska;" the challenged Environmental Impact Statement was prepared in

Alaska; "the environment and the communities affected by . . . [the] disputed decision [were] in

Alaska;" and the voluminous record was located in Alaska. *Id.* at 13, 16.

Although it recognized the importance of the controversy to Alaska residents, the court

denied transfer, citing the following factors to demonstrate a meaningful nexus to Washington,

D.C.: (1) the proposed project concerned a national resource; (2) the Secretary of the Interior

visited the proposed site, signed the record of decision in Washington, D.C., and briefed the

public on the issue in Washington, D.C.; (3) the government received more than 7,000 comments

on the EIS from all fifty states; (4) the New York Times published an editorial about the issue;

and (5) six out of eight plaintiffs were national conservation organizations, four of the plaintiffs

were headquartered in Washington, D.C., and two others had offices there. *Id.* at 13–14, 17–18.

Each of the factors weighing against transfer in *Wilderness Society* is present here—many

of them to an even greater extent. As described above, Secretary Haaland has visited and

advocated for the Refuge; citizens from all 50 states have submitted comments; the New York

Times and other national publications have published opinion pieces or news articles about the

proposed project; and three out of four plaintiffs are national organizations headquartered in

Washington, D.C. In addition, despite Twin Pines' claim that this case—and thus, the status of

its NWPR AJDs—is an "intensely local" dispute, ECF No. 25-1 at 14, Twin Pines made

precisely the opposite claim when it suited the company's interest in the Georgia litigation. *See*

AR000024. There, it argued that the minerals to be mined are purportedly "essential to the

national economy and national defense." *Id.*

In short, any impact to the Okefenokee Wildlife Refuge will be felt not only locally but across the nation. As a result, this factor cannot tip the heavy balance against transfer.

## CONCLUSION

As shown above, Twin Pines has not met its heavy burden to show that the Southern District of Georgia is a superior forum to the District of Columbia. To the contrary, nearly all of the relevant factors weigh against transfer, and the lone supporting factor—the geographic location of the Okefenokee National Wildlife Refuge—is outweighed by the national scope of impacts. As a result, the Court should deny Twin Pines' motion to transfer venue to the Southern District of Georgia, ECF No. 25.

Respectfully submitted this 24th day of May, 2023.

/s/ Megan Hinkle Huynh
Megan Hinkle Huynh
Southern Environmental Law Center
Ten 10th Street NW, Suite 1050
Atlanta, GA 30309
Telephone: (404) 521-9900
mhuynh@selcga.org

Mark Sabath
Southern Environmental Law Center
122 C Street NW, Suite 325
Washington, DC 20001
Telephone: (434) 977-4090
msabath@selcva.org

Kelly F. Moser
Southern Environmental Law Center
601 West Rosemary Street, Suite 220
Chapel Hill, NC 27516-2356
Telephone: (919) 967-1450
kmoser@selcnc.org

Carl Brzorad
*Application for admission pending*
Southern Environmental Law Center
525 East Bay Street, Suite 200
Charleston, SC 29403
Telephone: 843-720-5270
cbrzorad@selcsc.org

*Counsel for the Conservation Groups*

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 24, 2023, I electronically filed the foregoing Response in Opposition to Motion to Transfer with the Clerk of Court using the CM/ECF system, which will send notification of this filing to the attorneys of record.

/s/ Megan Hinkle Huynh