# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL WILDLIFE REFUGE ASSOCIATION, NATIONAL PARKS CONSERVATION ASSOCIATION, DEFENDERS OF WILDLIFE, and CENTER FOR BIOLOGICAL DIVERSITY,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS and MICHAEL CONNOR, in his official capacity as Assistant Secretary of the Army for Civil Works,<br><br>Defendants. | Civil Action No. 1:22-cv-03498-JDB |

## DEFENDANT-INTERVENOR TWIN PINES MINERALS LLC'S REPLY IN SUPPORT OF ITS MOTION TO TRANSFER VENUE

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ......................................................................................................................... 1

I.  The Private Interest Factors Strongly Support Transfer to the Southern District of Georgia, where the Claim Arose ........................................................................................... 1

  A.  Plaintiffs' Challenge to the Settlement Agreement Arose in the Southern District of Georgia ................................................................................................. 2

  B.  Plaintiffs' Choice of Forum is Entitled to No Deference ............................................ 4

    1.  Plaintiffs' Claim Lacks Meaningful Ties to this District ...................................... 5

    2.  Plaintiffs' Choice Is Tainted by Forum Shopping ................................................ 6

  C.  To the Extent Relevant, the Southern District of Georgia Would Be More Convenient ............................................................................................................... 10

II.  The Public Interest Factors Strongly Support Transfer ....................................................... 11

  A.  The Only Neutral Factor — Relative Congestion — Is Not Significant ..................... 11

  B.  Local Interest in this Case Is Exceptionally Strong .................................................. 12

  C.  Plaintiffs' Attempts to "Nationalize" the Controversy All Fail .................................. 14

  D.  Considerations of Judicial Efficiency and Duplicative Litigation Warrant Transfer ................................................................................................................... 17

CONCLUSION ............................................................................................................................ 18

CERTIFICATE OF SERVICE .................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aftab v. Gonzalez*,
  597 F. Supp. 2d 76 (D.D.C. 2009) ..................................................................................2

*Alabama v. U.S. Army Corps of Eng'rs*,
  304 F. Supp. 3d 56 (D.D.C. 2018) ..........................................................................11, 14

*Alaska Wilderness League v. Jewell*,
  99 F. Supp. 3d 112 (D.D.C. 2015) (Bates, J.) ............................................... *passim*

*Altamaha Riverkeeper v. U.S. Army Corps of Eng'rs*,
  No. 4:18-cv-251 (S.D. Ga.) ..........................................................................................6

*Cameron v. Thornburgh*,
  983 F.2d 253 (D.C. Cir. 1993) ......................................................................................6

*Center for a Sustainable Coast v. U.S. Army Corps of Eng'rs*,
  No. 4:13-cv-179 (S.D. Ga.) ..........................................................................................6

*Commonwealth of Kentucky v. U.S. Envt'l Prot. Agency*,
  No. 3:23-cv-7 (E.D. Ky.) ...........................................................................................7, 8

*Coosa River Basin Initiative v. Mount Vernon Mills, Inc.*,
  No. 4:23-cv-88 (N.D. Ga.) ............................................................................................6

*Defenders of Wildlife v. Jewel*,
  74 F. Supp. 3d 77 (D.D.C. 2014) ...............................................................................1, 6

*Ensco Offshore Co. v. Salazar*,
  No. 2:10-cv-1941 (E.D. La.) .........................................................................................8

*F.T.C. v. Cephalon, Inc.*,
  551 F. Supp. 2d 21 (D.D.C. 2008) (Bates, J.) ............................................................11

*Flint Riverkeeper, Inc. v. Southern Mills, Inc.*,
  No. 5:16-cv-435 (M.D. Ga.) ..........................................................................................6

*Gabet v. Amazon.com, Inc.*,
  No. 1:22-CV-35-HAB, 2022 WL 4078442 (N.D. Ind. Sep. 6, 2022) ..........................7

*Georgia ForestWatch v. U.S. Forest Service*,
  No. 2:19-cv-77 (N.D. Ga.) ............................................................................................6

*Georgia River Network v. U.S. Army Corps of Eng'rs*,
No. 4:10-cv-267 (S.D. Ga.) ................................................................................................6

*Georgia v. Wheeler*,
No. 2:15-cv-79 (S.D. Ga.) .............................................................................................6, 7

*Glynn Envtl. Coal. v. Hutcheson*,
No. 2:11-cv-100 (S.D. Ga.) ................................................................................................6

*Gulf Oil Corp. v. Gilbert*,
330 U.S. 501 (1947) ...........................................................................................................1

*Lockey v. Fudge*,
No. 1:20-CV-03193 (TNM), 2021 WL 2514685 (D.D.C. June 17, 2021) ...............................6

*M&N Plastics, Inc. v. Sebelius*,
997 F. Supp. 2d 19 (D.D.C. 2013) ......................................................................................6

*National Association of Home Builders v. U.S. E.P.A.*,
675 F. Supp. 2d 173 (D.D.C. 2009) ..................................................................................12

*National Wildlife Federation, Inc. v. U.S. Army Corps of Engineers*,
312 F. Supp. 3d 167 (D.D.C. 2018) ................................................................15, 16, 17

