UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL WILDLIFE REFUGE ASSOCIATION et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS et al.,<br><br>    Defendants,<br><br>    and<br><br>TWIN PINES MINERALS, LLC,<br><br>    Intervenor-Defendant. | Civil Action No. 22-3498 (JDB) |

**MEMORANDUM OPINION**

Before the Court is a motion to transfer brought by intervenor-defendant Twin Pines Minerals, LLC ("Twin Pines"). Twin Pines seeks to transfer this case to the Southern District of Georgia. Plaintiffs oppose the motion to transfer, and the federal defendants take no position. For the reasons explained below, the Court concludes that venue is proper in the Southern District of Georgia and the interests of justice support transferring venue. The Court will accordingly grant the motion.

**Background**

**I.  Factual Background**

Twin Pines has been working since at least 2017 to obtain the necessary permits and approvals to develop a heavy mineral-sands mine on a 12,000-acre plot of land in Charlton County, Georgia located three miles from the Okefenokee National Wildlife Refuge ("Okefenokee"), a renowned protected wetland. J.A. [ECF No. 29-1] ("AR") at 54–55, 115; see also Compl. for Declaratory & Injunctive Relief [ECF No. 1] ("Compl.") ¶¶ 25–27, 32.

1

Georgia law requires several permits before a site can be used for surface mining, and a federal permit is also required under Section 404 of the Clean Water Act, 33 U.S.C. § 1344, for "any activity" that causes "[a]ny discharge of dredged or fill material into the navigable waters," id. § 1344(f)(2), which are defined as "the waters of the United States," id. § 1362(7).  See AR 59–62.

Defendant United States Army Corps of Engineers (the "Corps") offers approved jurisdictional determinations ("AJDs") as a public service to landowners to determine whether a certain parcel of land contains "waters of the United States," rendering it "jurisdictional" such that a federal permit is required for any activity on that parcel that discharges material into such a body of water.  Compl. ¶ 36.  AJDs are binding on the federal government for five years and represent its position in any subsequent litigation concerning the determination.  AR 103; see also U.S. Army Corps of Engineers v. Hawkes Co., 578 U.S. 590, 595 (2016).

This controversy emerged from changing definitions of "waters of the United States" under § 1362(7).  In 2019, Twin Pines applied for a Section 404 permit under the Clean Water Act based on a December 2018 AJD "finding that over 45 percent of the proposed mine site was made up of jurisdictional wetlands" based on the then-operative definition of "waters of the United States."  Compl. ¶¶ 37–39; AR 116.  Twin Pines slightly amended its application in March 2020.  Compl. ¶ 42; AR 63.  Then, in April 2020, while the application was still pending, the EPA promulgated the Navigable Waters Protection Rule ("NWPR"), which changed the definition of "waters of the United States," effectively "narrow[ing] . . . the scope of waters protected by the Clean Water Act."  Id. ¶ 45; see AR 63; see also The Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22250 (Apr. 21, 2020).

In response to this changed definition, Twin Pines applied for an AJD in June 2020 to determine whether there were any protected wetlands at the mine site under the NWPR. AR 63–64; Compl. ¶ 47. The Corps issued new AJDs in October 2020 and March 2021 confirming that none of the wetlands on the proposed mine site were "waters of the United States" under the new definition. AR 63–66, 250–63 (Mar. 2021 AJD), 268–83 (Oct. 2020 AJD); Compl. ¶¶ 48–49. Because a Section 404 permit was no longer necessary per the new AJDs, Twin Pines withdrew its application. AR 63–66, 116–17.

But the definition of "waters of the United States" changed again in August and September 2021 when the NWPR was vacated by two federal courts. Compl. ¶ 52. In June 2022, defendant Michael Connor, Assistant Secretary of the Army for Civil Works, rescinded the October 2020 and March 2021 AJDs before their five-year term of validity had expired due to the Corps's failure to consult with the Muscogee (Creek) Nation and other Tribal Nations before issuing them, in violation of the pre-NWPR regulatory regime. Id. ¶¶ 58–59; see AR 200–02.