*New Hope Power Co. v. U.S. Army Corps of Eng'rs*,
724 F. Supp. 2d 90 (D.D.C. 2010) ....................................................................................11

*One Hundred Miles v. U.S. Army Corps of Eng'rs*,
No. 4:21-cv-134 (S.D. Ga.) ................................................................................................6

*One Hundred Miles v. U.S. Army Corps of Eng'rs*,
No. 4:22-cv-297 (S.D. Ga.) ................................................................................................6

*Otay Mesa Properties L.P. v. U.S. Department of Interior*,
584 F. Supp. 2d 122 (D.D.C. 2008) .............................................................................12, 13

*Pac. Mar. Ass'n v. NLRB*,
905 F.Supp.2d 55 (D.D.C. 2012) ........................................................................................3

*Schmid Labs., Inc. v. Hartford Accident & Indem. Co.*,
654 F. Supp. 734 (1986) ....................................................................................................4

*Seafreeze Shoreside Inc. v. United States Dep't of the Interior*,
2022 WL 3906934 (D.D.C. June 27, 2022) ....................................................................11, 16

*Twin Pines Minerals, LLC v. U.S. Army Corps of Eng'rs*,
No. 5:22-cv-36 (S.D. Ga.) ..................................................................................... *passim*

*W. Watersheds Project v. Pool*,
  942 F. Supp. 2d 93 (D.D.C. 2013) .......................................................................4, 16

*Wilderness Soc'y v. Babbitt*,
  104 F. Supp. 2d 10 (D.D.C. 2000) ...........................................................................13

## INTRODUCTION

Plaintiffs have challenged an action taken by the Corps to effectuate a Settlement Agreement negotiated in the Southern District of Georgia. Given this, the private interest factors heavily favor transferring their case to that district, where the claims arose. Transferring this case to the place of its origin would also serve the strong judicial interest in ensuring that an extraordinarily significant local controversy is resolved in the "view and reach" of those most acutely affected, "rather than in remote parts of the country where they can learn of it by report only." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947).

In addition to being the correct result based on a straight-forward application of the § 1404(a) balancing factors, this result also aligns with the judicial interest in promoting "full, fair, and complete adjudication[s]" and "the 'compelling public interest in avoiding duplicative proceedings'" *See Defenders of Wildlife v. Jewel*, 74 F. Supp. 3d 77, 87 (D.D.C. 2014) (quoting *Reiffin v. Microsoft Corp.*, 104 F. Supp. 2d 48, 58 (D.D.C. 2000)). Rather than letting the first litigation run its course, and then attacking the resulting Settlement Agreement in a subsequent case, Plaintiffs could and should have intervened in the first litigation to defend the Corps' original decision to rescind the AJDs. By waiting, they apparently hoped to effect a back-door change of venue. But by doing so, they also limited their claim to one explicitly arising from the district they were trying to avoid. Plaintiffs' gamesmanship should weigh heavily in the balance, because their tactics are deleterious to judicial efficiency and unfair to the prior litigants. Transferring this case to the original venue is a natural and appropriate way to discourage such behavior in the future.

## I.   The Private Interest Factors Strongly Support Transfer to the Southern District of Georgia, where the Claim Arose

The most significant private interest factors are where the claim arose and Plaintiffs' forum choice. Both strongly favor transfer for the reasons mentioned above. Plaintiffs respond by

asserting their claim arose in this District; but as shown below, their argument depends on ignoring the narrow claim actually presented. Plaintiffs also assert that their choice of forum is entitled to deference because three of the four of groups are headquartered here. (ECF 27 at 7–8.) This argument fails because the Plaintiffs forum choice — including even the composition of their group — is tainted by forum shopping.

### A.   Plaintiffs' Challenge to the Settlement Agreement Arose in the Southern District of Georgia

Plaintiffs assert that their claim arose in Washington D.C. because "decisionmakers in Washington, D.C." allegedly directed the Savannah District to reinstate the AJDs. (ECF 27 at 12.) They further assert that "the relevant question is 'where the decisionmaking process occurred' — not where an administrative task carrying out the decision was performed." (*Id.*) And yet, the instructions implemented by the Savannah District were set forth in the Settlement Agreement, which was not signed by any official residing in Washington, D.C. Paragraph 6 of that agreement states: "Within seven days of the Effective Date of this Agreement, the United States Army Corps of Engineers, Savannah District, shall provide a letter to Twin Pines reiterating that the Twin Pines AJDs are valid…." AR 6.