On June 22, 2022, Twin Pines filed suit against the Corps in the U.S. District Court for the Southern District of Georgia seeking to reinstate the rescinded AJDs. See Twin Pines Mins., LLC v. U.S. Army Corps of Engineers, Civ. A. No. 22-36 (S.D. Ga. 2022); Compl. ¶ 61; AR 163–89. Two months later, Twin Pines and the Corps settled, and the Corps reinstated the October 2020 and March 2021 AJDs as part of the settlement terms. Compl. ¶ 62; AR 2–11.

## II.  Procedural Background

In November 2022, plaintiffs National Wildlife Refuge Association, National Parks Conservation Association, Defenders of Wildlife, and Center for Biological Diversity brought this action against the Corps and Assistant Secretary Connor challenging the Corps's reinstatement of the two AJDs issued to Twin Pines as arbitrary and capricious and lacking a reasoned explanation

3

under the Administrative Procedure Act ("APA").  See Compl. ¶¶ 70–83.  The Court granted Twin Pines's motion to intervene as a defendant on April 6, 2023.  Apr. 6, 2023 Order [ECF No. 21] at 6.  One month later, Twin Pines filed the instant motion to transfer to the Southern District of Georgia pursuant to 28 U.S.C. § 1404(a).  See Mot. to Transfer by Twin Pines [ECF No. 25]; Def.-Intervenor Twin Pines's Mem. of Law in Supp. of Mot. to Transfer [ECF No. 25-1] ("Mot.").  The federal defendants take no position on the motion, see Defs.' Resp. to Mot. to Transfer [ECF No. 26] ("Defs.' Resp.") at 1, and plaintiffs oppose the motion, see Pls.' Resp. in Opp'n to Mot. [ECF No. 27] ("Opp'n").  Twin Pines filed a reply in support of its motion.  See Def.-Intervenor Twin Pines's Reply in Supp. of Mot. [ECF No. 28] ("Reply").  The motion is now ripe for decision.

## **Legal Standard**

28 U.S.C. § 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice," a court may transfer a civil action to any other district "where it might have been brought."  A court has "broad discretion to decide" whether transfer is appropriate, Ravulapalli v. Napolitano, 773 F. Supp. 2d 41, 55 (D.D.C. 2011) (citing SEC v. Savoy Indus. Inc., 587 F.2d 1149, 1154 (D.C. Cir. 1978)), based on an "individualized, case-by-case" assessment of the interests involved, id. (quoting Van Dusen v. Barrack, 376 U.S. 612, 622 (1964)).  The moving party bears the burden of establishing that transfer is warranted.  Aracely, R. v. Nielsen, 319 F. Supp. 3d 110, 127 (D.D.C. 2018) (citing Montgomery v. STG Int'l, Inc., 532 F. Supp. 2d 29, 32 (D.D.C. 2008)).

To carry its burden, the movant must first establish that the proposed transferee district is one where the action "might have been brought"—that is, where venue is proper.  Ctr. for Env't. Sci., Accuracy & Reliability v. Nat'l Park Serv., 75 F. Supp. 3d 353, 356 (D.D.C. 2014) (quoting § 1404(a)).  The movant must then show that "considerations of convenience and the interest of

justice weigh in favor of transfer." Sierra Club v. Flowers, 276 F. Supp. 2d 62, 65 (D.D.C. 2003). Courts "'balance a number of case-specific factors,' related to both the public and private interests at stake," when making this assessment. Douglas v. Chariots for Hire, 918 F. Supp. 2d 24, 31 (D.D.C. 2013) (quoting Stewart Org. v. Ricoh Corp., 487 U.S. 22, 29 (1988)).

## Analysis

### I. Venue

As relevant here, in "civil action[s] in which a defendant is an officer or employee of the United States or any agency thereof," or is "an agency of the United States," venue is proper "in any judicial district in which . . . a defendant in the action resides," "a substantial part of the events . . . giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(e)(1). "[A]n entity with the capacity to sue and be sued in its common name under applicable law . . . shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." Id. § 1391(c)(2).