While it is true that the government's trial attorney obtained approval from the Assistant Attorney General for the Environment and Natural Resources Division ("ENRD") of the Department of Justice before executing the Settlement Agreement, ECF 27 at 12, there is no evidence that individual played any role in the development of the agreement. The only signature appearing on it is that of the trial attorney himself. It is well-established that the mere approval of an action by a supervisor residing in this district is not a "meaningful tie" for venue purposes. *See, e.g., Aftab v. Gonzalez*, 597 F. Supp. 2d 76, 82 (D.D.C. 2009) (collecting cases). Indeed, under the Department of Justice's procedures, all but the most routine settlements require this level of

approval. *See* U.S. Dept. of Justice, Environment and Natural Resources Division, Directive No. 2016-04 at Part II.B.5 (requiring all settlements "in nonmonetary cases which are other than routine" to approved by the Assistant Attorney General, ENRD").[1]

Instead of focusing on such formalities, the focus of the venue analysis is where the "decisionmaking process" occurred. In this case, the settlement negotiations were focused squarely on *Twin Pines* litigation in the Southern District of Georgia, where the case being settled was pending. The only participants in those discussions were the Department of Justice trial attorney and the undersigned counsel for Twin Pines, all of whom were operating as officers of the court in the Southern District of Georgia. None of the discussions occurred in Washington, D.C. or involved any D.C. officials. *See, e.g.*, *Pac. Mar. Ass'n v. NLRB*, 905 F.Supp.2d 55, 60, 62 (D.D.C. 2012) (transferring case because "[a]lthough the final act transpired in the defendant's Washington, D.C. headquarters, the rest of the play was set elsewhere" and Oregon was the "true locus of this dispute").

Given the absence of any other tie to this District, Plaintiffs' argument based on the Assistant Attorney General's sign-off would convert every settlement of any non-routine matter into an action "arising" in Washington, D.C. — no matter where the original case was venued, where the settlement discussions occurred, or whether Washington-based officials played any material role. That is not how venue decisions are made, however. This Court has not hesitated to transfer litigation challenging agency action approved by high-level officials who were not significantly involved the decision-making process — even in situations unlike the present case, where those officials not only approved, but signed, the decision document.

---

[1] *Available at* https://www.justice.gov/enrd/page/file/1042511/download.

For example, in *Airport Working Group of Orange County, Inc. v. United States Department of Defense*, several environmental organizations sued the Department of Defense for alleged violations of NEPA and the Clean Air Act relating to the sale of a military base in California. 226 F. Supp. 2d 227 (D.D.C. 2002). There, unlike in this case, the Record of Decision had been signed by a high-level official stationed in Washington. D.C. *Id.* at 228. In addition, the Commandant of the U.S. Marine Corps, who was in charge of transferring the base, worked at the Pentagon. *Id.* at 230. But the court found that the plaintiffs' choice of forum was entitled to only "limited deference" because there was "no evidence to suggest that these officials had an active or significant role in this matter" and "any role played by officials in the District of Columbia [was] overshadowed by the fact that their decisions were based on work done by government employees in California." *Id.*

The same principles apply here. Because Plaintiffs challenge a Settlement Agreement that was entered to settle litigation pending in the Southern District of Georgia — an agreement signed by the trial attorney operating under the jurisdiction of that court — any challenge to the Settlement Agreement should be deemed to have arisen there.  *See, e.g., W. Watersheds Project v. Pool*, 942 F. Supp. 2d 93 (D.D.C. 2013).

### B.    Plaintiffs' Choice of Forum is Entitled to No Deference

While a Plaintiff's choice of forum is usually entitled to substantial weight, courts routinely discount this factor when the selected forum has no meaningful tie to the controversy or there are "specific facts that would cause a district court to question plaintiffs' choice of forum . . . ." (ECF 27 at 7 (quoting *Wilderness Soc'y v. Babbitt*, 104 F. Supp. 2d 10, 12 (D.D.C. 2000)); *see also* ECF 25-1 at 17–19 (discussing cases declining to give weight to plaintiffs' chosen forum). This is especially true when the plaintiffs' choice is tainted by strategic forum shopping, as here. (ECF 25-1 at 17–19); *Schmid Labs., Inc. v. Hartford Accident & Indem. Co.*, 654 F. Supp. 734, 736–37

(1986) (rejecting argument that plaintiff's choice of forum should be favored and transferring case where plaintiff "engaged in forum shopping" and made tactical decision to file in Washington, D.C. "to take advantage of favorable precedent").

### 1.   Plaintiffs' Claim Lacks Meaningful Ties to this District

As discussed, this controversy is laser focused on the Southern District of Georgia and has no meaningful ties to this district. Plaintiffs' attempt to manufacture ties depends on blurring the line between the claim before this Court (Plaintiffs' challenge to the Corps' reinstatement of the AJDs pursuant to the Settlement Agreement) and the claim before the Southern District of Georgia in the prior litigation (Twin Pines' challenge to the Corps' original rescission of the AJDs), in which they pointedly declined to intervene to defend. (ECF 27 at 8, 16–17.) Only by focusing on the prior litigation, and whistling past their own claim, are they able to assert that Washington-based officials played any meaningful role. The Court should not be fooled by this sleight-of-hand.