The Corps is "an agency of the United States" with an office located in Savannah, Georgia, which is within the Southern District of Georgia. See Mot. at 8; see also AR 1, 130 (letterhead with an office address in Savannah, Georgia). The Savannah office of the Corps was responsible for the actions that form the basis of plaintiffs' claim, namely reinstating Twin Pines's AJDs and effectuating the settlement agreement that terminated the prior action in the Southern District of Georgia. Mot. at 8; see also AR 1, 130. And perhaps most importantly, the action revolves around Twin Pines's property, which is located within the Southern District of Georgia. Mot. at 8. Thus, venue is proper in the proposed transferee district.

## II.   Balance of Public and Private Interests

Having established that venue is proper in the Southern District of Georgia, whether a transfer is appropriate ultimately depends on a consideration of the public- and private-interest factors. For the reasons described below, after weighing these factors, this Court finds that transfer to the Southern District of Georgia is in the interests of convenience and justice.

### A. Public-Interest Factors

In assessing whether transfer is in the public interest, courts consider "(1) the transferee's familiarity with the governing laws; (2) whether one circuit is more familiar with the same parties and issues than other courts; (3) the relative congestion of each court; and (4) the local interest in deciding local controversies at home." Alabama v. U.S. Army Corps. of Engineers, 304 F. Supp. 3d 56, 63 (D.D.C. 2018).

#### i.   The Local Interest in Deciding Local Controversies at Home

"The Court begins with the final public-interest factor because the 'interest in having local controversies decided at home' is preeminent." U.S. Army Corps of Engineers, 304 F. Supp. 3d at 67 (quoting W. Watersheds Project v. Pool, 942 F. Supp. 2d 93, 97 (D.D.C. 2013)). Courts weigh this factor heavily because "justice is promoted by having a 'localized controversy [] resolved in the region it impacts.'" Id. (quoting W. Watersheds Project, 942 F. Supp. 2d at 102). Accordingly, courts "have consistently transferred cases when the challenged action predominately affects local interests." Id. That this is an administrative law dispute does not diminish the importance of this factor—"[t]his rationale applies to controversies involving federal decisions that impact the local environment[] and to controversies requiring judicial review of an administrative decision." W. Watersheds Project, 942 F. Supp. 2d at 102 (internal quotation marks omitted). To determine if a controversy is local, courts consider

6

> where the challenged decision was made; whether the decision directly affected the citizens of the transferee state; the location of the controversy[;] whether the issue involved federal constitutional issues rather than local property laws or statutes; whether the controversy involved issues of state law[;] whether the controversy has some national significance; and whether there was personal involvement by a [local] official.

Otay Mesa Prop. L.P. v. U.S. Dep't of Interior, 584 F. Supp. 2d 122, 125 (D.D.C. 2008). However, "[t]he mere presence of a local interest, in the form of property located within the proposed transferee district, is not dispositive in the transfer analysis." Nat'l Ass'n of Home Builders v. EPA, 675 F. Supp. 2d 173, 177 (D.D.C. 2009).

Twin Pines and plaintiffs generally agree about the facts, but they disagree about their import. The site for the proposed mine is located in the Southern District of Georgia. Mot. at 12; see Opp'n at 15. Both parties agree that the mine will affect citizens residing within the transferee district. Mot. at 13; Opp'n at 15. But while Twin Pines emphasizes the "intensely local" nature of the controversy, Mot. at 10, plaintiffs argue that local concerns are not dispositive, especially where there are national implications, see Opp'n 15–22.

It is certainly true that the economic and environmental impacts of the mine are not fully contained to the local area, as evidenced by the national attention the dispute has drawn. Plaintiffs cite the "nearly 200,000 comments submitted . . . from across the nation and abroad," "the sustained national media attention," "the overwhelming number of non-resident visitors" to Okefenokee, and the general value of the refuge for scientific research. Opp'n at 15–16; see id. at 17–18 (noting that approximately 65% of visitors to Okefenokee are non-residents and highlighting attention from several prominent national news outlets). Notable officials located in Washington have commented on the controversy. Id. at 16–17.