Nor should the Court be swayed by their claims that three of the four Plaintiffs are based in Washington, D.C. As this Court has recognized, "having offices in the District of Columbia is not dispositive of the question of deference," and courts evaluating motions to transfer under "Section 1404(a) have laid much less emphasis on this residence factor." *Alaska Wilderness League v. Jewell*, 99 F. Supp. 3d 112, 120 (D.D.C. 2015) (Bates, J.) (cleaned up). Here, it is true that four organizations without offices in Georgia were selected to represent the interests of the Okefenokee Protection Alliance — a group of "more than 40 conservation organizations representing millions of members that have joined forces to save the swamp from the proposed Twin Pines Minerals LLC titanium mine . . . ." Okefenokee Protection Alliance, Partners, attached as Exhibit 1 at 2. However, that group is both led and represented by Plaintiffs' attorneys at the

Southern Environmental Law Center in Atlanta, and fully 25 of its members are based in Georgia.[2]
*See id.* Picking four who lack ties to Georgia to serve as plaintiffs in this case substantially
undercuts the weight that should be given to the Plaintiffs' choice of forum here. *C.f. Cameron v.*
*Thornburgh*, 983 F.2d 253, 256 (D.C. Cir. 1993) ("Courts in this circuit must examine challenges
to personal jurisdiction and venue carefully to guard against the danger that a plaintiff might
manufacture venue in the District of Columbia.").

### 2.  Plaintiffs' Choice Is Tainted by Forum Shopping

Plaintiffs' choice should also be discounted based on their forum shopping. As Twin Pines
explained (ECF 25-1 at 17–19), Plaintiffs were expressly aware of the Georgia litigation but
declined to intervene, electing instead to wait that litigation out and then collaterally attack its
results in this district, far from where the Twin Pines case was filed. "Equitable principles do not
favor … strategic forum shopping," *Defenders of Wildlife*, 74 F. Supp. 3d at 86, and courts weigh
such behavior heavily in the transfer calculus, *see, e.g., M&N Plastics, Inc. v. Sebelius*, 997 F.
Supp. 2d 19, 25–27 (D.D.C. 2013) (transferring case based on the court's finding that "both the
private and public interest factors, *particularly the law's aversion to forum shopping*, heavily favor
transfer) (emphasis added); *Lockey v. Fudge,* No. 1:20-CV-03193 (TNM), 2021 WL 2514685, at

---

[2] Notably, other Georgia-based partners in the Okefenokee Protection Alliance routinely
participate in litigation, including in the Southern District of Georgia, where they are represented
by attorneys at the Southern Environmental Law Center. *Compare*, *e.g.*, Exhibit 1, *with Coosa*
*River Basin Initiative v. Mount Vernon Mills, Inc.*, No. 4:23-cv-88 (N.D. Ga.); *One Hundred Miles*
*v. U.S. Army Corps of Eng'rs*, No. 4:22-cv-297 (S.D. Ga.); *One Hundred Miles v. U.S. Army Corps*
*of Eng'rs*, No. 4:21-cv-134 (S.D. Ga.); *Georgia ForestWatch v. U.S. Forest Service*, No. 2:19-cv-
77 (N.D. Ga.); *Altamaha Riverkeeper v. U.S. Army Corps of Eng'rs*, No. 4:18-cv-251 (S.D. Ga.);
*Flint Riverkeeper, Inc. v. Southern Mills, Inc.*, No. 5:16-cv-435 (M.D. Ga.); *Georgia v. Wheeler*,
No. 2:15-cv-79 (S.D. Ga.) (representing intervenor-defendant One Hundred Miles); *Center for a*
*Sustainable Coast v. U.S. Army Corps of Eng'rs*, No. 4:13-cv-179 (S.D. Ga.); *Glynn Envtl. Coal.*
*v. Hutcheson*, No. 2:11-cv-100 (S.D. Ga.); *Georgia River Network v. U.S. Army Corps of Eng'rs*,
No. 4:10-cv-267 (S.D. Ga.).

*4 n.8 (D.D.C. June 17, 2021) ("While courts normally give a plaintiff's choice of forum great weight, that deference falls away where forum shopping is in play."); *Gabet v. Amazon.com, Inc.*, No. 1:22-CV-35-HAB, 2022 WL 4078442, at *4, 6 (N.D. Ind. Sep. 6, 2022) (explaining that "while a plaintiff's choice of forum is generally afforded substantial weight, that choice is afforded little deference where forum shopping is apparent," holding: "Because the Court finds obvious forum-shopping, transfer is appropriate regardless of any other considerations.").

Plaintiffs assert they did not intervene in the prior litigation because they did not have time to do so, because the case settled "prior to the deadline for the filing of an answer or responsive pleading." (ECF 27 at 10.) The Southern District's docket and Plaintiffs' own, contemporaneous statements belie that claim, however. Twin Pines filed its Complaint on June 22, 2022. ECF 1, *Twin Pines Minerals, LLC v. U.S. Army Corps of Eng'rs*, No. 5:22-cv-36 (S.D. Ga.). Twin Pines filed its motion for preliminary injunction on July 8, 2022. *Id.*, ECF 19. And the case did not settle until August 22, 2022 — 61 days after Twin Pines' complaint was filed and 45 days after Twin Pines moved for preliminary relief. *See id.*, ECF 28.