But there is no escaping the conclusion that "[t]he instant controversy is decidedly local: the [mining] project is local . . . and the impact will be on local residents . . . , local governments,

7

local economies, [and] local recreational opportunities." U.S. Army Corps of Engineers, 304 F. Supp. 3d at 67 (emphasis added).  The natural site

> at the center of this dispute [is] located within the [transferee district], as are the people, environments, and commercial interests that will be directly affected by a decision in this case.  Decidedly, this controversy will have no real-world impact on this district.  Hence, the "most important factor"—the "interest in having localized controversies decided at home"—strongly weighs in favor of transfer.

Nat'l Wildlife Fed'n, Inc. v. U.S. Army Corps of Engineers, 312 F. Supp. 3d 167, 169 (D.D.C. 2018) (quoting W. Watersheds Project, 942 F. Supp. 2d at 102).  There are strong local economic, employment, recreational, and environmental interests on both sides of the dispute over the mine site, see Mot. at 10–11, interests that eclipse any effects of this dispute felt outside Georgia.  Cf. Nat'l Ass'n of Home Builders, 675 F. Supp. 2d at 178 (failing to give this factor much weight in part because "[t]here [was]s no indication . . . that the designation of the relevant reaches of the Santa Cruz River as traditional navigable waters will have a major impact on local economic, political and environmental interests" and there were no "comments or any other type of communication from the public indicating that there [wa]s a high degree of local public interest in the regulation at issue" (citation omitted)).

Hence, because this dispute is an intensely local controversy, this factor weighs heavily in favor of transfer.

### ii.   Transferee Court's Familiarity with Governing Laws

The Southern District of Georgia's relative familiarity with the governing laws does not sway the outcome.  It is widely understood that "no federal court is more competent than any other to resolve questions of federal law." Oceana v. Bureau of Ocean Energy Mgmt., 962 F. Supp. 2d 70, 78 (D.D.C. 2013); see also Miller v. Insulation Contractors, Inc., 608 F. Supp. 2d 97, 103 (D.D.C. 2009) ("[A]ll federal courts are presumed to be equally familiar with the law governing

8

federal statutory claims . . . ."). Because this dispute is brought under a federal statute (the APA), both this District and the transferee district are equally competent to resolve it. Hence, this factor is neutral.

### iii. Relative Familiarity with Parties and Issues

The courts' relative familiarity with the parties and issues is also a neutral factor. Both the Southern District of Georgia and this District have some familiarity with the controversy. The previous litigation was before the transferee court, but only for a very short period, settling just two months after the complaint was filed. That voluntary dismissal occurred "before the deadline for the Corps and other federal defendants to answer or otherwise respond to the Complaint," Opp'n at 5, and "at no time did the court issue any substantive ruling," Defs.' Resp. at 2. Likewise, the instant case has been before this Court for only seven months, and this Court has not made any rulings on the merits. Thus, the Southern District of Georgia and this District are similarly familiar with the parties and merits.

Both districts also have similar topical legal experience. Twin Pines contends that the transferee district is "thoroughly familiar with [the] background principles of [the] Clean Water Act" due to overseeing previous disputes. Mot. at 15. Plaintiffs make a similar argument with respect to this District's familiarity with administrative law. Opp'n at 14; see also Stewart v. Azar, 308 F. Supp. 3d 239, 248 (D.D.C. 2018) (reasoning that "[i]f anything, [the District of the District of Columbia] has more experience with APA cases, which would weigh against transfer"). But, as discussed, "all federal courts are presumed to be equally familiar with the law governing federal statutory claims." U.S. Army Corps of Engineers, 304 F. Supp. 3d at 68 (internal quotation marks omitted).