This is more than enough time for Plaintiffs and their counsel to intervene, as their history in other cases demonstrates. *Compare*, *e.g.*, Motion to Intervene, ECF 22 at 5, *Commonwealth of Kentucky v. U.S. Envt'l Prot. Agency*, No. 3:23-cv-7 (E.D. Ky.) (moving to intervene on behalf of EPA, arguing: "The Conservation Groups have moved to intervene just eight days after Plaintiffs filed their complaints and motions for preliminary injunction"); Memorandum in Support of Motion to Intervene as Defendants, ECF 36-1 at 5, *State of Georgia v. Wheeler*, No. 2:15-cv-79 (S.D. Ga.) (motion to intervene on behalf of the agency and defend a rule defining "waters of the United States" under the Clean Water Act, where the plaintiffs "move[d] to intervene at a very early stage of the action," and the motion was "filed only thirty-one days after the original

complaint, and only eleven days after the amended complaint"); Motion to Intervene, ECF 23-1 at 2, *Ensco Offshore Co. v. Salazar*, No. 2:10-cv-1941 (E.D. La.) (motion to intervene on behalf of federal agencies by counsel at Southern Environmental Law Center, arguing that the "motion is timely, as it has been filed less than two weeks after the initial filing of the complaint in the case, and within a week of Applicants' being made aware of the litigation and that there interests might be implicated").

Likewise, Plaintiffs suggest they "could not reasonably have known" the government might entertain a settlement, (ECF 27 at 10), but this is not persuasive. To begin, Plaintiffs and their counsel at the Southern Environmental Law Center routinely seek to intervene on behalf of the federal government to defend agency actions they support and want to see upheld. In so doing, they have recognized that "governmental entities do not adequately represent the interests of aspiring intervenors," because "the government's objectives 'involve a much broader range of interests, including competing policy, economic, political, legal, and environmental factors.'" Motion to Intervene, ECF 22 at 16, *Commonwealth of Kentucky v. United States Environmental Protection Agency*, No. 3:23-cv-7 (E.D. Ky.) (collecting cases). They have also recognized that governmental positions regarding an action can change, and that they have often found their interests at odds with those of the government. *See id.* at 17–18. Plaintiffs' assertion that they could envision no circumstance in which the federal government might not defend to the bitter end the decision challenged in the Georgia case is simply not credible.

Moreover, the circumstances and public filings in the Georgia case were more than sufficient to put Plaintiffs and their counsel on notice. The Federal Defendants' deadline for responding to Twin Pines' motion for preliminary injunction was extended with Twin Pines' consent not once, but three times. *Twin Pines*, ECF 20, 21, 23, 25, 26, 27. Each request and order

granting the extension was entered on the court's public docket. In a case where the challenged decision was directly interfering with Twin Pines' business, its ability to contract with potential buyers and to raise capital, and its ability to secure the needed environmental permits from the State of Georgia, *see Twin Pines*, ECF 19-6, Ingle Decl. ¶¶ 13–23 — and where the "harms" from the challenged decision would "continue to grow each day the decision remains in effect," *id.* ¶ 13 — these multiple, joint extensions in a highly contested case where time is of the essence should make the possibility that settlement discussions are occurring highly probable.

To borrow Plaintiffs' phrase, (ECF 27 at 10), any assertion by Plaintiffs that they were not tracking these developments and had no idea the case might settle "strains credulity." It also strains credulity that these national organizations, whose Atlanta-based lawyers have shown their readiness to intervene within weeks in any venue, could not muster the resources within 60 days to intervene in a matter they have been tracking literally for years and organized a national coalition to oppose.

A more convincing explanation for Plaintiffs' absence is supplied by the real-time communications from Plaintiffs' counsel, which Plaintiffs do not even mention in their response (*See generally* ECF 27.). As discussed in Twin Pines' motion, (ECF 25-1 at 1, 5–6), Plaintiffs' counsel wrote to Twin Pines and the Federal Defendants three days after they jointly requested a third extension, on August, 8, 2022. That letter both expressly referenced Twin Pines' ongoing litigation and made a point of asserting the results of the litigation were irrelevant because the AJDs would not be legally effective "even if reinstated." AR 19–21. This shows that Plaintiffs absence was not due to any timing issue. They had ample time to analyze Twin Pines' claims and write a detailed letter stating their position; they could have moved to intervene with little more

effort. The letter reveals the Plaintiffs made a strategic decision not to intervene and instead to adopt an outward posture of not caring if the AJDs were reinstated.

It is also not correct that Plaintiffs had "no mechanism, as intervenors …, to influence an out-of-court settlement between Twin Pines and the Corps." (ECF 27 at 10–11.) Had Plaintiffs intervened and answered Twin Pines' complaint, rather than sending letters and remaining strategically absent, Plaintiffs could have protected the interest they now claim by objecting to Twin Pines' voluntary dismissal based on the Settlement Agreement and reinstatement of the AJDs. *See* Fed. R. Civ. Proc. 41(a)(1), (2) (providing for voluntary dismissal without a court order only where the dismissal is filed before the opposing party answers or the stipulation of dismissal is "signed by all parties who have appeared," and otherwise providing "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper").

Finally, the Court should not be distracted by Plaintiffs' assertions that the reinstatement of the AJDs constitutes "final agency action." (ECF 27 at 10.) Twin Pines has not denied that the Corps' reinstatement of the AJDs constitutes final agency action. For purposes of this motion, the question is not whether the Corps' reinstatement of the AJDs can be challenged; it is where their challenge should be heard. In fairness to the prior litigants and in the interest of justice, any collateral attack on the Settlement Agreement should be transferred to the district in which it was negotiated.