9

Considering the abbreviated history of the prior litigation and this case, as well as both courts' experience in the legal subject matter, this factor is neutral.

### iv.    Relative Court Congestion

The only public-interest factor that weighs against transfer—albeit only slightly—is the relative congestion of the courts. "[O]nly substantial congestion differences will tip the balance." Alaska Wilderness League v. Jewell, 99 F. Supp. 3d 112, 118 (D.D.C. 2015) (cleaned up). Although they do not tell the whole picture, the statistics measuring relative congestion indicate that the Southern District of Georgia is relatively more congested.[1]  While judges in this District have an average of 262 and 296 civil and total cases, respectively, judges in the Southern District of Georgia have 332 and 529, respectively.  U.S. Courts, Federal Court Management Statistics 2, 95 (Mar. 2023), https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0331.2023.pdf.  And the median time each court takes to dispose of civil cases, which is perhaps more indicative of congestion, tells a similar story: the median lifespan of civil cases in this District is 4.7 months compared to 9.5 months in the Southern District of Georgia. Id.

There is no hard-and-fast rule separating trivial from significant differences in congestion, but case law provides some guidance. See, e.g., Alaska Wilderness League, 99 F. Supp. 3d at 118 ("[D]ocket congestion [was] 'neutral' where [the] difference between [average time to dispose] . . . was less than a month." (quoting Johnson v. VCG Holding Corp., 767 F. Supp. 2d

---

[1] Court congestion "can be difficult to assess, because judicial 'statistics provide, at best, only a rough measure of the relative congestion of the docket' and 'do not, for example, reflect the differences in the caseloads carried by different individual judges.'" Akinyode v. U.S. Dep't of Homeland Sec., Civ. A. No. 21-110 (JDB), 2021 WL 3021440, at *5 (D.D.C. July 16, 2021) (quoting United States v. H&R Block, Inc., 789 F. Supp. 2d 74, 84 (D.D.C. 2011)).  Twin Pines argues that if there is a significant difference in congestion between the districts, that difference should not be accorded much weight because the Southern District of Georgia's higher figures are due to either a higher prevalence of APA cases (which are resolved more quickly) in this District or more cases with pro se parties in the Southern District of Georgia.  Mot. at 16 n.3.  Although those observations may explain some variance in the statistics, they do not give the Court a basis to fully disregard the data.

10

208, 217 (D. Maine 2011))); F.T.C. v. Cephalon, Inc., 551 F. Supp. 2d 21, 31 (D.D.C. 2008) (finding that the difference between 5.7 and 9 months was "not an especially significant difference"); Akinyode, 2021 WL 3021440, at *5 (finding five-month discrepancy "slightly" influential); Taylor v. Shinseki, 13 F. Supp. 3d 81, 91 (D.D.C. 2014) (same regarding approximately four-month difference); Virts v. Prudential Life Ins. Co., 950 F. Supp. 2d 101, 108 (D.D.C. 2013) (same regarding six-month difference). Because the difference in average time to dispose between this District and the transferee district—4.8 months—is consistent with ranges this court has deemed at least somewhat or "slightly" meaningful, and because the average caseload per judge is higher in the transferee district, the relative congestion of the courts weighs slightly against transfer.

\*   \*   \*

Taking all the public-interest factors into account, the localized interests affected by this dispute are "preeminent," U.S. Army Corps of Engineers, 304 F. Supp. 3d at 67; thus, the public-interest factors support transfer to the Southern District of Georgia.

### B. Private-Interest Factors

The private-interest factors to be considered include

> (1) the plaintiffs' choice of forum, unless the balance of convenience is strongly in favor of the defendants; (2) the defendants' choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) the ease of access to sources of proof.