## C.   To the Extent Relevant, the Southern District of Georgia Would Be More Convenient

Closing out the private interest factors, Plaintiffs assert that Twin Pines has "concede[d] that the Southern District of Georgia is not a more convenient forum." (ECF 27 at 9.) That is not correct. Twin Pines merely observed that two of the private interest factors — the "convenience of witnesses" and "access to proof" — are "neutral … because this is an APA case that will be

decided on the administrative record . . . ." (*See* ECF 25-1 at 23 (citing *Alabama v. U.S. Army Corps of Eng'rs*, 304 F. Supp. 3d 56, 66 (D.D.C. 2018)).)

Therefore, it is not significant that Plaintiffs' lead counsel is based in Atlanta, rather than Brunswick. *Compare* (ECF 27 at 13 (arguing convenience does not support transfer because "no counsel is located in the Southern District of Georgia")) *with Alabama*, 304 F. Supp. 3d at 66 ("[C]ourts have repeatedly stated that 'the location of counsel carries little, if any, weight in an analysis under § 1404(a).'") (quoting *Reiffin v. Microsoft Corp.*, 104 F. Supp. 2d 48, 52 n.7 (D.D.C. 2000), and collecting cases). It is relevant that proceedings in South Georgia would be far more accessible to interested observers, however, including Plaintiffs' "members who routinely visit the Okefenokee National Wildlife Refuge." ECF 1 at ¶ 21.

## II.  The Public Interest Factors Strongly Support Transfer

While the private interest factors strongly support transfer, the public interest factors all but demand it. The dispositive factor is the judicial interest in deciding local controversies locally. Plaintiffs assert the local interest in having local controversies decided at home is not always "dispositive." (ECF 27 at 15.) That may be true; but in this case, as in many others, it is. *See Alaska Wilderness League*, 99 F. Supp. 3d at 116; *Seafreeze Shoreside Inc. v. United States Dep't of the Interior*, 2022 WL 3906934, at *4 (D.D.C. June 27, 2022) (same); *New Hope Power Co. v. U.S. Army Corps of Eng'rs*, 724 F. Supp. 2d 90, 97 (D.D.C. 2010) (finding local interest to be the "decisive factor").

### A.      The Only Neutral Factor — Relative Congestion — Is Not Significant

Of the four public interest factors, the only one that does not strongly support transfer is relative congestion. While the median time to dispose of a case in the Southern District is slightly higher, this Court has described a similar statistical difference as "not especially significant." *F.T.C. v. Cephalon, Inc.*, 551 F. Supp. 2d 21, 31 (D.D.C. 2008) (Bates, J.). "Absent a showing that

either court's docket is *substantially* more congested than the other, this factor weighs neither for

nor against transfer." *Alaska Wilderness League*, 99 F. Supp. 3d at 116 (quoting *Pres. Soc'y of*

*Charleston v. U.S. Army Corps of Eng'rs*, 893 F. Supp. 2d 49, 57 (D.D.C. 2012) (emphasis added)

(internal quotation marks omitted)).

> ### B.     Local Interest in this Case Is Exceptionally Strong

As Twin Pines explained, the local interest in this case is overwhelming. (ECF 25-1 at 13–

17.) The hand-full of counter-examples cited in Plaintiffs' brief are easily distinguished as cases

in which the local interest was minimal. For example, in *National Association of Home Builders*

*v. U.S. E.P.A.*, 675 F. Supp. 2d 173 (D.D.C. 2009) (cited by Plaintiffs in ECF 27 at 15), the local

interest was limited to the "location of the property," and "no aspect" of that controversy

"compel[ed] the Court to ascribe significant weight" to that factor. *Id.* at 178. "There [was] no

indication" there — as here — that the contested federal action would "have a major impact on

local economic, political and environmental interests." *Id.* Nor was there evidence of "a high

degree of local public interest" in the matter. *Id.*

Similarly, *Otay Mesa Properties L.P. v. U.S. Department of Interior*, 584 F. Supp. 2d 122

(D.D.C. 2008), was a challenge to the Fish and Wildlife Service's designation of critical habitat

for the San Diego fairy shrimp in coastal waters near that city. *Id.* at 126. The court found most

factors to be a wash, but denied the motion to transfer based on its finding that the designation

would "have no direct or unique impact upon residents of San Diego County." *Id.* at 127. As the

court explained, the challenged designation "directly affect[ed] only the Plaintiffs," landowners

who did not want their property included in the designation. *Id.* at 128. Nobody else appeared to

care. The land was not accessible to the public; "no construction project" was planned for the

property; and no other impacts to the larger community were noted. *Id.* Given these facts, the court

concluded that local interest was substantially weaker than other cases, where the "local population

faced a specific injury of a particularly local nature either as a result of, or upon enjoinment of, a challenged action." *Id.* at 127. In contrast, Twin Pines' AJDs allow the development of a regionally significant mining project that will create hundreds of high-paying jobs and double the host county's tax digest. Thus, the present case is much more like those the *Otay* court distinguished than *Otay* itself.