Nat'l Ass'n of Home Builders, 675 F. Supp. 2d at 176 (citing Trout Unlimited v. U.S. Dep't of Agric., 944 F. Supp. 13, 16 (D.D.C. 1996)).

i. Plaintiffs' Choice of Forum

"[A] plaintiff's choice of forum is afforded substantial deference." Alabrash v. U.S. Dep't of Homeland Sec., Civil Case No. 22-1875 (CKK), 2022 WL 16948559, at *3 (D.D.C. Nov. 15,

11

2022). There are two exceptions: "when the plaintiff is a 'foreigner' to the forum, or there is a lack of 'meaningful ties' between the controversy, the parties, and the forum." Id. But neither exception applies here. Plaintiffs are not "foreigner[s] to the forum," as three of the four plaintiffs are headquartered in D.C., and the fourth has an office in D.C. Compl. ¶¶ 16–19; Opp'n at 7–8. There are also "'meaningful ties' between the controversy, the parties, and the forum": the dispute stems from the Corps's reinstatement of Twin Pines's AJDs, and approval for that decision came from the Assistant Attorney General for the Environment and Natural Resources Division at the Department of Justice, who was located in Washington.[2]

The Court will thus place a fair amount of weight on plaintiffs' choice of forum.

    ii.    <u>Defendant's Choice of Forum</u>

"[A] defendant's choice of forum is typically granted deference only when they can establish that the added convenience and justice of litigating in their chosen forum overcomes any deference to plaintiffs' choice of venue." Melnattur v. U.S. Citizenship and Immigr. Servs., Civ. A. No. 20-3013 (JDB), 2021 WL 3722732, at *5 (D.D.C. Aug. 23, 2021) (cleaned up). As established above, plaintiffs' choice of venue is entitled to deference. Twin Pines, an intervenor-

---

[2] Twin Pines raises another reason for why plaintiffs' choice of forum should not be afforded deference: they claim plaintiffs engaged in forum shopping when choosing to file their complaint in this District. Twin Pines contends that the Okefenokee Alliance—who is not a plaintiff in this case—specifically selected these four plaintiffs to represent them. Reply at 5. Because there are "more than 40 conservation organizations . . . that have joined forces to save the swamp from the proposed . . . mine," id. (internal quotation marks omitted), Twin Pines argues it is suspicious that "four organizations without offices in Georgia were selected to represent the interests" of the broader group, id. Twin Pines also points to plaintiffs' decision not to intervene in the previous Southern District of Georgia litigation as further evidence of forum shopping. Id. at 6–8.

These criticisms fall flat. First, there are a plethora of reasons why these four plaintiffs could have been selected (if they were even "selected" at all) to bring this action that are not necessarily evidence of a broader, nefarious conspiracy to litigate the suit in Washington. Second, it is hard to fault plaintiffs for not intervening in the previous litigation because the suit was dismissed "within just 60 days." Opp'n at 10. Finally, it is worth noting that forum shopping is a "two-way street." Sierra Club v. Van Antwerp, 523 F. Supp. 2d 5, 12–13 (D.D.C. 2007) (concluding that "plaintiffs' alleged forum shopping [was] insufficient to warrant transfer" because "for each strategic rationale that motivated plaintiffs . . . there [wa]s likely an equally compelling strategic basis" spurring the movant's motion to transfer). Every party to a lawsuit has strategic decisions to make; far from being evidence of maliciousness, these choices are inherent in the civil legal system.

defendant, fails to meet its high burden of demonstrating "the added convenience and justice" of their proposed forum.

Convenience does not heavily favor Twin Pines's choice of forum—while Twins Pines and its counsel are located in the Southern District of Georgia, neither of the federal defendants nor their counsel are located there, Opp'n at 13, and three of the four plaintiffs are headquartered here, Compl. ¶¶ 16–19. Moreover, because this is a case that "involves judicial review of an administrative decision . . . neither discovery, witnesses, nor a trial will be required," and thus convenience is not "particularly relevant to this case." U.S. Army Corps of Engineers, 304 F. Supp. 3d at 66 (quoting Alaska Wilderness League, 99 F. Supp. 3d at 118 n.5).