*The Wilderness Society v. Babbitt*, 104 F. Supp. 2d 10 (D.D.C. 2000), is also readily distinguishable: the national interest was much greater than in this case, while the local interest was far more minimal. That case was a challenge to a federal decision to open the National Petroleum Reserve in Alaska to oil and gas development. *Id*. at 11–12. The national interest was clear because Congress had consistently treated the energy reserve as a national resource through congressional declarations requiring it to "be regulated in a manner consistent with the total energy needs of the Nation." *Id.* at 13. Additionally, two of the seven policymakers who made the decision to open these federal lands to development were based in Washington, D.C., and the decisionmaking process preceding that decision included a public hearing in Washington, D.C. On the other side of the scale, there is no discussion in the reported decision of any local support or opposition to the challenged action. Potential local impacts are mentioned only in the abstract.

These examples stand in sharp contrast to the present case, in which local interest is extraordinarily high. Indeed, of all the reported decisions discussing the public interest in deciding local controversies at home, the present case is the only one involving a project that promises to double the tax digest of a rural county needing economic development, and it is the only one that inspired congressional hearings by a State General Assembly.

Given the local interests at stake here, *Alaska Wilderness League v. Jewell*, 99 F. Supp. 3d 112 (D.D.C. 2015), provides a much closer analogy. That case involved a critical habitat

designation for the Chukchi Sea. Despite its national implications, described further below, this Court found that it "looked local at every turn." *Id.* at 116 (quotations omitted). First, the Court noted the regulation challenged in the lawsuit was local in nature, "govern[ing] *only* activities in the Chukchi Sea" and within Alaska's sovereign territory. *Id.* Similarly, "those regulated" by the rule at issue were purely local, being limited to Alaska. *Id.* Given these facts, this Court concluded that "the District of [Alaska] possesses a significant and predominant interest in this suit given the impact its resolution will have upon the affected lands, wildlife, and people of that district." *Id.* (quoting *W. Watersheds Project*, 942 F. Supp. 2d at 102).

The same considerations apply here. Plaintiffs have not challenged a federal decision about the management of major federal facilities or significant federal resources. Nor have they challenged a rule or regulation of national applicability. Instead, they have challenged the narrow decision to settle Twin Pines litigation and to reinstate two "jurisdictional determinations" relating to one parcel of private property in Charlton County, Georgia. And yet, while the jurisdictional determination affects only private property held by a single landowner, the context of the dispute is a project of intense local interest that promises to transform the economic future of a depressed rural area.

### C.    Plaintiffs' Attempts to "Nationalize" the Controversy All Fail

Plaintiffs seek to nationalize the controversy by (1) emphasizing the national significance of the resources at stake; (2) noting that the case has drawn national attention; and (3) noting that federal officials have taken an interest in the Okefenokee Swamp. These arguments do not change the local nature of the present dispute and have all been rejected before.

<u>*First*</u>, this Circuit is replete with precedent transferring local controversies about nationally and globally significant resources to local districts. A recent example is *State of Alabama v. U.S. Army Corps of Engineers*, 304 F. Supp. 3d 56 (D.D.C. 2018), in which this court found a case to

be "decidedly local" despite involving a river basin spanning three States. And in a related case, *National Wildlife Federation, Inc. v. U.S. Army Corps of Engineers*, 312 F. Supp. 3d 167 (D.D.C. 2018), this Court specifically rejected the plaintiffs' attempt to nationalize the controversy by emphasizing the national and global significance of the resources at stake. *Id.* at 169 n.1. Indeed, those plaintiffs alleged the challenged federal action by the U.S. Army Corps of Engineers would literally "devastate" the Apalachicola River and Bay, the site of a National Estuarine Research Reserve and a UNESCO International Biosphere Reserve. The Plaintiffs' focus in this case on the status and significance of the Okefenokee National Wildlife Refuge is directly analogous. This Court rejected these arguments, underscoring that "precedent in this circuit does not require or even encourage resolution in this forum of ... environmental claims involving national known resources." *Id.* (citations omitted).

Similarly, in *Alaska Wilderness League v. Jewell*, this Court transferred the case to Alaska based on local interest despite the fact that it covered some 90,000 square miles of (mostly) federal territory and touched national concerns about the plight of the warming of the Arctic Ocean. 90 F. Supp. 3d at 117. As in *National Wildlife Federation*, this Court rejected Plaintiffs' argument that such national implications justified hearing the case in Washington, D.C. because "there is no 'blanket rule that "national policy" cases should be brought" in the District of Columbia." *Id.* . (quoting *Starnes v. McGuire*, 512 F.2d 918, 928 (D.C. Cir. 1974)). Instead, this Court held that such cases must undergo the regular case-by-case analysis.