Thus, this factor weighs against transfer.[3]

    iii.    Whether the Claim Arose Elsewhere

To determine where the claim arose, "courts generally focus on where the decisionmaking process occurred." Alaska Wilderness League, 99 F. Supp. 3d at 119 (quoting Nat'l Ass'n of Home Builders, 675 F. Supp. 2d at 179). But where the decision-making occurs is not always the same as where the subject of the decision is located. See Nat'l Ass'n of Home Builders, 675 F. Supp. 2d at 178 (noting "the high degree of involvement of officials outside of Arizona" even though the subject of the dispute was a river in Arizona); see also Akiachak Native Cmty. v. Dep't of Interior, 502 F. Supp. 2d 64, 67–68 (D.D.C. 2007) (rejecting the argument that transferee court was more appropriate because "the subject of [the] dispute [was] located there and the impact of

---

[3] Twin Pines also argues that, as a matter of justice, their "original choice of forum should be given effect" because they were the "original" plaintiff. Mot. at 18. They contend that permitting plaintiffs to control the forum "would allow [them] to secure a back-door transfer of the Georgia litigation to this district, without . . . ever having to participate in the case, subject themselves to the jurisdiction of the Georgia court, or be bound by its rulings." Id. at 18–19. The consequence, they argue, would be a de facto transfer of venue outside the process established in § 1404(a). For the same reasons the Court disregarded Twin Pines's forum-shopping argument, it will reject this one as well. Plaintiffs were not parties to the original action and Twin Pines has not given the Court any reason to believe their decision to file this lawsuit in the District of Columbia was an attempt at a "back-door transfer."

any decision [would] be felt there," since the "national rule-making process . . . when formulating the regulation" and "public discussions" occurred in the original district).

The central claim in this lawsuit is that Assistant Secretary Connor acted arbitrarily and capriciously in his decision to reinstate the AJDs on behalf of the Corps as part of the terms of the settlement of the previous Southern District of Georgia litigation. The parties paint different pictures regarding where the relevant decision-making occurred: while Twin Pines contends the process was confined to the Southern District of Georgia, plaintiffs and the federal defendants insist the decision-making occurred in Washington. Twin Pines bases its view on settlement negotiations that occurred in Georgia between "the Department of Justice trial attorney and the . . . counsel for Twin Pines, all of whom were operating as officers of the court in the Southern District of Georgia." Reply at 3. They contend that "[n]one of the discussions occurred in Washington D.C. or involved any D.C. officials" and that the "Settlement Agreement was not signed by any official residing in Washington." Id. at 2–3.

While not contesting that some discussions may have occurred in Georgia, plaintiffs explain that "Savannah District personnel do not have the authority to withdraw or reverse a decision made by the Assistant Secretary of the Army." Opp'n at 12. Hence, D.C. decision-makers directed the "Savannah District[] . . . to provide a letter to Twin Pines reiterating that the Twin Pines AJDs [were] valid." Id. (quoting AR 6). The Corps concurs with this characterization, articulating that "[t]o enter into the Settlement Agreement . . . counsel obtained approval and authorization from the Assistant Attorney General for the Environment and Natural Resources Division[,] . . . [who] is located in Washington, DC." Defs.' Resp. at 2 (citing 28 C.F.R. § 0.160(a)(4)); see AR 11; see also Dep't of Just., Contact the Division, https://www.justice.gov/enrd/contact-division (last visited Aug. 4, 2023).

14

But, as Twin Pines correctly notes, "mere involvement on the part of federal agencies[] or some federal officials who are located in Washington D.C. is not determinative." Shawnee Tribe v. United States, 298 F. Supp. 2d 21, 25–26 (D.D.C. 2002); see also Airport Working Grp. of Orange Cnty., Inc. v. U.S. Dep't of Defense, 226 F. Supp. 2d 227, 230 (D.D.C. 2002) (noting that "connections" must "create a meaningful factual nexus"). Almost all decisions by administrative agencies involve the participation of actors located in Washington at least to some degree. Here, a substantial amount of the actions and decisions that led up to the challenged action took place in the transferee district, with only the final approval taking place in Washington.