<u>Second</u>, national interest in the subject matter of the dispute "does not alter the fact that the people 'whose rights and interests are in fact most vitally affected by the suit' live and work" in

Georgia.[3] *See Seafreeze Shoreside Inc.*, 2022 WL 3906934, at *5 (quoting *Adams v. Bell*, 711 F.2d 161, 167 n.34 (D.C. Cir. 1983)). For purposes of Section 1404(a), it is unnecessary to show that local interests are the *only* interests affected by the litigation. *W. Watersheds Project*, 942 F. Supp. 2d at 103. It is enough to show that strong local interests exist. And because Georgia residents "have a broad interest in the issues, and because it will impact them directly, the controversy is local in nature." *Id.*

> *Third*, Plaintiffs assert that Interior Secretary Deb Haaland and Assistant Secretary of the Army Michael Connor each played an "outsized role" in the "proposed mine review." (ECF 27 at 16.) They also state that former federal officials opposed similar proposed projects in the past. (*Id.* at 17.) Once again, however, Plaintiffs forget the limitations of the narrow claim they have presented to this Court, which is not about the "the proposed mine review." It is about the Federal Defendants' decision to settle the *Twin Pines* case by reinstating two Approved Jurisdictional Determinations establishing that aquatic resources on Twin Pines' private property are not subject to federal jurisdiction. What federal defendants would do if they *had* jurisdiction — which they do

---

[3] Plaintiffs suggest that national media coverage regarding the Okefenokee Swamp warrants venue in Washington, D.C. But the decades-long "Tri-State Water Wars" over the Apalachicola-Chattahoochee-Flint (ACF) Basin was also widely covered in both national and international media outlets, including the Washington Post (On Florida's 'Forgotten Coast,' a Supreme Court fight over fresh water, Jan. 7, 2018); New York Times (A Fight Over Water, and to Save a Way of Life, June 3, 2013); National Public Radio (Water Wars: Who Controls the Flow?, June 15, 2013; A 3-Decade-Long Water Dispute Heads to the Supreme Court, Jan. 7, 2020); National Geographic (Water Wars Threaten America's Most Endangered Rivers, Apr. 12, 2016); USA Today (Florida's Long Fight with Georgia Over Water to Apalachicola Bay and its Oysters Heads Back to Court, Oct. 30, 2019); The Wall Street Journal (The Water Wars that Defined the American West Are Heading East, Dec. 2, 2019); and The Economist (Lawns v Oysters, Feb. 19, 2015), just to name a few. Nevertheless, this Court found that the local interest in having controversies resolved where the lands, waters, wildlife and effects of the action will be felt warranted transfer of litigation over the ACF Basin to the Northern District of Georgia. *National Wildlife Fed'n*, 312 F. Supp. 3d at 169 n.1.

not — is literally irrelevant to the jurisdictional determination itself, which is restricted by law to an examination of the hydrological features of the specific parcels in question.

Nor is there any evidence in the record that Assistant Secretary of the Army Michael Connor played any role in the settlement of Twin Pines' claims. While Assistant Secretary Connor did play a role in the Corps' original decision to rescind Twin Pines' AJDs, that was the subject of the *prior* litigation, not this one. *This* case is focused on other officials' decision to settle Twin Pines' claims and reinstate the AJDs based on the claims Twin Pines asserted in the Southern District of Georgia litigation. There is no evidence in the record of any direct involvement by the Assistant Secretary in this latter decision, which as discussed above, was negotiated and executed in the Southern District of Georgia. *See National Wildlife Federation*, 312 F.Supp.3d at 169 n.1 (noting the Court was "unconvinced" by arguments against transfer based on the involvement of federal officials in aspects of a nationally significant, local controversy unrelated to the specific final agency action at issue in the lawsuit).

### D.   Considerations of Judicial Efficiency and Duplicative Litigation Warrant Transfer

As Twin Pines explained, accepting Plaintiffs' approach would create incentives for piecemeal and wasteful litigation, even requiring Twin Pines litigation to be reinstated. (ECF 25-1 at 23–24.) Plaintiffs do not address this risk. The Federal Defendants, however, suggest it is "not necessarily correct that 'were this Court to grant relief, Twin Pines original case in the Southern District of Georgia would be reinstated," suggesting that remand without vacatur might allow the Settlement Agreement to remain intact. (ECF 25 at 3.) Under the Settlement Agreement, however, Twin Pines' "sole remedy" for "noncompliance [with the Agreement] is to move the Court to reactivate [the Georgia] case." (ECF 15-1 at 7.) Thus, whether or not remand without vacatur might be appropriate, potential complications arising from Plaintiffs' tactics are minimized by

transferring this case to Georgia, where it can be heard by the same court that oversaw the Twin Pines' case.

## CONCLUSION

For all of these reasons, Plaintiffs' challenge to the *Twin Pines* settlement agreement should be transferred to the district in which it was negotiated.

Respectfully submitted this 31st day of May, 2023.

/s/ *Lewis B. Jones*
Lewis B. Jones
John L. Fortuna
Jones Fortuna LP
111 New Street, Suite A
Decatur, GA 30030
Phone: 404-850-3835
Email: ljones@jonesfortua.com
          jfortuna@jonesfortuna.com

*Counsel for Twin Pines Minerals, LLC*

**CERTIFICATE OF SERVICE**

I certify that on this date, I filed the foregoing DEFENDANT-INTERVENOR TWIN PINES MINERALS, LLC'S REPLY IN SUPPORT OF ITS MOTION TO TRANSFER with the Court's CM/ECF system, which will automatically provide email notification of such filing to all registered CM/ECF users.

/s/ Lewis B. Jones
*Counsel for Twin Pines Minerals, LLC*