Thus, while this factor may not strongly favor transfer, it leans that way.

      iv.    Convenience of the Parties, Witnesses, and Access to Sources of Proof

This factor is neutral. As discussed above, three of the four plaintiffs are headquartered in D.C., the fourth has an office here but is headquartered in Georgia, Compl. ¶¶ 16–19, plaintiffs' attorneys are located in Georgia, Reply at 5–6, defendants and their counsel are located in D.C., and Twin Pines and its counsel are located in Georgia, id. at 18. Hence, the parties are split between the forums and, because this is an APA case, there will be no depositions or discovery that would suggest greater convenience in either forum.[4]

      v.    Other Factors

Twin Pines argues that this case should be adjudicated in the Southern District of Georgia, where the prior action was settled, in the interest of disincentivizing piecemeal litigation. Because the "parties to the first case spent time and money negotiating the settlement agreement plaintiffs

---

[4] Twin Pines argues that the transferee district "would be far more accessible to interested observers" given its proximity to Okefenokee, Reply at 11, but interested observers are not parties to this dispute; this consideration is relevant to the public-interest factor concerning the local interest in deciding local controversies, not the private-interest convenience factor.

now seek to unwind," the court should avoid "[w]asteful, duplicative litigation." Mot. at 20.[5] They are concerned that if relief is granted, the previously settled case would be reinstated. Id.[6] While not particularly significant, this concern is an additional consideration leaning towards transfer.

\* \* \*

The private-interest factors taken together are largely neutral: plaintiffs' choice of forum is entitled to more deference than Twin Pines's preference, but the majority of the decision-making process underlying the claim occurred in the Southern District of Georgia, and neither forum is more convenient than the other.

### III. Whether to Transfer to the Southern District of Georgia

To recap, one public-interest factor (the local interest in deciding local controversies at home) weighs heavily in favor of transfer to the Southern District of Georgia, and one private-interest factor (whether the claim arose elsewhere) also modestly supports transfer. One private-interest factor (plaintiffs' choice of forum) weighs against transfer, and one public-interest factor (relative court congestion) slightly leans that same way. The remaining factors are neutral.

Despite the usual deference shown to the plaintiffs' choice of forum, the Court will exercise its discretion and grant the motion to transfer primarily because it is "particularly concerned about exercising jurisdiction over a case that will affect the development of a massive area in [Georgia] in a venue with which [Georgia] citizens have little to no connection." Shawnee Tribe, 298 F. Supp. 2d at 26. "[S]uits such as this one, which involve water rights, environmental regulation,

---

[5] The Court declines Twin Pines's invitation to consider arguments regarding duplicative litigation because a motion to transfer venue is not the appropriate vehicle for making preclusion or abstention arguments.

[6] As the federal defendants point out, this Court could grant relief other than reinstating the previous claim. See Defs.' Resp. at 3 (the Court "could elect to award relief that leaves the Settlement Agreement intact"); see also Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers, 985 F.3d 1032, 1052 (D.C. Cir. 2021) (under the APA, "unsupported agency action normally warrants vacatur, [but] a court is not without discretion to leave agency action in place while the decision is remanded for further explanation" (cleaned up)).

and local wildlife—matters that are of great importance in the State of [Georgia]—should be resolved in the forum where the people 'whose rights and interests are in fact most vitally affected by the suit'" are located. Trout Unlimited, 944 F. Supp. at 19–20 (quoting Adams v. Bell, 711 F.2d 161, 167 n.34 (D.C. Cir. 1983)).

Thus, on balance, the Court determines that the interests of justice are better served by transferring this action to the Southern District of Georgia, where the local effects are most acutely felt.

## Conclusion

For the foregoing reasons, considerations of fairness, efficiency, and justice favor transferring this dispute to the Southern District of Georgia. The Court will accordingly grant Twin Pines's motion to transfer venue to the Southern District of Georgia. A separate Order consistent with this Opinion will issue.

/s/
JOHN D. BATES
United States District Judge

Dated: August 7, 2023